# UNITED STATES DISTRICT COURT
# DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>                       Plaintiff,<br>   v.<br><br>RUSSELL ARMAND, a/k/a "Saitamaguru1";<br>MAXWELL HERNANDEZ, a/k/a "MaxEquation";<br>MANPREET SINGH KOHLI, a/k/a "Mkay Saitama," a/k/a "mannythehitman"; and<br>NAM TRAN, a/k/a "Ntran1234,"<br><br>                    Defendants. | Civil Action No. 24-CV-____(___)<br><br>JURY TRIAL DEMANDED |

## COMPLAINT

Plaintiff, Securities and Exchange Commission (the "Commission" or "SEC"), alleges the following against the defendants, Russell Armand, a/k/a "Saitamaguru1"; Maxwell Hernandez, a/k/a "MaxEquation"; Manpreet Singh Kohli, a/k/a "Mkay Saitama," a/k/a "mannythehitman"; and Nam Tran, a/k/a "Ntran1234":

## SUMMARY

1.      This action arises from the defendants' unregistered and fraudulent offers and sales of crypto assets being offered and sold as securities to the investing public and their manipulative trading of those securities.

2.      Starting in or around June 2021, Defendants Russell Armand, Maxwell Hernandez, Manpreet Singh Kohli, and Nam Tran (the "Defendants") engaged in a scheme to distribute "Saitama Inu" ("Saitama")—a dog-themed crypto asset that Defendants claimed would

create wealth for investors through passive income and would supposedly promote financial literacy and global financial well-being.

3.      Starting in or around March 2022, defendants Armand, Kohli, and Tran (but not Hernandez) also engaged in an overlapping scheme to distribute and manipulate the market for "SaitaRealty"—a related dog-themed crypto asset that these three defendants launched to supposedly "tokenize" both physical real estate and "digital real estate" in the metaverse, luring investors with more promises of passive income and wealth creation.

4.      Each Defendant offered and sold Saitama as a security, and defendants Armand, Tran, and Kohli also offered and sold SaitaRealty as a security.  Defendants were thus required to register those offers and sales with the Commission unless an exemption from registration was available.  No Defendant filed a registration statement with the Commission for their offers or sales, and no exemption from registration was available.

5.      Each Defendant attempted to create active secondary markets on which Saitama could be traded, and Defendants Armand, Tran, and Kohli attempted to create active secondary markets on which SaitaRealty could be traded.

6.      Defendants also engaged in manipulative trading of Saitama, making coordinated, relatively small purchases of Saitama through multiple crypto asset wallets with the express purpose of creating the false appearance of organic investor interest in Saitama.  At various times, Defendants also hired two purported "market makers"—ZM Quant Investment Ltd. and Gotbit Consulting LLC—to engage in manipulative trading on their behalf, thereby artificially inflating Saitama and SaitaRealty's price and trading volume on multiple trading platforms.

7.      To generate investor interest in Saitama, Defendants promoted it through social media and other public communication channels including X (formerly Twitter), Instagram,

YouTube, Vimeo, Facebook, Discord, and the encrypted messaging platform Telegram.  They also created a public website on which they published multiple iterations of a whitepaper describing Saitama and Defendants' efforts to create an ecosystem of applications that would supposedly generate value for Saitama holders.  Armand, Tran, and Kohli promoted SaitaRealty to investors through similar means.

8.     Defendants made material misrepresentations via these channels about the nature and functionality of Saitama; the applications and platforms they were developing to support Saitama; and their own transactions involving Saitama, falsely telling the investing public, for example, that Defendants had never sold their Saitama holdings and that they intended to hold their Saitama while they were in fact dumping the crypto asset on unsuspecting retail investors. Defendants also promoted the launch of a new crypto asset trading platform related to Saitama throughout the fall of 2021, despite knowing that the platform would not be ready by the promised launch date.  Meanwhile, as the doomed launch date approached, Defendants sold additional large portions of their Saitama holdings to unsuspecting investors.

## **VIOLATIONS**

9.     As a result of the conduct alleged herein, Armand, Hernandez, Kohli, and Tran, violated, and unless restrained and enjoined will continue to violate, Sections 5(a), 5(c), and 17(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. §§ 77e(a), (c) and 77q(a)], Sections 9(a)(2) and 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §§ 78i(a)(2) and 78j(b)], and Rule 10b-5(a), (b), and (c) thereunder [17 C.F.R. §§ 240.10b-5(a), (b), and (c)].

**RELIEF SOUGHT**

10.     The Commission seeks permanent injunctions against Defendants; disgorgement of all ill-gotten gains from the unlawful conduct set forth in this Complaint, together with prejudgment interest pursuant to Sections 21(d)(5) and (7) of the Exchange Act [15 U.S.C. §§ 78u(d)(5) and (7)]; civil penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)]; an order prohibiting Defendants from participating, directly or indirectly, including but not limited to, through any entity controlled by them, in any offering of securities, including any crypto asset security, provided however, that such injunction shall not prevent them from purchasing or selling securities listed on a national securities exchange for their personal accounts; a bar pursuant to Section 20(e) of the Securities Act [15 U.S.C. § 77t(e)] and Section 21(d)(2) of the Exchange Act [15 U.S.C. § 78u(d)(2)] from acting as an officer or director of any issuer that has a class of securities registered pursuant to Section 12 of the Exchange Act [15 U.S.C. § 78l] or that is required to file reports pursuant to Section 15(d) of the Exchange Act [15 U.S.C. § 78o(d)]; and such other relief as the Court may deem appropriate.

**JURISDICTION AND VENUE**

11.     This Court has jurisdiction over this action pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)] and Sections 21(d), 21(e), and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e), and 78aa].

12.     Venue lies in this Court pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)] and Section 27 of the Exchange Act [15 U.S.C. § 78aa].  Certain of the acts, practices, transactions and courses of business alleged in this Complaint occurred within the District of Massachusetts, and were effected, directly or indirectly, by making use of means or

instrumentalities of transportation or communication in interstate commerce, or the mails.  For example, at all relevant times, Defendant Hernandez resided in the District of Massachusetts and communicated with other defendants in furtherance of the violations of securities laws described herein from within this District.  Defendants individually and collectively acted through and on behalf of Saitama LLC, a limited liability company organized in the District and headquartered in Lawrence, Massachusetts from its creation in August 2021 through its dissolution in June 2022.  Defendants offered securities to individuals who reside in the District.  In addition, individuals residing in the District purchased Saitama during the period in which Defendants Armand, Hernandez, Kohli and Tran made materially misleading public statements regarding Saitama as well as the individual speaker's intention to hold the security while surreptitiously selling it.

## DEFENDANTS

13.    **Russell Armand, a/k/a "Saitamaguru1,"** 42, resides in Texas.  At all relevant times, Armand was the Chief Executive Officer of Saitama LLC.

14.    **Maxwell Hernandez, a/k/a "MaxEquation,"** 36, resides in Massachusetts.  At all relevant times, Hernandez was the Chief Technology Officer of Saitama LLC.

15.    **Manpreet Singh Kohli, a/k/a "Mkay Saitama," a/k/a "mannythehitman,"** 39, resides in India and London, England.  At all relevant times, Kohli was the Chief Financial Officer of Saitama LLC.

16.    **Nam Tran, a/k/a "Ntran1234,"** 49, is believed to reside in Washington.  At all relevant times, Tran was the Chief Business Officer of Saitama LLC.

## RELATED INDIVIDUALS AND ENTITIES

17.    Saitama LLC was a limited liability company organized in Massachusetts in

August 2021, headquartered in Lawrence, Massachusetts.  It was dissolved in June 2022, when Armand, Kohli, and Tran formed a new company in Dubai and moved operations there.

18.     "Individual 1," 36, resides in Texas.  Individual 1 was a manager of Saitama LLC and served as its Chief Marketing Officer (the "Saitama CMO").

19.     Gotbit Consulting LLC, a/k/a Gotbit Hedge Fund, ("Gotbit") is a limited liability company registered under the laws of Belize, with a registered office in Belize City, Belize. Gotbit was founded in or around 2017 and purports to have offices in Armenia, Portugal, Turkey, Vietnam, the United Arab Emirates, and the United Kingdom.  Gotbit offers various services for crypto asset projects, including purported "market-making."  The Commission has charged Gotbit with securities fraud in a separate complaint.  *See SEC v. Gotbit Consulting LLC et al*. (D. Mass. 2024).

20.     ZM Quant Investment Ltd. ("ZM Quant") is a company registered in the British Virgin Islands that operated both inside and outside the United States.  ZM Quant offers various services for crypto asset projects, including purported "market-making."  ZM Quant purports to have offices in Hong Kong, Singapore, London, and Seoul.  The Commission has charged ZM Quant with securities fraud in a separate complaint.  *See SEC v. ZM Quant Investment Ltd. et al*. (D. Mass. 2024).

21.     Vy Pham resides in California and worked with members of the Saitama LLC leadership team, including Defendants and "Individual 1."  The Commission charged Pham for conducting an unregistered offering of, and manipulating the market for, both Saitama and another crypto asset being offered and sold as a security in a separate complaint.  *See SEC v. Pham* (D. Mass. 2024).

## REGULATORY BACKGROUND

22.      As the Supreme Court has recently reemphasized, the Securities Act and the Exchange Act "form the backbone of American securities law."  *Slack Tech., LLC v. Pirani*, 598 U.S. 759, 762 (2023).  Together, these Acts provide for the regulation of various activities in the markets for securities and define "security" broadly to include a wide range of assets, including "investment contracts."  Securities Act § 2(a)(1) [15 U.S.C. § 77b(a)(1)]; Exchange Act § 3(a)(10) [15 U.S.C. § 78c(a)(10)].

23.      Congress enacted the Exchange Act in part to provide for the regulation of the national securities markets.  Congress created the SEC and charged it with protecting investors, preserving fair and orderly markets, and facilitating capital formation.  In keeping with Congress' goals, these Acts contain broad anti-fraud and anti-manipulation prohibitions.

24.      Sections 5(a) and 5(c) of the Securities Act generally require an issuer of securities to register an offering of securities through an effective registration statement before the securities are offered and sold to the public.  *See* 15 U.S.C. §§ 77e(a) and (c).  Registration statements for a securities offering provide public investors with material information about the issuer and the securities to be offered and sold.

25.      Over seventy years ago, the Supreme Court in *SEC v. W.J. Howey Co.*, 328 U.S. 293 (1946), set forth the relevant test for determining whether an instrument is an investment contract subject to regulation under U.S. securities laws.

26.      Investment contracts are transactions, contracts, or schemes through which a person invests money in a common enterprise and reasonably expects profits or returns derived from the entrepreneurial or managerial efforts of others.

27.      Congress defined "security" broadly to embody a "flexible rather than a static

7

principle, one that is capable of adaptation to meet the countless and variable schemes devised by those who seek the use of the money of others on the promise of profits." *Id.* at 299.

## BACKGROUND ON CRYPTO ASSETS

28.     As used herein, the terms "crypto asset" or "token" generally refer to an asset issued and/or transferred using blockchain or distributed ledger technology, including assets referred to colloquially as a "digital asset," "cryptocurrency," "virtual currency," and digital "coin."

29.     A blockchain or distributed ledger is a database spread across a network of computers that records all transactions in theoretically unchangeable, digitally recorded data packages, referred to as "blocks."  The system relies on cryptographic techniques for secure recording of transactions.

30.     The Ethereum blockchain is an example of a blockchain.  Ether (or "ETH") is the Ethereum blockchain's native token.  (Some crypto assets may be "native tokens" to a particular blockchain—meaning that they are represented on their own blockchain, though other crypto assets may also be represented on that same blockchain, as is the case with the Ethereum blockchain.)

31.     ERC-20 is a standard protocol (or technical specification of the type of crypto token) currently used on the Ethereum blockchain to create and represent tokens on that blockchain.

32.     A crypto asset "wallet" is hardware or software that enables users to store private keys, which function like passwords that are used to access and transfer crypto assets.

33.     Crypto asset trading platforms allow their customers to purchase and sell crypto assets for fiat currency (legal tender issued by a country) or for other crypto assets, depending on

the platform.  "Off-chain" transactions are tracked in the internal recordkeeping mechanisms of

the platform but do not involve transferring crypto assets from one wallet to another, while "on-

chain" transactions are those involving the transfer of a crypto asset from one blockchain address

to another.

34.     On July 25, 2017, the SEC issued the *Report of Investigation Pursuant to Section

*21(a) of the Securities Exchange Act of 1934:  The DAO*, advising "those who would use . . .

distributed ledger or blockchain-enabled means for capital raising[] to take appropriate steps to

ensure compliance with the U.S. federal securities laws," and finding that the offering of crypto

assets at issue in that report involved investment contracts and thus securities.

## BACKGROUND ON MARKET MAKERS

35.     "Market makers" are in the business of buying securities from those who wish to

sell, and selling securities to those who wish to buy, and operate in many traditional securities

markets.  Market makers "make markets" by continuously and publicly quoting both a price at

which they are willing to buy a security (the "bid") and a higher price at which they are willing

to sell the security (the "ask").  The difference between these prices is known as the "bid-ask

spread," (or just "the spread") and is one of the ways market makers earn money through both

buying and selling—i.e., "making a market" for—securities.

36.     Market makers can affect the liquidity, depth, and efficiency of markets by

ensuring that there is always a counterparty willing to transact with buyers and sellers at publicly

quoted prices.  This is especially the case for thinly traded securities, where there may be few

"natural" (or "organic") buyers and sellers in the market.  A market maker can provide liquidity

to a seller of a security when it is difficult to find a natural buyer, or to a buyer of a security

when it is difficult to find a natural seller.

37.     In traditional securities markets, trading platforms such as national securities exchanges frequently offer incentives for market makers to provide real liquidity to traders on the platform, even for illiquid securities and during periods of market stress.

38.     In traditional securities markets, market makers and other market participants are regulated with a view toward promoting benefits to the overall market and deterring any conflicts of interest or unfair trading advantages.  Market makers are subject to requirements regarding registration, capital, trade reporting, and business conduct standards, among other things.  By contrast, self-described market makers operating on unregistered crypto asset trading platforms do not adhere to these requirements.  In such an environment and in the absence of regulatory compliance and its concomitant oversight, market makers have ample opportunities to act on powerful incentives to manipulate a token's price and/or trading volume.

39.     For example, unlike in the traditional, regulatorily compliant markets, in the crypto asset markets it is often the token offeror who pays these market makers a monthly fee.  These fees pay for services that may include artificially inflating trading volumes to create the false impression that there is a robust market for what is in reality a thinly traded crypto asset.  A market maker might accomplish this by using one or more accounts it directly or indirectly controls to trade against its own quotation.  Here, there is no change in beneficial ownership of the asset traded, but the trade creates the appearance of a market-driven transaction.  This phenomenon is known as "wash trading."

40.     Similarly, the token offeror might seek to have one or more market makers create artificial volume to meet minimum requirements for having their crypto asset made available on one or more crypto asset trading platforms.  This could give the crypto asset greater prominence and potentially attract more natural buyers and sellers.

41.     Manipulative trading can benefit both the offeror and the market maker at the expense of natural investors.  Each has incentives to generate public interest in the token so that they can liquidate their token supplies at higher prices—particularly if the crypto asset's offerors and their affiliates have retained large portions of the assets at inception (as is common in the crypto asset markets), which they cannot monetize absent demand from natural buyers.

**FACTS**

42.     Saitama is an ERC-20 standard token on the Ethereum blockchain.

43.     No later than June 2021, Defendants published a website and a whitepaper in which they described Saitama as a "platform that promotes global financial wellbeing by empowering the youth to be in control of their money and create their own wealth opportunities."[1]

44.     According to the whitepaper, Defendants would build an "ecosystem" of products and services specifically built for Saitama, including:

> a. a smart wallet application called "SaitaMask," which Defendants described in the whitepaper as "a safe and smart wallet that will allow the community to store their digital assets like $SAITAMA and learn about finance and investment opportunities";
>
> b. a marketplace called "SaitaMarket" in which individuals could "use $Saitama and other partner tokens to purchase goods and services";
>
> c. a platform for creating and trading so-called non-fungible tokens ("NFTs") called "SaitaMaker" in which users could "create, launch and promote

---

[1]  According to the Saitama whitepaper, the Saitama "brand and token name took inspiration from the legend of a mysterious 'ghost dog' that is said to be roaming the mountains in the region of Saitama in Japan" and is revered as "a guardian against misfortune."

projects based on the $SAITAMA monetary system"; and

d. a "multi-channel content platform" called "Saitama Edutainment" that would educate young investors "on how to save, invest, manage money and create wealth opportunities while entertaining our audience."

45.     Defendants were among the leaders of a project to develop this ecosystem.  Over time, Defendants in fact developed and launched many of these products.  Moreover, they continued to expand the Saitama "ecosystem" to include other products, including a new "smart wallet" application called "SaitaPro" and a crypto asset trading platform called "SaitaSwap."

46.     Defendants Armand, Kohli, and Tran also participated in the development and promotion of SaitaRealty, a separate, but related crypto asset that was offered and sold as a security, along with a corresponding physical and virtual real estate platform; a virtual debit card that purported to allow users to make payments using crypto assets ("SaitaCard"); and an application that purported to use artificial intelligence to ship packages ("SaitaLogistics").

47.     Defendants promoted Saitama and the Saitama ecosystem through several social media and communications platforms, including X (formerly Twitter), Instagram, YouTube, Vimeo, Facebook, Discord, and the encrypted messaging platform Telegram, in addition to the Saitama website, which they periodically updated and on which they published a series of iterative whitepapers that described Saitama, and their collective efforts to generate value for Saitama investors.

48.     All of these communications were aimed at the investing public, including investors in the United States.

49.     At all relevant times, Defendants had ultimate authority over the statements made in their personal social media accounts.  Defendants also collectively controlled the official

Saitama social media accounts, and both contributed to and approved the contents of the Saitama website and the Saitama whitepapers available on the site.

50.     Defendants were aware of the contents of the website and the whitepapers, and both adopted and promoted them (often linking to them) on their personal and official Saitama social media accounts.

## I.     Defendants Engaged in Unregistered Saitama Offers and Sales.

51.     Defendants offered and sold Saitama as a security, specifically as an investment contract, on numerous crypto asset trading platforms.

52.     *First*, Saitama purchasers, including those who bought it on crypto asset trading platforms, invested money—specifically U.S. dollars, Bitcoin, or ETH—when they purchased Saitama.

53.     *Second*, all Saitama purchasers invested in a common enterprise with each other and with Defendants, who at all relevant times retained significant Saitama holdings.  Because the value of Saitama rose or fell together for all holders, all Saitama holders profited or suffered losses in amounts proportionate to their Saitama holdings.  As such, their financial fortunes— including the realization of future profits—were inextricably tied to the financial fortunes of each other as well as those of Defendants.

54.     Defendants each offered and sold Saitama to the investing public both to enrich themselves personally, and to collectively fund their efforts to develop the "Saitama ecosystem."

55.     In addition, Saitama investors' financial fortunes depended on Defendants' efforts to grow the Saitama ecosystem, including by creating new uses for Saitama such that its utility would increase, thereby increasing the demand for, and correspondingly the price of, Saitama.

56.     Moreover, for each on-chain Saitama transaction, two percent of the value of the

transaction was redistributed to Saitama holders in proportion to their Saitama holdings, and another two percent of the value of the transaction was "burned" or destroyed, decreasing the supply of Saitama.[2]  These automatic redistributions of Saitama further ensured that the financial fortunes of Defendants (who held large positions in Saitama and were developing uses for the token, including with the proceeds of Saitama sales) and the financial fortunes of other investors were intertwined.

57.    *Third*, Defendants led Saitama investors to reasonably expect that they would profit from their Saitama investments, based on Defendants' entrepreneurial and managerial efforts.

58.    Through the Saitama website, whitepaper, social media, and other public outlets, Defendants held themselves out, together with others, as the driving force behind the creation and future development, maintenance, and growth of the Saitama ecosystem from which Saitama derived its value.

59.    Moreover, beginning as early as July 2021, Defendants identified themselves on the Saitama website and highlighted their backgrounds; their purported experience in traditional finance and crypto-related projects; and their entrepreneurial and managerial efforts to increase the value of Saitama.

60.    In August 2021, Defendants further formalized the management of the Saitama project by establishing Saitama LLC in Massachusetts, with each Defendant (and Individual 1) serving as a manager of the corporate entity.  At various times, Defendants publicly identified themselves as corporate officers of the Saitama enterprise:  Armand identified himself as

---

[2] "Burning" crypto assets refers to sending those assets to an inaccessible wallet from which the tokens cannot be withdrawn, thereby removing them from circulation.

Saitama's Chief Executive Officer and Chief Operations Officer; Hernandez as its Chief

Technology Officer; Kohli as its Chief Financial Officer; and Tran as its Chief Business Officer.

61.     Defendants published the first Saitama whitepaper in June 2021.  In that

whitepaper, Defendants expressly and repeatedly described Saitama as an investment with the

potential for substantial profit, while describing themselves as the individuals who would

undertake the efforts needed to achieve those profits—specifically, as "a group of committed

individuals" that "took over [the Saitama] project and continued developing it."  That

development took the form of creating various applications, including those previously

described, in which investors could supposedly use and trade Saitama tokens.

62.     Investors were led to reasonably expect not only that Defendants' development of

these applications would increase demand for Saitama and therefore its price, but also that such

applications would lead to additional Saitama transactions.  As described above, each on-chain

transaction resulted in a two-percent redistribution to existing Saitama holders and an additional

two-percent burn.  From the earliest iterations of their Saitama website and whitepaper,

Defendants touted these aspects of Saitama as a way for investors to earn passive income on their

Saitama holdings.

63.     Defendants' promises of profits only intensified over time.  In September 2021,

for example, Defendants updated the Saitama website to inform prospective investors,

"Everyone is expected to make profit."  They explained that because "2% of every transaction

with $SAITAMA is deducted and redistributed to our pool of holders . . .  [i]t means that just by

holding it you will see the number of [your] tokens increasing automatically everyday as the

community transacts."  Defendants also continued touting Saitama as a "Deflationary Currency,"

noting that because an "additional 2% of the amount of all transactions is taken out of

circulation, . . . *our token supply is constantly shrinking and making your $SAITAMA increase in value with time*." (emphasis added).

64.     Beyond their statements on the Saitama website and whitepapers, Defendants periodically explained their ongoing efforts to generate profits for Saitama investors in a series of "ask me anything" interviews on YouTube, in which investors and potential investors could pose questions to Defendants and other leaders of the Saitama project.  Each Defendant participated in one or more of these sessions in which they touted Saitama as an investment to the public.

65.     In one of those interviews from January 2022, Armand, joined by Hernandez, Kohli, and three others, explained:

> [A]ll the different things that we're doing, it's all geared with the same premise—and that's to make the token more valuable—to make Saitama more valuable, to make the price increase, to burn more of the circulating supply, to give it more of a use case.

66.     In discussing Defendants' development of the SaitaMask application, for example, Armand stated, "It's for one purpose only—and that's to make Saitama['s] price increase, to make the coin more valuable, to give it more utility.  Everything we do . . . it is all geared to make this company and coin more valuable."

67.     Defendants also led investors to reasonably expect to profit from their Saitama investments by publicly touting the results of Defendants' efforts to have Saitama listed on numerous trading platforms, where investors would be able to sell their Saitama for a profit. Saitama initially traded on Uniswap, and later on numerous other platforms, including at various times Bybit, OKX, Gate, LBank, Bitmart, MEXC, and XT, among others.

68.     At all relevant times, Defendants encouraged investors to purchase Saitama, and provided specific instructions on how to do so on the Saitama website.

69.     As a result of the above representations and the economic reality of what

Defendants were offering and selling, Saitama investors had a reasonable expectation of profiting from Defendants' efforts to develop the Saitama ecosystem and list Saitama on trading platforms.

70.     From June 2021 through the end of May 2022, Defendants offered and sold the following amounts of Saitama:

| Defendant | Approx. Number of Saitama Sold | Approx. Value of Saitama Sold |
|---|---|---|
| Armand | 321.43 trillion | $2.13 million |
| Hernandez | 1.17 quadrillion | $10.97 million |
| Kohli | 1.91 quadrillion | $22.09 million |
| Tran | 3.30 quadrillion | $14.56 million |

## II.   Defendants Engaged in Manipulative Trading of Saitama.

71.     In early July 2021, Defendants, along with Vy Pham and Individual 1, were part of a group that engaged in a series of coordinated Saitama purchases intended specifically to: (1) induce holders of large quantities of Saitama (referred to as "whales") to sell their positions; (2) induce members of the investing public to buy Saitama; and (3) increase the price of Saitama.

72.     This group was particularly concerned that if the existing "whales" liquidated their Saitama holdings, the price of Saitama would fall, undermining their efforts to inflate the price of Saitama and increase the number of Saitama holders.  So Defendants and other Saitama project leaders sought to buy out these whales through coordinated purchases.  As Pham put it in a private Telegram group chat regarding one such whale:  "[W]e need to lure this idiot to empty his wallet."  Doing so would then enable Defendants to inflate the price of Saitama without fear of large holders later cashing out and depressing the price.

73.     The plan worked.  Through their coordinated purchases across numerous wallets

in relatively small increments, they successfully induced large Saitama holders to sell their positions while simultaneously attracting new Saitama purchasers.  During their approximately two-day buying spree, the price of Saitama increased by approximately 60 percent.

74.     Defendants, Pham, Individual 1, and others involved in the scheme, described their plan—and their successful execution of it—on July 3 and 4, 2021 in a private group chat on Telegram.

75.     In that private Telegram group chat, Armand explained that he was creating a separate public Telegram "shill group" to promote Saitama to potential investors.  Armand was confident that if he initially populated his "shill group" with some people and "some bots," then "a lot of [people] will join."  He explained:  "If we add this to a pump we create.  A lot of [people] will FOMO in."[3]  Pham asked:  "How much are we gonna pump now?"  Armand responded:  "We will create an illusion of massive buys and new holders . . . .  It'll incite [people] to buy more."  Armand continued, stating the group was "[b]asically creating our own pump through illusion."

76.     Kohli and Tran reported to the group that they were ready to buy, and Individual 1 (the Saitama CMO) demonstrated his agreement with the plan with the following GIF:



77.     Armand, Kohli, Tran, Pham, and Individual 1 continued to discuss the optimal

---

[3]  In this context, "FOMO" or "fear of missing out" refers to investors' "fear" that they may lose out on profiting from an increase in a crypto asset's price.

size of their purchases to accomplish the "pump."

78.     Defendants coordinated their purchases with Armand's public "shilling" of Saitama on Telegram.  As potential investors joined Armand's public Telegram group, Defendants, along with Pham and Individual 1, each began purchasing Saitama.  Armand instructed them to purchase two to three trillion Saitama per transaction.  Although numerically large, two to three trillion Saitama was small relative to the total initial supply of Saitama, which was approximately 100 quadrillion.  Armand explained, "W[e] want [a] list of small buys to look like it's mor[e] buyers."  Pham, Kohli, Hernandez, Tran, and Individual 1 all began purchasing Saitama at Armand's direction and discussed their transactions in the private Telegram group chat.

79.     For instance, Tran noted that people were joining Armand's public Telegram chat group and told his co-Defendants to begin buying immediately.  Armand responded:  "Is like fishing with dynamite."  Pham, Tran, and Individual 1 agreed, each responding "Lol."  Pham repeatedly emphasized the need for the group to closely coordinate its purchasing (the timing, volume, and number of wallets), in order to maximize its impact on price and to convince the "whales" to sell.

80.     Each Defendant participated in the coordinated purchases of Saitama, which occurred in multiple rounds over the course of July 3 and July 4, 2021.  Tran, for instance, announced in the private Telegram group chat:  "Round 2 start [sic] now!"  Hernandez responded that he "bought a few times."  Tran later asked the other project leaders:  "Round 3?"  Armand responded:  "[Y]ea small buys," again advising the group to make multiple small purchases to create the appearance of broad public interest in Saitama and obscure the fact that a small number of Saitama insiders were responsible for the increased demand.  In response,

Pham, Tran, and Kohli each confirmed they were once again buying Saitama.  Pham noted: "[T]his is where new holders will get attracted . . . and give people confidence."

81.     A few hours later, Armand told Kohli again to keep his purchases small, explaining that "the idea is to keep the [price] chart trending upward to generate traction and stability[.]  Will keep [people] from wanting to sell and will instead buy more."  Kohli indicated he understood the plan:  "Gaaaaat it."

82.     Defendants discussed in their private Telegram group chat how their coordinated purchases were in fact succeeding in inducing new investors to purchase Saitama.  Relatively early in their efforts, Armand reported that their purchases were increasing the number of Saitama holders: "Soooo success so far."  Hernandez agreed:  "[Y]es holder increase is pretty steady."  Armand later reported to the group:  "Holders are increasing nicely and distribution is looking much better.  We have a better foundation today then [sic] we did last week from the eyes of a future investor."  Kohli responded:  "And sell again on high what we created."

83.     Armand apprised the group of the status of their efforts, stating for example, "We've already bled out most of the big wallets[;] there's only a couple that remain."  After a few hours of continued coordinated purchases by Defendants and other Saitama project leaders, Armand reported that one of the wallets they targeted sold roughly 800 trillion Saitama, leading Armand to conclude:  "Mission semi-accomplished."

84.     Defendants and others involved in the scheme recognized the need to hide their coordinated purchases from the investing public not only by breaking their Saitama purchases into small transactions, but also by using multiple wallets to disguise their coordinated activity. For example, after making a series of Saitama purchases, Kohli asked others in the private group chat whether he should use another account, noting "all from same . . . looks weird."  The

Saitama CMO responded:  "Yes . . . . Use two or 3 wallets."  Later, Kohli commented, "I think

too many from my address wallet," referring to the number of Saitama purchases he made from

the same wallet address.  Armand replied, "Yea need new wallet."

85.    Defendants understood that they needed to keep their coordinated purchases

hidden from the investing public.  Kohli, for instance, warned the participants in the private

Telegram group chat:  "Don't involve too many in group . . . .  It will really bring downfall if

someone take screen shot and start posting."

86.    After two days of coordinated purchases of Saitama that eliminated many large

wallets and expanded the number of Saitama investors, Armand complimented Pham and the rest

of the Saitama project leaders:  "Ladies and gentlemen that is how you start a hype.  Perfectly

executed well done all[.]  Still have to keep small buys incoming if it pulls though.  Lot of ppl

[people] watching chart right now[.]"  Later in the day, after continued discussion of their

manipulation of Saitama, Tran posted to the group:



87.    Later in the conversation, Individual 1 (the Saitama CMO) added:



88.    Working in the manner and for the specific purposes described above, Defendants

collectively purchased more than 242 trillion Saitama from July 3 to July 4, 2021.  Specifically:

    a.    Armand purchased approximately 36.5 trillion Saitama for approximately $1,207;

    b.    Hernandez purchased approximately 111.13 trillion Saitama for approximately $4,255;

    c.    Kohli purchased approximately 82.99 trillion Saitama for approximately $3,021; and

    d.    Tran purchased 12.3 trillion Saitama for approximately $434.

89.    In addition, Pham and Individual 1 purchased another approximately 308 trillion Saitama during that period.

    a.    Pham purchased approximately 258.81 trillion Saitama for approximately $8,859; and

    b.    Individual 1 purchased approximately 48.97 trillion Saitama for approximately $1,692.

### III.    Defendants Hired Purported Market Makers to Inflate the Trading Volume of Saitama and SaitaRealty.

#### A.  ZM Quant Manipulated the Trading Volume of Saitama and SaitaRealty.

90.    In or around September 2021, as Defendants prepared to launch Saitama on additional crypto asset trading platforms, they began discussing with ZM Quant the possibility of serving as the token's "market maker."

91.    During these introductory discussions, ZM Quant provided Defendants with a slide deck to pitch its services, touting ZM Quant's ability to "attract market participants" by

providing "increased volume" and "perfect candles."[4]  ZM Quant also sent Defendants a two-page document listing five different levels of service offerings, with the cost ranging from $1,500 to $10,000 monthly to be paid in USDT (or "Tether," another crypto asset).  The most basic offering, for $1,500 in Tether per month, was entitled "Trading bot for candle chart and volume" and promised, among other things, to "[d]emonstrate [a] good and continuous candle chart" and to "create volume in accordance with your case."

92.     Defendants understood the reference to "perfect candles" and "continuous candles" to mean that ZM Quant would engage in manipulative trading to artificially "create volume" with the intent of generating trading charts that suggest steady growth of—and organic investor interest in—a particular crypto asset.

93.     Defendants ultimately engaged ZM Quant to provide these services, initially for Saitama and later SaitaRealty, at the service level priced at $1,500 in Tether.

94.     From 2021 through 2023, Defendants paid ZM Quant at least $27,000 for the express purpose of creating artificial trading volume for these tokens on various crypto asset trading platforms.

95.     To achieve these ends, Defendants regularly provided ZM Quant with both Saitama and SaitaRealty tokens for trading on various crypto asset trading platforms.

96.     For example, in or around January 16, 2023, Tran and Kohli requested a call with ZM Quant to "set up funds and API for mm [market making]."  Approximately 20 minutes after

---

[4]  A "candle" is a graphic snapshot of whether the market price of a security moved positively or negatively and to what degree.  The "candlestick" measures the opening and closing prices during a given timeframe, and the "wick" measures the highest and lowest prices.  A "green candle" shows that a security's market price has increased during the relevant period, whereas a "red candle" shows that a security's market price has decreased during the relevant period.

requesting the call, Tran confirmed to ZM Quant that he had deposited "2k each pair" for "Saitama(v2)"—the second version of the Saitama token[5]—on the "XT" trading platform. Approximately two hours later, ZM Quant confirmed that it would start market making "asap."

97.     Approximately 12 hours thereafter, Tran asked ZM Quant to "also put XT live."

98.     Trade data from the XT trading platform reflects that during the 24-hour period following the call and subsequent Telegram chat described above, transaction volume increased significantly from fewer than 16 million trades and less than $20 in trading volume to more than 132 billion trades and $250,000 in trading volume.

99.     Trading volumes for Saitama on the XT platform increased substantially from there and stayed above the pre-manipulation levels for months thereafter.  Figure 1 summarizes data extracted from the XT trading platform that illustrates this spike in trading volume.

| Date | Transaction Quantity | Transaction Volume |
|---|---|---|
| 2023-01-10 | 5,497,618 | $ 4.84 |
| 2023-01-11 | 5,989,277 | $ 5.27 |
| 2023-01-12 | 4,487,968,259 | $ 4,334.02 |
| 2023-01-13 | 20,275,208 | $ 23.61 |
| 2023-01-14 | 85,886,097,807 | $ 163,834.70 |
| 2023-01-15 | 10,646,516 | $ 12.54 |
| 2023-01-16 | 15,391,498 | $ 19.56 |
| 2023-01-17 | 132,832,039,198 | $ 258,477.30 |
| 2023-01-18 | 2,339,892,144,504 | $ 5,871,951.70 |
| 2023-01-19 | 1,323,892,786,509 | $ 3,514,804.79 |
| 2023-01-20 | 14,710,179,632,379 | $ 82,530,094.79 |
| 2023-01-21 | 1,382,117,888,352 | $ 10,545,965.50 |
| 2023-01-22 | 1,016,754,798,975 | $ 6,684,639.71 |
| 2023-01-23 | 2,362,039,171,313 | $ 16,956,533.90 |

*Figure 1:  Transaction quantity and volume for Saitama, January 2023*

---

[5]  In or around mid-2022, the Saitama project leaders released a new version of the Saitama smart contract (i.e. "v2").  The total supply of Saitama was reduced, with existing investors receiving new Saitama tokens in proportion to their existing holdings.  The token "tax" was altered, but the structure and incentives remained similar.

100.     The following day, after Saitama trading volumes had increased on XT as a result of ZM Quant's wash trading, Tran sent ZM Quant the information that it would need to trade the SaitaRealty token on Bitmart and requested that ZM Quant "please get that going also."  Less than 24 hours later, Tran followed up to request that ZM Quant start trading "asap," and a ZM Quant employee indicated that he had started the trading bot for the SaitaRealty token on Bitmart.  Approximately 45 minutes after that, however, that employee reported high trading fees, which led him to report that he was going to "pause the self trade for now," meaning that he would stop trading back and forth between accounts controlled by ZM Quant—i.e., wash trading.

101.     At other times, ZM Quant generated artificial trading volume on the XT platform for the express purpose of meeting XT's minimum volume requirements.  For example, on or around May 26, 2023, a representative from the XT trading platform warned the leaders of the SaitaRealty project in a private Telegram chat that the SaitaRealty token was at risk of being "delist[ed]" if its trading metrics did not improve.

102.     In response, Defendant Tran immediately replied to the group, which included ZM Quant, "[w]e will increase volume within a day."  Tran then asked for XT to "whitelist" an account for "market making" to avoid the platform's trading fees.

103.     Once XT approved the whitelist request and ZM Quant was cleared to restart trading, trading volume for the SaitaRealty token increased immediately.  Specifically, trading volume increased from de minimis levels in the several days prior to the May 26, 2023 Telegram chats with XT to quadrillions of individual trades and billions of dollars in daily volume the day after the Telegram chat.  Figure 2 below summarizes the data from the XT platform that illustrates the foregoing, reflecting a more than 412,000,000,000 percent increase in transaction quantity volume from the last day there was trading four days earlier.

| Date | Transaction Quantity | Transaction Volum |
|---|---|---|
| 2023-05-11 | 25 | $ 0.00 |
| 2023-05-12 | 1,008,016 | $ 0.20 |
| 2023-05-13 | 3,246,150,625 | $ 165.67 |
| 2023-05-14 | 1,002,001 | $ 0.03 |
| 2023-05-15 | 97,594,641 | $ 18.84 |
| 2023-05-16 | 1 | $ 0.00 |
| 2023-05-17 | 804,609 | $ 0.03 |
| 2023-05-19 | 9 | $ 0.00 |
| 2023-05-23 | 28,217,344 | $ 1.02 |
| 2023-05-27 | 116,306,053,937,387,000 | $ 5,410,119,906.21 |
| 2023-05-28 | 331,922,343,174,080,000 | $ 14,353,345,447.17 |
| 2023-05-29 | 303,448,214,804,873,000 | $ 11,988,999,558.89 |
| 2023-05-30 | 327,175,768,971,768,000 | $ 12,028,905,405.89 |
| 2023-05-31 | 342,102,350,531,006,000 | $ 11,554,209,294.91 |
| 2023-06-01 | 319,432,108,341,295,000 | $ 11,988,908,970.88 |
| 2023-06-02 | 310,056,580,774,290,000 | $ 12,804,600,197.92 |
| 2023-06-03 | 314,976,358,389,182,000 | $ 13,012,798,303.20 |
| 2023-06-04 | 324,242,836,501,716,000 | $ 13,398,912,268.08 |
| 2023-06-05 | 321,579,146,844,501,000 | $ 13,787,716,052.18 |
| 2023-06-06 | 304,533,887,413,584,000 | $ 13,496,043,922.30 |

*Figure 2: Trading quantity and volume for SaitaRealty in May-June 2023*

104.    Trading volume for the SaitaRealty token did not drop below eight figures for months thereafter.

105.    ZM Quant's involvement in trading the Saitama and/or SaitaRealty continued through at least September 2023.

**B.  Gotbit Manipulated the Trading Volume of Saitama.**

106.    Beginning not later than in or around March 2023, Defendants Armand, Kohli, and Tran hired Gotbit to manipulate Saitama's trading volume on a crypto asset trading platform called LBank.  Gotbit controlled the total volume on the platform through wash trading masquerading as "market making."

107.    Generally, Gotbit inflated Saitama's trading volume at the request of these defendants.

108.    But Gotbit's control of the market meant Gotbit could also quickly *reduce* trading volume on request if necessary.  In at least one instance, that is exactly what Gotbit did at the request of LBank, which viewed Gotbit's Saitama wash trading volume as so high that it posed risks to the reputation of the trading platform.

109.    Specifically, on April 29, 2023, a representative of LBank stated in a private Telegram chat with Gotbit and Armand, Tran, and Kohli:  "[O]ur risk control found that your trading volume is too high, which already effect [sic] your project and our exchange, pls reduce the trading volume under 200k ASAP.  Otherwise they have to interrupt data interface connection with cmc [i.e., CoinMarketCap] and cg [i.e., CoinGecko]."

110.    Gotbit understood that maintaining a presence on websites like CoinMarketCap and CoinGecko is crucial for attracting investors.  So Gotbit agreed to pull back its wash trading. A Gotbit employee replied:  "We already decreased our volume but it will take some time to make the daily volume figure go down[.]  I think result will be noticeable in about 6 hours[.]"

111.    Armand, Kohli, and Tran also hired Gotbit to conduct wash trading on XT.  After establishing "whitelisted" accounts with XT that allowed Gotbit to wash trade with no fees or minimal fees, Gotbit began its wash-trading campaign in November 2023, increasing the trading volume on XT roughly 90-fold to more than $74 million in a single day.

## IV.    Defendants Made Materially False and Misleading Statements About Saitama, the Saitama Ecosystem, and Their Personal Trading in Saitama.

### A.    Defendants Made False Statements About the Ability of Saitama's Smart Contract Code to Protect Investors from Market Manipulation.

112.    Beginning in June 2021, Defendants claimed on their website that features of the Saitama code would protect investors from price manipulation by individuals who held large Saitama positions.  For instance, one of the earliest versions of the Saitama website, which was

active at least as of July 26, 2021, claimed that Saitama incorporated an "Anti Whale Contract" that was designed to combat the large holders' efforts "to manipulate prices to their advantage." Defendants knew or were reckless in not knowing that this claim was materially false and misleading.

113.    Hernandez examined the Saitama smart contract code himself and found no evidence of any feature that would prevent price manipulation or dumping by large Saitama holders.  On July 24, 2021, he asked another coder involved in the Saitama project whether the smart contract code contained any such features.  In a private Telegram chat, the coder confirmed:  "There is no anti whale code in this contract."  Hernandez provided this information directly to Armand and Tran in a separate private Telegram chat on July 26, 2021.  Hernandez stated, "[W]e have to discuss this and create a damage control plan because we have been all under the impression there was anti-whale code."  Hernandez and Armand agreed to keep the matter "internal" to the Saitama project's leadership, which included their co-Defendants.

114.    Despite knowing that there was no "anti-whale code," Defendants continued to promote this purported feature of Saitama on their website, which continued to mislead investors to believe that the coding of the Saitama contract prevented price manipulation and dumping by holders of large quantities of Saitama.

115.    In fact, rather than correct or remove the false and misleading description of the Saitama code, Defendants doubled down, updating the website in or around August 2021 to, among other things, highlight the purported anti-whale coding, expressly stating that Saitama was "coded in a way that prevents big wallet holders (whales) from trying to manipulate the price in their favour or from dumping the token by selling out."  Defendants knew or were reckless in not knowing that this statement was false and misleading.  No coding feature of

Saitama prevented "whales" from "trying to manipulate the price" or from "dumping the token."

116.    Defendants knew this not only because Hernandez told them no "anti-whale" feature existed, but also because they themselves were large holders of Saitama who easily manipulated its price and dumped their holdings.  Moreover, they sought to buy out other "whales" expressly to prevent them from dumping their holdings and collapsing the price, thereby demonstrating their knowledge that nothing in the Saitama code would prevent such investors from doing so.

117.    Defendants continued to promote this non-existent feature of the Saitama smart contract after learning that it did not exist.  For example, on December 4, 2021, Armand posted to X:  "The @InuSaitama provides:\n🎈 Deflationary token\n💱 Passive income\n🐡 Anti-whale trap."  Armand, Kohli, and Tran each included in their X profiles a link to the Saitama website containing what they knew to be materially false and misleading statements about the Saitama coding.  They also linked to the then-current iteration of the Saitama whitepaper in some of their posts to X.

### B.  Defendants Manipulated Saitama's Ranking on a Popular Website and Deceptively Promoted that Inflated Ranking to Investors.

118.    DEXTools is a well-known website in the crypto asset community that contains information on various crypto assets that trade on purportedly "decentralized" trading platforms. Among the information available on the website is a "community trust score" for each crypto asset and a list of crypto assets that are "trending" in increased popularity, based on, among other things, the number of queries from website users relating to the crypto asset, and whether users designate the crypto asset as a "favorite."

119.    Defendants believed that increasing Saitama's community trust score and causing it to trend on DEXTools would generate investor interest and increase the demand for Saitama.

So they set about manipulating those rankings on DEXTools and promoting Saitama based in part on those manipulated rankings.

120.    Beginning in or about July 2021, Defendants at various times artificially inflated Saitama's community trust score and caused Saitama to trend on DEXTools by making it appear as though a broad base of Saitama holders were interested in and trusted Saitama.  Specifically, Defendants used multiple computers, cryptocurrency wallets, web browsers, and web browser tabs to continuously access the DEXTools website and choose Saitama as a "favorite," "upvote" Saitama to increase its community trust score, and ultimately cause Saitama to be featured on DEXTools as a trending crypto asset.

121.    Tran provided other Defendants with written instructions to accomplish the manipulation.  He noted:  "[M]y pc can runs [sic] 24/7," enabling him to engage continuously in the conduct described above.  Hernandez, who also engaged in the ranking manipulation, responded, "Yea same I threw it on one of my servers."  Armand noted:  "Think we need several wallets to do this holding 1000 dex coins with multiple tabs open that's the 🔑[.]"

122.    Tran sent the other Defendants a video depicting his efforts to manipulate the Saitama rankings on DEXTools using his own computer with approximately 11 web browser windows:



*Figure 3:  Still image from video depicting Tran's computer*

123.    Armand noted that he had previously had success using these manipulative techniques with another crypto asset and that "3-4 ppl [people] running a few tabs with about 20 likes," which had caused that crypto asset to rise to "#12 on dextools."  He continued, "If we can get 100 likes and 10 devices connected each running 10-15 tabs we can hit #2-5 easily," referring to boosting Saitama's ranking on DEXTools by using multiple machines with multiple web browser tabs querying DEXTool's Saitama page.  Tran responded, "Hahah Max and I can handle those tabs."  Defendants continued to use these deceptive techniques to promote Saitama's rankings on DEXTools at various times while they were selling their Saitama holdings.

124.    As Defendants improved Saitama's profile on DEXTools through these deceptive means, Defendants then promoted their manipulated rankings to the investing public via X and Instagram, among other platforms.  For example:

    a.    On July 16, 2021, Armand posted to X:  "RT @InuSaitama:  Looks [sic] at this chart! We will have new [all time] high price soon!! 💥🔥🚀 🖼️ and we are Top Trending Dextools 5 days in the roll now ❤️ #SaitamaIn…[sic]"

b.  On July 25, 2021, Kohli posted to X:  "RT @InuSaitama: 🦡 Update on 07/25 🍥 New ATH 1260! ... 🧬 Top 7 Dextools … 🟦105.2% 24h; 🟦1446.72 % WoW🥇8286+ Holders," referring to an all-time high ("ATH") price for Saitama, along with 24-hour and week-over-week ("WoW") gains, and increases in the number of holders of the crypto asset.

c.  On August 1, 2021, one of Saitama's primary X accounts (@WeAreSaitama) that was controlled by Defendants posted:  "🧬 Top 3 Dextools. "

d.  On September 13, 2021, Tran posted to X:  "We are #1 Dextools Trending 6 days straight and the 4 hour chart is so Bullish 🧡🚀."  Two days later, he posted to X that Saitama was "🔥Top 6 Trending Dextools."

**C.  Defendants Falsely Claimed that Saitama's Business Plan Was Reviewed by Regulators.**

125.    Beginning at least in or around September 2021, Defendants stated on the Saitama website that their whitepaper "has been reviewed by regulators, third-party audit firms and advisors, that includes legal and industry experts."

126.    Defendants knew or were reckless in not knowing that this statement was false and misleading.  The whitepaper was not reviewed by regulators.

127.    This statement was material to investors, as it provided false assurances that Defendants had complied with applicable laws in offering and selling Saitama to the investing public, and false assurances regarding the purported veracity of statements they made in the Saitama whitepaper.

### D.  Defendants Each Made False Statements to Investors Regarding Their Sales of Saitama.

128.   On October 31, 2021, Armand posted to social media platform X "zero ✎

saitama sold just to be clear lol."  This statement from Saitama's Chief Executive Officer was

materially false and misleading.  That day alone, Armand sold 490 billion Saitama.  He had sold

more than 240 trillion Saitama in the six months preceding that false X post.[6]  Moreover,

Armand falsely stated in a November 2, 2021 interview available on YouTube that he had not

used Saitama as a "revenue stream" or for "personal gain."  To the contrary, by that time,

Armand had sold approximately 32 trillion Saitama for more than $1 million in proceeds.

129.   Similarly, in an interview posted to YouTube on September 15, 2021, Hernandez

falsely claimed that, like Armand, he too had never sold Saitama.  "I myself haven't really sold

anything since the beginning . . . and if I have taken anything out of my wallet it's been, you

know, to donate for like you know giveaways and other stuff like that."  This public statement,

coming from Saitama's Chief Technology Officer and developer of the SaitaMask platform, was

materially false and misleading.  By September 15, 2021, Hernandez had sold more than 541

trillion Saitama for more than $175,000 in proceeds.

130.   Tran also made materially false and misleading public statements regarding his

Saitama transactions.  On September 15, 2021, for example, Tran posted to X at 8:17 a.m.:  "I

am buying more" Saitama.  That night, Tran posted to X an image of a price chart for Saitama

and stated that Saitama's price had reached a new all-time high.  While telling the public that he

was buying more Saitama and touting its price, he actually sold nearly 1.2 trillion Saitama (net)

---

[6] Armand had been planning to sell his Saitama holdings for some time.  In a private Telegram chat on
July 25, 2021, he told Tran:  "I will be pulling some out in another month or two . . . Adding a waterfall to
my pool in backyard."

that day yielding proceeds of more than $8,000.  On October 23, 2021, Tran posted to X, "I said

HOLD!" along with an image depicting the Saitama mascot on a rocket, suggesting a rapid price

increase:



131.    Meanwhile, on October 23, 2021, Tran sold approximately 1.53 trillion Saitama

yielding net proceeds of more than $90,000.

**E.  Defendants Armand, Tran, and Kohli Made Materially False and Misleading
      Statements Regarding the Development of SaitaMask.**

132.    Defendants also sold Saitama amid misrepresentations as to the readiness of the

SaitaMask trading platform and mobile app, which was one of the key features of the Saitama

ecosystem that Defendants promoted as potentially increasing Saitama's value.  Specifically,

Defendants promoted SaitaMask as a pillar of the "Saitama Inu Ecosystem" and described

SaitaMask on their website as "a one stop show where you can connect your payment system of

choice and be able to buy, sell, swap, transfer and do whatever you need with any coin without

leaving the mobile app."  The website also described using SaitaMask for connecting to

Saitama's educational content and connecting to two other Saitama platforms purportedly being

developed by Defendants:  "SaitaMaker and SaitaMarket, helping users to buy and sell items

with crypto inside the app."

133.    Starting in September 2021, Saitama announced that a SaitaMask launch party

would be held in November 2021.  Specifically, on September 16, 2021, Armand tweeted,

"November 13th will go down in history" along with an image of a phone that appeared to be

running the SaitaMask app, captioned "SaitaMask Where no wallet has gone before."  Closer to

the time of the purported launch, on November 9, 2021, Armand stated in a YouTube video:

"We've already put all the preliminary measures in place and the wallet itself is done like the

swap function's done. Everything is done."  On November 8, 2021, Kohli posted to X, "6 more

days to go for SaitaMask Launch 🚀 🚀 🚀 🚀 🚀 .  Lot more coming this week and weekend,"

and posted to X again on November 12, "[One] Day left for our Launch and few great

announcements" (tagging Saitama's official account and the Saitama CMO's handle on X).

134.    Then, on the day of the launch party, Armand tweeted that the trading platform

was ready for launch and "out of beta."  Amidst Defendants' touting the imminent launch of

SaitaMask, Saitama's price reached an all-time high of $0.0000001394 on November 12, 2021—

an increase of over 477,000 percent from July 2021.

135.    Hernandez was the lead developer for the SaitaMask platform.  He had known or

recklessly disregarded for weeks that the software would not be ready for launch on November

13th.  He communicated this information to the other Defendants, each of whom also knew or

recklessly disregarded, as they promoted the launch of SaitaMask on social media, that the

application would not be ready for launch on November 13th.

136.    Meanwhile, as Defendants promoted the November 13th launch of SaitaMask,

Armand, Hernandez, Tran, and Kohli sold large amounts of Saitama, including leading up to the

time of the launch party, knowing the launch would not occur because the platform was unfinished.  Specifically:

   a.   Armand sold more than 4.3 trillion Saitama between October 27 and November 12, 2021, for approximately $369,000;

   b.   Hernandez sold more than 123 trillion Saitama between October 12 and November 11, 2021, for approximately $6,593,000;

   c.   Tran sold more than 143 trillion Saitama between October 1 and November 12, 2021, for approximately $8,337,000; and

   d.   Kohli sold more than 87 trillion Saitama between October 1 and November 12, 2021, for approximately $6,520,000.

137.   After Defendants announced delays in the launch (which in reality would not occur until early 2022), the price of Saitama fell—27 percent over two days, and 72 percent over the course of the following month.

**V.   Defendants Armand, Tran, and Kohli Engaged in Unregistered SaitaRealty Offers and Sales.**

138.   In March 2022, Defendants Armand, Tran, and Kohli (the "SaitaRealty Defendants") began offering and promoting a second crypto asset on the Ethereum blockchain: SaitaRealty (ticker:  SRLTY).  SaitaRealty, another ERC-20 standard token, purported to relate to "a real estate ecosystem" that, according to an initial whitepaper that the SaitaRealty Defendants published in March 2022, would "provide a range of opportunities in many different forms like Zero-Emission Homes, multi family dwelling units/condominiums, affordable housingz [sic], business complexes, and commercial land development."  The SaitaRealty Defendants were among the leaders of the project to develop this ecosystem.

139.   The whitepaper stated that SaitaRealty "is a sister token of Saitama LLC and is

36

led by the same trusted team," which included Armand (as Chief Operations Officer), Tran (as Chief Business Officer), and Kohli (as Chief Financial Officer), among others.[7]

140.   The SaitaRealty Defendants offered and sold SaitaRealty as a security, specifically an investment contract, including on several crypto asset trading platforms.

141.   *First*, SaitaRealty purchasers, including those who bought it on crypto asset trading platforms, invested money—specifically U.S. dollars, Bitcoin, or ETH—when they purchased SaitaRealty.

142.   *Second*, all SaitaRealty purchasers invested in a common enterprise with each other and with the SaitaRealty Defendants, who retained significant SaitaRealty holdings. Because the value of SaitaRealty rose or fell together for all holders, all SaitaRealty holders profited or suffered losses in amounts proportional to their SaitaRealty holdings.  As such, their fortunes—including the realization of future profits—were inextricably tied to the SaitaRealty Defendants' fortunes and each others'.

143.   The SaitaRealty Defendants collectively funded the SaitaRealty enterprise through (1) increasing the value of SaitaRealty, a large portion of which they held in reserve, and (2) collecting a portion of a "token tax" on every on-chain SaitaRealty transaction, which they used to fund operations.

144.   The whitepaper published by the SaitaRealty Defendants further explained the economics of the SaitaRealty enterprise.  According to the whitepaper, each on-chain SaitaRealty transaction incurred a 9 percent "token tax."  Of the 9 percent "token tax," 5 percent was used to

---

[7]  Hernandez was also initially identified as a leader of the SaitaRealty project and its Chief Technology Officer.  On or about April 20, 2022, Hernandez told Armand via WhatsApp that he was planning to resign to avoid being associated with Saitama "when the sec shows up."  On May 18, 2022, Hernandez announced on X his resignation from the Saitama project.

provide capital for Armand, Tran, Kohli, and other project leaders to invest in physical real estate.  The remaining 4 percent was allocated as follows:  1 percent was burned, decreasing the overall token supply; 1 percent was redistributed to existing SaitaRealty holders; and 2 percent was retained for use by Armand, Tran, Kohli, and other project leaders for marketing development.

145.    As was the case with Saitama, SaitaRealty's automatic redistribution and destruction of tokens further ensured that the financial fortunes of the SaitaRealty Defendants (who held large positions in SaitaRealty and were developing uses for the token) and those of investors were intertwined.

146.    *Third*, the SaitaRealty Defendants led Saitama investors to reasonably expect that they would profit from their SaitaRealty investments, based on the SaitaRealty Defendants' managerial efforts.

147.    As noted, the SaitaRealty Defendants held themselves out as the managers of a project to increase the value of SaitaRealty, responsible for the development of the SaitaRealty ecosystem and for the investment of capital raised through SaitaRealty sales.

148.    The SaitaRealty Defendants explained on the SaitaRealty website how the capital raised from investors' SaitaRealty purchases would be invested and how returns on those investments would be distributed to SaitaRealty holders.

149.    Specifically, they stated that "Capital comes from a token tax per each transaction . . . .  The funds will then be used to purchase real property for development.  Once the real property generates revenue, the distribution is as follows:  50% Franchising and Expansion[;] 25% Profit Redistribution for Staked Coin Holders[;] 25% Outreach Initiative for Homeless Veterans and for Affordable Housing."

150.     In October 2023, the SaitaRealty Defendants announced, via the official SaitaRealty account on X, that they had acquired their first piece of physical real estate (a townhouse in Dubai) and promised "a future filled with many more such properties" that would "creat[e] the best portfolio possible for investors, and of course sharing profits on sells."

151.     In the fall of 2022, Armand, Tran, and Kohli announced on the SaitaRealty website that investors stood to profit not only from purchases of physical real estate, but from purchases of digital real estate located in the "metaverse": "We designed a plan that allows investors to help develop a realty ecosystem via strategic tokenomics that will collect the capital necessary to fund these new infrastructures while returning profit to the investors." The SaitaRealty Defendants launched a new application called SaitaCity, a "real estate market simulator" where players could build and trade property in the metaverse to earn profit, badges, and voting power, in what Armand, Tran, and Kohli claimed was a decentralized autonomous organization.

152.     A version of the SaitaRealty whitepaper dated October 5, 2022, stated that SaitaRealty would offer a "Value Proposition" for metaverse "real estate investors" by combining SaitaRealty's purported consumptive use as a currency with a built-in tax system to fund purchases of metaverse real estate. The whitepaper also stated that both SaitaRealty and Saitama tokens would be used by the developers in SaitaCity for purposes of "supply burn" and "funding."

153.     The SaitaRealty Defendants also led investors to reasonably expect to profit from their SaitaRealty investments by publicly touting the results of the SaitaRealty Defendants' efforts to have SaitaRealty listed on numerous trading platforms, where investors would be able to sell their SaitaRealty.

154.    For example, on March 25, 2022, the SaitaRealty Defendants used the official SaitaRealty account on X to inform the public that SaitaRealty had launched and was available to trade on SaitaMask, the smart wallet application Defendants created.  On April 26, 2022, the SaitaRealty Defendants posted to X that SaitaRealty would be "listed" (or made available for purchase) on LBank as of April 28, 2022.  Later, Defendants Armand, Tran, and Kohli informed investors that SaitaRealty was listed on two other exchanges, MEXC and XT.

155.    Leading up to SaitaRealty's launch and continuing thereafter, the SaitaRealty Defendants regularly promoted the investment on various social media platforms.

156.    At all relevant times, the SaitaRealty Defendants encouraged investors to purchase SaitaRealty, and provided specific instructions on how to do so on the SaitaRealty website.

157.    As a result of the above representations and the economic reality of what the SaitaRealty Defendants were offering and selling, SaitaRealty investors had a reasonable expectation of profiting from the SaitaRealty Defendants' efforts to develop the SaitaRealty ecosystem, to invest in physical and digital real estate, and to list SaitaRealty on trading platforms.

**FIRST CLAIM FOR RELIEF**
**UNREGISTERED OFFERINGS OF SECURITIES**
**(Violations of Sections 5(a) and 5(c) of the Securities Act by**
**Armand, Hernandez, Kohli, and Tran)**

158.    Paragraphs 1 through 157 above are re-alleged and incorporated by reference as if fully set forth herein.

159.    During the Relevant Period, Saitama was offered and sold as a security under Section 2(a)(1) of the Securities Act [15 U.S.C. § 77b(a)(1)].

160.    By reason of the conduct described above, Defendants, directly or indirectly:

40

(a) made use of the means or instruments of transportation or communication in interstate commerce or of the mails to sell, through the use or medium of a prospectus or otherwise, securities as to which no registration statement has been in effect and for which no exemption from registration has been available; and/or (b) made use of the means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell, through the use or medium of a prospectus or otherwise, securities as to which no registration statement has been filed and for which no exemption from registration has been available.

161.    As a result, Defendants violated Sections 5(a) and (c) of the Securities Act [15 U.S.C. §§ 77e(a), (c)] and will continue to violate those sections unless enjoined.

## SECOND CLAIM FOR RELIEF
### UNREGISTERED OFFERINGS OF SECURITIES
**(Violations of Sections 5(a) and 5(c) of the Securities Act by Armand, Kohli, and Tran)**

162.    Paragraphs 1 through 157 above are re-alleged and incorporated by reference as if fully set forth herein.

163.    During the Relevant Period, SaitaRealty was offered and sold as a security under Section 2(a)(1) of the Securities Act [15 U.S.C. § 77b(a)(1)].

164.    By reason of the conduct described above, defendants Armand, Kohli, and Tran, directly or indirectly:  (a) made use of the means or instruments of transportation or communication in interstate commerce or of the mails to sell, through the use or medium of a prospectus or otherwise, securities as to which no registration statement has been in effect and for which no exemption from registration has been available; and/or (b) made use of the means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell, through the use or medium of a prospectus or otherwise, securities as to which no registration statement has been filed and for which no exemption from registration has been

available.

165.    As a result, defendants Armand, Kohli, and Tran violated Sections 5(a) and (c) of the Securities Act [15 U.S.C. §§ 77e(a), (c)] and will continue to violate those sections unless enjoined.

**THIRD CLAIM FOR RELIEF**
**FRAUD IN THE OFFER OR SALE OF SECURITIES**
**(Violations of Sections 17(a) of the Securities Act)**

166.    Paragraphs 1 through 157 above are re-alleged and incorporated by reference as if fully set forth herein.

167.    During the Relevant Period, Saitama was offered and sold as a security under Section 2(a)(1) of the Securities Act [15 U.S.C. § 77b(a)(1)].

168.    By reason of the conduct described above, Defendants, in connection with the offer or sale of securities, by the use of the means or instrumentalities of interstate commerce or of the mails, directly or indirectly, acting intentionally, knowingly, recklessly, or negligently (i) employed devices, schemes, or artifices to defraud; (ii) obtained money or property by means of untrue statements of material facts or omissions to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (iii) engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon any persons, including purchasers or sellers of the securities.

169.    By reason of the conduct described above, Defendants violated Securities Act Sections 17(a)(1), (2), and (3) [15 U.S.C. §§ 77q(a)(1), (2), and (3)] and will continue to violate those sections unless enjoined.

## FOURTH CLAIM FOR RELIEF
## FRAUD IN CONNECTION WITH THE PURCHASE OR SALE OF SECURITIES
### (Violations of Section 10(b) of the Exchange Act and Rules 10b-5(a), (b), and (c))

170.    Paragraphs 1 through 157 above are re-alleged and incorporated by reference as if fully set forth herein.

171.    During the Relevant Period, Saitama was offered and sold as a security under Section 3(a)(10) of the Exchange Act [15 U.S.C. § 78c(a)(10)].

172.    By reason of the conduct described above, Defendants, directly or indirectly, in connection with the purchase or sale of securities, by the use of the means or instrumentalities of interstate commerce or of the mails, or of any facility of any national securities exchange, intentionally, knowingly, or recklessly, (i) employed devices, schemes, or artifices to defraud; (ii) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, and (iii) engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon any persons, including purchasers or sellers of the securities.

173.    By reason of the conduct described above, Defendants violated Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Rules 10b-5(a), (b), and (c) [17 C.F.R. §§ 240.10b-5(a), (b), and (c)] thereunder and will continue to violate those provisions unless enjoined.

## FIFTH CLAIM FOR RELIEF
## MARKET MANIPULATION
### (Violations of Section 9(a)(2) of the Exchange Act)

174.    Paragraphs 1 through 157 above are re-alleged and incorporated by reference as if fully set forth herein.

175.    During the Relevant Period, Saitama was offered and sold as a security under Section 3(a)(10) of the Exchange Act [15 U.S.C. § 78c(a)(10)].

176.    By reason of the conduct described above, Defendants, directly or indirectly, effected a series of transactions in a security not registered on a national securities exchange, creating actual or apparent active trading in such security, or raising or depressing the price of such security, for the purpose of inducing the purchase or sale of such security by others.

177.    By reason of the conduct described above, Defendants violated Exchange Act Section 9(a)(2) [15 U.S.C. § 78i(a)(2)] and will continue to violate that section unless enjoined.

## PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that this Court:

A.    Enter a permanent injunctions restraining Defendants, their agents, servants, employees and attorneys, and those persons in active concert or participation with them who receive actual notice of the injunction by personal service or otherwise, from violating Sections 5(a) and (c), and 17(a)(1), (2), and (3) of the Securities Act [15 U.S.C. §§ 77e(a), (c); 77q(a)(1), (2) and (3)], and Sections 9(a)(2) and 10(b) of the Exchange Act [15 U.S.C. §§ 78i(a)(2) and 78j(b)] and Rules 10b-5(a), (b), and (c) thereunder [17 C.F.R. §§ 240.10b-5(a), (b), and (c)].

B.    Order Defendants to disgorge, with prejudgment interest, all ill-gotten gains obtained by reason of the unlawful conduct alleged in this Complaint pursuant to Sections 21(d)(5) and (7) of the Exchange Act [15 U.S.C. §§ 78u(d)(5) and (7)];

C.    Order Defendants to pay civil monetary penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)];

D.    Enter an order prohibiting Defendants from participating, directly or indirectly, including but not limited to, through any entity controlled by them, in any offering of securities, including any crypto asset security, provided, however, that such injunction shall not prevent

them from purchasing or selling securities listed on a national securities exchange or their

personal accounts.

        E.      Enter an order, pursuant to Section 20(e) of the Securities Act [15 U.S.C. § 77t(e)]

and Section 21(d)(2) of the Exchange Act [15 U.S.C. § 78u(d)(2)], barring each of the

Defendants from acting as an officer or director of any issuer that has a class of securities

registered pursuant to Section 12 of the Exchange Act [15 U.S.C. § 78l] or that is required to file

reports pursuant to Section 15(d) of the Exchange Act [15 U.S.C. § 78o(d)].

        F.      Retain jurisdiction over this action to implement and carry out the terms of all

orders and decrees that may be entered; and

        G.      Grant such other and further relief as this Court may deem just and proper.

## **JURY DEMAND**

The Commission demands a jury in this matter for all claims so triable.


DATED:  October 9, 2024.



                            Respectfully submitted,


                            */s/ David J. D'Addio*
                            David J. D'Addio (Mass. Bar No. 665790)
                            Amy Harman Burkart (Mass. Bar No. 651828)
                            Jeffrey Cook (Fla. Bar No. 647578)
                            Joy Guo (N.Y. Bar No. 5294764)

                            SECURITIES AND EXCHANGE COMMISSION
                            Boston Regional Office
                            33 Arch St., 24th Floor
                            Boston, MA 02110
                            Phone:  (617) 573-4526 (D'Addio direct)
                            Fax:  (617) 573-4590 (fax)
                            Daddiod@sec.gov (D'Addio email)