**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | | |
|---|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,** | § | |
| | § | |
| **Plaintiff,** | § | **No. 1:24-cv-12586-AK** |
| | § | |
| **v.** | § | |
| | § | |
| **RUSSELL ARMAND, et al.,** | § | |
| | § | |
| **Defendants.** | § | |
| | § | |

# MEMORANDUM OF LAW IN OPPOSITION TO THE DEPARTMENT OF JUSTICE'S MOTION TO INTERVENE AND FOR A STAY PENDING RESOLUTION OF THE CRIMINAL CASE

Eric S. Rosen
DYNAMIS LLP
225 Franklin St., 26th Floor
Boston, MA 02110
(646) 541-8484
erosen@dynamisllp.com

Michael B. Homer
DYNAMIS LLP
225 Franklin St., 26th Floor
Boston, MA 02110
(617) 693-9732
mhomer@dynamisllp.com

*Attorneys for Defendant Kohli*

# TABLE OF CONTENTS

**Page**

I.     Preliminary Statement ........................................................................................ 1

II.    Factual Background ......................................................................................... 2

    A.  Overview of the Charges ............................................................................ 2

    B.  The Allegations and Proceedings Against Manpreet Kohli ........................... 4

    C.  Status of the Other Cases ............................................................................ 5

III.   The Government's Request for a Stay Should Be Denied .................................... 6

    A.  Legal Standard ......................................................................................... 7

    B.  Staying the SEC Against Mr. Kohli Would Unduly Prejudice Him ................... 8

    C.  The DOJ's Boilerplate Motion Presents No Specific Reason Why a Stay is Needed ....... 13

IV.   Conclusion ..................................................................................................... 16

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Austin v. Unarco Indus., Inc.,* 705 F.2d 1 (1st Cir. 1983) .............................................................7

*Microfinancial, Inc v. Premier Holidays Intern., Inc*., 385 F.3d 72 (1st Cir. 2004) .......................7

*New England Sports Network, LP v. Alley Interactive, LLC*
2023 WL 2140474 (D. Mass. Feb. 21, 2023) ....................................................................12, 15

*SEC v. Balwani*, No. 5:18-cv-01603-EJD, 2019 WL 2491963 (N.D. Cal. 2019) ......................7–8

*SEC v. Cioffi*, No. 08-CV-2457, 2008 WL 4693320 (E.D.N.Y. Oct. 23, 2008)............................8

*SEC v. Fraser*, No. CV–09–00443, 2009 WL 1531854 (D. Ariz. June 1, 2009) ...........................8

*SEC v. Kanodia*, 153 F. Supp. 3d 478 (D. Mass. 2015) ...............................................7–8, 13, 15

*SEC v. Mazzo*, No. SACV 12–1327–DOC, 2013 WL 812503 (C.D. Cal. Feb. 25, 2013) ..........7–8

*SEC v. Nicholas*, 569 F. Supp. 1065 (S.D. Ca. 2008)..................................................................13

*SEC v. O'Neill*, 98 F. Supp. 3d 219 (D. Mass. 2015) .........................................................6–8, 15

*SEC v. Sandifur*, No. C05–1631 C, 2006 WL 3692611 (W.D. Wash. Dec. 11, 2006)...................7

**Other Authorities**

Fed. R. Civ. P. 24 ........................................................................................................................6

## I.     <u>PRELIMINARY STATEMENT</u>

The Securities and Exchange Commission ("SEC") and the Department of Justice ("DOJ") together investigated the individuals involved with the Saitama project. The SEC then went ahead and filed a Complaint (Dkt. 1) against Defendant Manpreet Kohli. The Complaint was filed at almost the same time in October 2024 that the DOJ unsealed its own Indictment against Kohli. Both the DOJ and the SEC published press releases within days of each other, highlighting the cases the agencies filed against Kohli.[1] The SEC then, shortly after Kohli's arrest in the United Kingdom on the DOJ charges, made the effort to serve Kohli with the Complaint in the UK, thereby forcing him to engage counsel and spend money to file a motion to dismiss.

Now, having received every benefit of a parallel investigation and having received credit for filing two cases by two different agencies against Kohli, the DOJ, apparently surprised that Kohli would attempt to defend himself, has now filed a motion to halt the SEC case, even before the SEC has had a chance to respond to Kohli's motion to dismiss—and well before this Court has had an opportunity to rule on Kohli's motion to dismiss. In effect, the Government wants to have its cake (file two cases in parallel) and eat it too (prevent Kohli from defending himself).

The Government's brief recites a few different factors as to why a stay is warranted; however, the primary reason offered by the Government is that they do not want Kohli to "abuse" the Federal Rules of Civil Procedure to assist himself in the criminal action. But this logic makes no sense for many reasons, as set forth below. But perhaps most importantly, the DOJ and SEC knew, *before* they filed parallel actions, that the Federal Rules of Civil Procedure existed and that discovery was permitted under *those rules*. Knowing this, the DOJ and SEC worked together in

---

[1] *See* https://www.justice.gov/usao-ma/pr/eighteen-individuals-and-entities-charged-international-operation-targeting-widespread; https://www.sec.gov/enforcement-litigation/litigation-releases/lr-26155.

parallel and then the SEC went ahead and filed a Complaint and served that Complaint on Kohli anyway. To the extent that the DOJ suffers any harm from the continuation of the SEC's case, it is a self-inflicted wound. If the DOJ is so worried about civil discovery, the SEC can dismiss its case. For this reason, and for many others articulated below, the DOJ's motion must be denied.

II.    **FACTUAL BACKGROUND**

A. *Overview of the Charges.*

This criminal case is part of what appears to be a five-defendant alleged conspiracy to commit fraud and market manipulation with respect to the Saitama token, as well as operate as part of an unlicensed money transmitting business. The defendants are charged in three separate charging instruments, all of which are similar.

On June 27, 2024, a grand jury returned an indictment charging Manpreet Kohli, Nam Tran and Haroon Mohsini with a conspiracy to commit market manipulation, to operate an unlicensed money transmission business, and to commit wire fraud. 24-CR-10189-AK (Dkt. 1) (the "Indictment"). In addition, the Indictment included three substantive charges of market manipulation. Count Two charged Kohli with market manipulation related to Saitama Token on July 3, 2021. *Id*. at 14. Counts Three and Four charged Nam Tran and Haroon Mohsini with that same market manipulation. *Id*. at 15–16. Count Five charged Mohsini with wire fraud for sending an electronic message on July 3, 2021 to a co-conspirator (Maxwell Hernandez); Count Six charged Nam Tran with wire fraud for an electronic message he sent to a co-conspirator (Maxwell Hernandez); and, Count Seven charged Kohli with wire fraud for a February 14, 2022 message he sent to Hernandez that stated: "US is easiest to get in trouble lol." *Id*. at 17–18.

On October 9, 2024, the SEC filed a civil complaint against Kohli, Nam Tram, Russell Armand, and Maxwell Hernandez. Dkt. 1. Mohsini, who was charged criminally, was *not* charged

in the civil complaint. Accompanying the filing was a lengthy press release put out by the SEC, which provided a link to the Complaint.[2] The press release described an alleged fraudulent scheme involving Kohli and others, and further described how the SEC had already settled the case with two alleged co-conspirators, Armand and Hernandez. The release listed seven SEC employees who were responsible for the case, and an additional six SEC attorneys who supervised the filing. The SEC wrote in the press release that it appreciated the "assistance of the FBI" and the US Attorney's Office for Massachusetts, which "has announced parallel criminal actions."

The civil complaint alleges that Armand, Hernandez, Kohli and Tran violated Sections 5(a) and 5(c) of the Securities Act by selling Saitama, which the SEC alleges is a security. Dkt. 1 at ¶¶ 158–61. The SEC also alleges, in its Second Claim, violations of those same sections for selling SaitaRealty, another token. Dkt. 1 at ¶¶ 162–65. The SEC further alleges that all the defendants committed fraud in violation of Section 17(a) of the Securities Act (¶¶ 166–69) and Section 10(b) of the Exchange Act (¶¶ 170–73) through their sales and promotion of Saitama. Last, the SEC contends that the defendants engaged in market manipulation as it relates to Saitama in violation of Section 9(a)(2) of the Exchange Act. Id. at ¶¶ 174–77.

Although the charges are somewhat different (the SEC is, of course, limited to charges related to securities), the facts of the civil and criminal actions do have some overlap. Effectively, both the DOJ and SEC allege that beginning in June 2021, and continuing through at least 2022, the conspirators manipulated the trading of Saitama Tokens, solicited investors to buy Saitama Tokens through the Internet, made material false statements about Saitama, sold Saitama tokens while telling others that they were not doing so, and moved Saitama's operations offshore. In

---

[2] https://www.sec.gov/enforcement-litigation/litigation-releases/lr-26155 (attached hereto as Exhibit A).

effect, the DOJ and SEC charge Kohli and the others with fraudulently pumping and dumping the Saitama token in order to make money for themselves.

However, despite this factual overlap, there are important differences between the DOJ Indictment and the SEC Complaint. As examples, the Indictment charges that the defendants created and operated an unlicensed money transmitting business, the Complaint does not. The Indictment effectively stops in July 2022, but the Complaint includes detailed allegations going through at least September 2023. The Complaint focuses significantly on a second token called "SaitaRealty," while the Indictment does not include this SaitaRealty token.[3] The Complaint talks about hiring third-party market makers to manipulate the price of Saitama in 2023, but the Indictment ends well before that is alleged to have taken place.[4] Finally, the Complaint includes a whole section on the SaitaMask trading platform, which the Indictment does not include. These are just some of the differences between the two charging instruments.

    *B.  The Allegations and Proceedings Against Manpreet Kohli.*

The Indictment consists of primarily general references to Kohli, grouping Kohli together with the other defendants but without specifically explaining what he did. In fact, the only specific references to statements made by Kohli himself are a series of electronic messages on July 3, 2021, and a February 14, 2022 message where Kohli allegedly informed the group that they needed to avoid the United States. Indictment at 5–7, 18. Likewise, although the SEC complaint is 45 pages long, it also includes few references to statements actually made by Kohli.  The Complaint includes

---

[3] SaitaRealty and SaitaMarket are briefly mentioned in passing. *See* Indictment at ¶ 8.

[4] The Indictment does allege that the defendants hired Company 1 and Company 2 to buy Saitama Tokens in order to artificially inflate the price, but it is unclear exactly what that refers to. Presumably, those companies are Gotbit and XM Quant, as mentioned in the SEC's complaint, but those allegations primarily concern activities in 2023 (well after the Indictment ends), with only brief mentions of 2021 with respect to ZM Quant.

the July 3, 2021 text messages and the July 25, 2021 and November 8, 2021 posts to Twitter. Dkt. 1 at ¶¶ 81–85, 124, 133. There are no other specific allegations about what Kohli himself allegedly falsely told potential purchasers of Saitama.

Nonetheless, in October 2024, Kohli was arrested at his home in the United Kingdom on the DOJ charges. All of his electronic devices—phones and computers, including the devices of his family—were seized by the police in the United Kingdom. In addition, Kohli has been prohibited from leaving the United Kingdom, and his passport and travel documents were confiscated. The DOJ has also commenced extradition proceedings, with the first hearing to be held in June 2025. Shortly after his arrest, Kohli was served by the SEC in the United Kingdom with its Complaint, and on January 31, 2025, Kohli moved to dismiss the Complaint.

   *C.  Status of the Other Cases Involving Alleged Co-Conspirators.*

On May 23, 2023, Hernandez pled guilty to an Information charging him with conspiracy to commit wire fraud and conduct an unlicensed money transmitting business and market manipulation. *See* Dkt. 23-CR-10135-AK. On January 30, 2024, Armand pled guilty to an Information containing those same charges. *See* Dkt. 24-CR-10014-AK. Given the fact that Armand and Hernandez pled guilty to Informations and sentencing has been delayed, the defense presumes that these individuals are cooperating with the Government's investigation.

Subsequent to the filing of the Complaint, the SEC moved this Court to enter consent judgments for Defendants Hernandez and Armand. Dkt. 4; Dkt. 5. As set forth in the consent judgments, which were signed by both defendants, Hernandez and Armand provided that they were pleading guilty to conspiracy and market manipulation counts in the parallel criminal proceeding, agreed to the entry of the judgment, and confirmed that they would: not: "take any action or make or permit to be made any public statement denying, directly or indirectly, any

allegation in the complaint or creating the impression that the complaint is without factual basis," or "make or permit to be made any public statement to the effect that Defendant does not admit the allegations of the complaint, or that this Consent contains no admission of the allegations," and each defendant "stipulates" that the "allegations in the complaint are true[.]" Dkt. 5-2 at ¶ 12; Dkt. 4-1 at ¶ 12.

Two other defendants were charged in the Indictment—Nam Tran and Haroon Mohsini. Indictment at 1. Tran has not been arrested and he is presumed to be overseas. Mohsini, a Texas resident, was arrested as part of the Indictment that includes Kohli, but has *not* been charged by the SEC. Discovery appears to be proceeding in the case against Mohsini, as the January 6, 2025 status report indicates. *See* 24-CR-10189-AK, Dkt. 31. The Government has made an "initial production of discovery" and neither party "presently anticipates seeking a protective order" concerning the discovery. *Id*. No trial date has yet been set.

### III.    THE GOVERNMENT'S REQUEST FOR A STAY SHOULD BE DENIED

The DOJ has moved to intervene and stay the SEC case pending the completion of the criminal case against Kohli, arguing broadly that a stay is necessary to protect the integrity of the pending criminal case. While the defense does not object to the DOJ intervening in the case pursuant to Rule 24(b) of the Federal Rules of Civil Procedure, the Government's motion to stay the case should be denied.[5]

---

[5] The defense does not believe the DOJ can intervene as of right under Fed. R. Civ. Pro 24(a), but rather that intervention is permissible under Fed. R. Civ. Pro. 24(b)(1)(B). *See SEC v. O'Neill*, 98 F. Supp. 3d 219, 221 (D. Mass. 2015) ("*O'Neill*").

A. *Legal Standard.*

The First Circuit is clear that a movant (here, the DOJ) carries a "heavy burden" to prevail in a motion to stay a related case. *See Microfinancial, Inc v. Premier Holidays Intern., Inc.*, 385 F.3d 72, 76 (1st Cir. 2004) (citing *Austin v. Unarco Indus., Inc.,* 705 F.2d 1, 5 (1st Cir. 1983) (explaining that the movant must demonstrate "a clear case of hardship" to be entitled to a discretionary stay)). In determining whether to grant or deny a stay, a court must weigh "competing interests," which is a "situation-specific task," where the "inquiring court must take a careful look at the idiosyncratic circumstances of the case before it." *Microfinancial*, 385 F.3d at 78. [6]

Notably, courts "have looked with disfavor to the Government's request for a stay when a branch of the Government, and not private parties, has brought the civil lawsuit that a U.S. Attorney's office is then seeking to stay." *SEC v. Balwani*, No. 5:18-cv-01603-EJD, 2019 WL 2491963, at *2 (N.D. Cal. 2019) (quoting *SEC v. Mazzo*, No. SACV 12–1327–DOC, 2013 WL 812503, at *2 n.3 (C.D. Cal. Feb. 25, 2013) ("*Mazzo*")) ("*Balwani*"). Put simply, "the government cannot elect to bring parallel civil and criminal proceedings and then complain about the effects." *SEC v. Kanodia*, 153 F. Supp. 3d 478, 482 (D. Mass. 2015) ("*Kanodia*"); *see also O'Neill*, 98 F. Supp. 3d at 221; *SEC v. Sandifur*, No. C05–1631 C, 2006 WL 3692611, at *2 (W.D. Wash. Dec. 11, 2006) ("[a]lthough courts have been receptive to Government stay requests in civil cases brought by parties other than the Government[,] [c]ourts regularly deny stays when civil regulators have worked directly in concert with the criminal prosecutors during the investigation").

---

[6] In *Microfinancial*, the First Circuit ruled: "Notwithstanding that each instance is *sui generis*, the case law discloses five factors that typically bear on the decisional calculus: (i) the interests of the civil plaintiff in proceeding expeditiously with the civil litigation, including the avoidance of any prejudice to the plaintiff should a delay transpire; (ii) the hardship to the defendant, including the burden placed upon him should the cases go forward in tandem; (iii) the convenience of both the civil and criminal courts; (iv) the interests of third parties; and (v) the public interest." 385 F.3d at 78.

Indeed, as the court wrote in *Balwani*, "the vast majority of cases hold that such a stay is improper absent a specific showing of prejudice that cannot be remedied by anything other than a complete stay of the civil proceeding." *Balwani*, 2019 WL 2491963, at *2 (quoting *SEC v. Fraser*, No. CV–09–00443, 2009 WL 1531854, at *3 (D. Ariz. June 1, 2009)); *see also O'Neill,* 98 F. Supp. 3d at 221; *Mazzo*, 2013 WL 812503, at *2; *Kanodia*, 153 F. Supp. 3d at 481 (citing *SEC v. Cioffi*, No. 08-CV-2457, 2008 WL 4693320, at *1 (E.D.N.Y. Oct. 23, 2008) ("Courts are justifiably skeptical of blanket claims of prejudice by the government where—as here—the government is responsible for the simultaneous proceedings in the first place.")).

B. *Staying the SEC Against Mr. Kohli Would Unduly Prejudice Him.*

**The DOJ and SEC cannot work together to bring parallel cases and then deprive Mr. Kohli of an opportunity to fight the charges**. It is undisputed that the DOJ and SEC worked in parallel to bring both the civil and criminal cases. Indeed, the SEC's own press release reflects that joint effort. It is undisputed that the SEC *chose* to file a Complaint in federal court against Kohli, and then chose to publicize that Complaint on their website. The SEC then, again voluntarily, chose to serve Kohli in the United Kingdom, thereby forcing him to either move to dismiss or answer the Complaint. In short, two federal agencies have aimed their fire against Kohli and have publicized the fact that Kohli has been charged by both federal agencies who worked *together* on both these matters, and now, when Kohli has decided to *defend* himself against the charges, the DOJ has moved to intervene to prevent Kohli from doing so.

This is exactly the type of gamesmanship that courts in this District have rejected. *See, e.g., O'Neill*, 98 F. Supp. 3d at 222 (denying motion to stay and explaining that conducting discovery in two parallel matters is "the risk[] that the government and the SEC run when they elect to pursue parallel investigations and prosecutions."). Indeed, it is puzzling why the SEC does "not oppose a

stay," given that it is the SEC that elected to file and prosecute its case and serve the Complaint upon Mr. Kohli in the United Kingdom. Dkt. 19 at 6. Powerful government agencies should not be in the business of commencing cases against individuals and then staying the case when it becomes too burdensome to prosecute. To the extent that the DOJ and the SEC come to the agreement that the SEC case is interfering with the DOJ case, the proper remedy is for the SEC to dismiss its case, not to "stay" it pending the outcome of criminal proceedings for which Mr. Kohli has not yet even been formally arraigned.

The gamesmanship is particularly acute here given that Mr. Kohli was forced to spend time and resources crafting a motion to dismiss the SEC's case, which was filed on January 31, 2025. Dkt. 16. Rather than have this Court rule on the motion, the DOJ wants to "stay" the case to save the SEC from potentially have an adverse decision issued against the agency. This is unfair. Mr. Kohli has a right to challenge the case against him, and he should not be forced to spend resources to challenge a case only to have the SEC being given the benefit of not having to respond to his motion to dismiss. For this reason, and the others set forth below, the Government's claim that Kohli will not be "prejudiced" by a stay is untrue. Dkt. 19 at 11.

**A "stay" of the SEC case would deprive Mr. Kohli of evidence needed to contest extradition as well as limit his ability to preserve evidence for future use.** As the court is aware, the DOJ convinced the United Kingdom police to arrest Mr. Kohli on the US criminal charges. In addition, Mr. Kohli's travel has been limited to the UK (his passport was seized), and his electronic devices were all taken. The DOJ has launched extradition proceedings against Mr. Kohli, with the first hearing occurring in June.

Mr. Kohli intends to challenge extradition. His chances of preventing extradition went up markedly, as the UK Supreme Court issued the recent decision denying extradition in the case of

*El-Khouri v. United States*. *See* <u>Exhibit B</u>. While beyond the subject of this opposition, the thrust of *El-Khouri's* case (who was charged with insider trading) is that when conduct affecting the United States was committed primarily outside the United States, the UK courts must determine, in analyzing the dual-criminality issues inherent within extradition cases, whether their own statutes also applie extraterritorially. If the UK statute at issue does not have extraterritorial application, there is no dual-criminality, even if the US statute does apply extraterritorially. This case promises to be critical to the extradition proceedings going forward, as it does not appear that the applicable UK statutes mimic those of the US with respect to their application to conduct that has taken place outside of the country.

As applicable here for purposes of the DOJ's motion to stay, the ability of Mr. Kohli to obtain discovery in the SEC case—discovery that will demonstrate that Mr. Kohli's conduct occurred outside the US—will be critical to fighting extradition in the criminal matter. Accordingly, a stay of discovery would prejudice Mr. Kohli in his fight against extradition.

Similarly, given that extradition can take considerable time (multiple years), it is important for Mr. Kohli to preserve and collection evidence that could later be used against him. The events at issue are already years' old—2021 to 2023. If civil discovery does not commence until 2027 or later, as extradition can be quite slow, it is inevitable that witnesses' memories will fade and electronic data will be lost.

**A stay of the SEC case would deprive Mr. Kohli of an ability to take advantage of the SEC's new outlook on crypto-related cases.** As the Court may be aware, the SEC appears to recently be trending in a different direction with respect to crypto that may be beneficial to Mr. Kohli. As examples, in June 2023, the SEC charged Coinbase, a major crypto exchange, with, in

summary, operating an unlicensed securities exchange.[7] Count Five against Coinbase was for violations of Sections 5(a) and 5(c) of the Securities Act, which prohibits the offer or sale of securities (crypto) without a registration statement. Just last week, it was reported that the SEC has agreed to dismiss the case against Coinbase.[8] Coinbase does not appear to be the only beneficiary of the SEC's change of heart. The SEC's case against the crypto exchange Binance, which also charges claims under Sections 5(a) and 5(c) of the Securities Act, has now been stayed for a period of 60 days. *See* 23-CV-1599-ABJ, Dkt. 282, 296. What this indicates is that the SEC is rethinking its approach to crypto and declining to charge crypto companies with the strict-liability offense of the unregistered offering of securities.

Here, Claim One of the SEC's case against Kohli alleges charges under Sections 5(a) and 5(c) of the Securities Act, which are the same claims at issue in the Coinbase and Binance litigations. Dkt. 1 at ¶¶ 158–61. Staying this case for years while the DOJ case drags on could result in precluding Mr. Kohli from challenging the Section 5 claims and/or having those particular claims dismissed.

Finally, and perhaps most importantly, on February 27, 2025, the SEC issued a "staff statement" declaring that "meme" coins ("a type of crypto asset inspired by internet memes, characters, current events, or trends for which the promoter seeks to attract an enthusiastic online community to purchase the meme coin and engage in its trading") were no longer considered to be securities, thereby depriving the SEC of jurisdiction over a significant swath of the crypto community.[9] Here, while the SEC may claim otherwise, the Saitama coin at issue was inspired by the "Saitama One-Punch Man" character, which could relegate the coin to "meme" status.

---

[7] *See* https://www.sec.gov/newsroom/press-releases/2023-102.
[8] *See* https://www.nytimes.com/2025/02/21/technology/coinbase-sec-lawsuit.html.
[9] *See* https://www.sec.gov/newsroom/speeches-statements/staff-statement-meme-coins.



**A stay of the SEC proceeding against Mr. Kohli makes little sense given that the criminal case against Mr. Mohsini is continuing**. Critically, Mr. Kohli is not the only person charged in his Indictment. Mr. Mohsini, a US resident, was also charged in the Indictment, and his case is proceeding to trial. Importantly, evidence, including witness reports, will be provided to Mr. Mohsini. And if Mr. Mohsini's case goes to trial—there is nothing on the docket indicating that he is preparing to plead guilty—the Government's witnesses will testify and be subject to cross-examination by defense counsel in that case. Accordingly, and as further discussed below, while the Government fears that Mr. Kohli will have an unfair advantage by being able to depose the Government's witnesses, there is a strong likelihood that the Government's witnesses, by the time depositions are scheduled in this case, will have already been subject to cross-examination at trial.

Likewise, although the DOJ generically argues that some witnesses may have to exercise their Fifth Amendment rights if discovery were to commence, as described above, the two main witnesses—Russel Armand and Maxwell Hernandez—have already pled guilty and have even signed SEC settlement agreements, by which they agree not to contest the allegations in the case. Thus, for at least the most important witnesses the Fifth Amendment should not be an obstacle.

*C.  The DOJ's Boilerplate Motion Presents No Specific Reason Why a Stay is Needed.*

While there are many reasons *not* to stay this case, the DOJ, in seeking a stay, fails to put forth any colorable claims for why a stay *is* merited. Instead, the SEC provides a list of generic reasons, lacking any real detail, and which fail to demonstrate any prejudice, let alone the "clear case of hardship" that is required to stay a parallel civil case.

**First, the DOJ contends that a stay is appropriate when there is substantial overlap between the DOJ and SEC cases**. But the DOJ does not cite a single First Circuit or District of Massachusetts case standing for that proposition, instead choosing to rely on a 2008 case from the Central District of California—*SEC v. Nicholas*, 569 F. Supp. 1065 (S.D. Ca. 2008) ("*Nicholas*"). As an initial matter, case "overlap" is not the most important factors for courts to consider. *See New England Sports Network, LP v. Alley Interactive, LLC*, 2023 WL 2140474, at *3 (D. Mass. Feb. 21, 2023) (describing "overlap" as just "another factor" that courts consider).

In addition, the one case in this District that engages with *Nicholas* is *Kanodia*, 153 F. Supp. 3d 478, which rejected the *Nicholas* holding. The *Kanodia* court explained that *Nicholas* was a case where the volume of discovery was "massive," and involved "eighty-eight options grants" and "twelve claims of securities fraud." 153 F. Supp. 3d at 482. A stay was needed because, in part, allowing both cases to proceed would "divert the Court's attention with burdensome discovery litigation and duplicative law and motion." *Nicholas*, 569 F. Supp. 2d at 1067. Here, the DOJ does not make the argument that this case is so massive that a stay is needed, thereby distinguishing *Nicholas* on that ground alone.

Further, to accept the DOJ's logic would mean that every case where there is parallel litigation between the DOJ and SEC would result in the stay of the civil case as, by definition, a parallel case necessarily involves significant overlap as they are the product of the same

investigation. But even accepting the DOJ's argument that an "overlap" requires a stay, as discussed above there are important differences in time, scope and charges between the DOJ Indictment and the SEC case. The SEC case involves far more conduct than the DOJ case, such that resolution of the DOJ case will not necessarily resolve all or even most of the issues in the SEC case.

Most importantly, however, as discussed above, the critical factor in determining whether a stay is appropriate is any claims of specific prejudice that a party may suffer from having to litigate on two fronts. Here, although the DOJ articulates how the cases overlap, the DOJ fails to articulate, at all, how the DOJ is prejudiced from such overlap.

**Second, the DOJ's contention that the "public interest" mandates a stay has been rejected multiple times in this District**. The DOJ makes the argument, long since discredited in this district, that defendants can find "various ways to impede parallel criminal proceedings," which necessarily entails the "abuse [of] civil discovery to circumvent limitations on discovery in criminal cases." Dkt. 19 at 708.

*First*, the DOJ and the SEC knew that that the SEC's action would entail civil discovery *before* they both filed cases involving the same subject matter at the same time. If the Government believed that civil discovery *in this matter* may "impede [the] parallel criminal case," it is unclear why the SEC brought the civil case to begin with. Certainly, the DOJ and SEC would have been aware that potential witnesses would be deposed in a civil case. The solution is not now to prohibit Mr. Kohli from defending himself while the SEC gets the benefit of well-publicized press release.

*Second*, the DOJ's demand that the defense be prohibited from using the tools of civil discovery is ironic given that the SEC and DOJ, by the SEC's own admission, worked in parallel to bring this case. The SEC typically sends out subpoenas and takes testimony of witnesses, all of

14

which can then be provided to the DOJ for their own investigation. Having taken advantage of a parallel proceeding with civil and criminal discovery tools, the DOJ cannot now turn around and claim that it is the *defendant* who is attempting to "abuse" the well-settled Federal Rules of Civil Procedure to defend himself. Dkt. 19 at 8. The defense is simply attempting to use the tools that have long since been provided for in the Rules. That is not and cannot be "abuse." *Id*.

*Third*, the Government's motion speaks in generalities. The motion provides no specifics on why civil discovery in this case will impede the criminal case. That alone is grounds for denial of the motion. Further, upon reading the Government's brief, the Government is not concerned so much with their case being impeded, but rather with the defense being provided with a so-called "improper advantage" from being allowed to "interrogate witnesses" and receive "Jencks Act" materials early. Dkt. 19 at 9. This generic concern has been rejected in this District. *See, e.g.*, *New England Sports Network*, 2023 WL 2140474, at *4; *Kanodia*, 153 F. Supp. 3d at 484; *O'Neill*, 98 F. Supp. 3d at 224. These cases held, in effect, that the "SEC and the U.S. Attorney's Office cannot pursue a strategy that allows them to take advantage of dual prosecutions, but then complain when the defendants, too, find ways to benefit from the otherwise burdensome task of having to defend on two fronts at the same time." *Kanodia*, 153 F. Supp. 3d at 484. As the *O'Neill* court wrote: "evidence supporting an indicted criminal case ought to be able to survive scrutiny, and the government should not be so invested in withholding information until disclosure is required— after all, the goal is a just resolution in both the civil and criminal cases, and there is no doubt that confidence in an outcome is highest where the evidence is known and can be tested." *O'Neill*, 98 F. Supp. 3d at  224.

*Fourth*, the Government engages in speculation when it argues that Kohli already has, due to his motion to dismiss, "an opportunity to seek discovery for use in the criminal case." Dkt. 19

at 9. The SEC has not provided discovery, has not filed an opposition to Kohli's motion to dismiss, and this Court has not ordered an evidentiary hearing. But even if the Government's arguments were grounded in reality, that still is not a basis to completely stay a case. Kohli has the right to move to dismiss the case which was filed and served upon him.

**Third, the Government's demand for a stay due to unnamed "efficiencies" cannot be credited**. In its final argument, the Government points to unnamed "efficiencies" that will result if the case is stayed. Dkt. 19 at 11. Namely, the Government expects Kohli to be convicted, which will narrow the issues in the case. As an initial matter, it is unclear how many issues would necessarily be narrowed. Many of the charges against Kohli in the civil case are different from those brought by Indictment. Indeed, the only overlap appears to be dual claims of "market manipulation" by both the DOJ and the SEC. But even accepting the Government's argument, the DOJ has not presented any evidence that Kohli will necessarily be convicted at trial. The Government's motion presupposes guilt without providing any evidence. It would be highly inefficient if, as the Government proposes, Kohli was extradited in a few years and then was *acquitted* at the criminal trial. The civil case, long dormant, would then have to be resurrected by this Court years after it was filed. That is not efficiency.

## IV.    <u>CONCLUSION</u>

For these reasons, the DOJ's motion for a stay should be denied.

Dated: February 28, 2025

Respectfully submitted,

*/s/  Eric S. Rosen*
Eric S. Rosen
DYNAMIS LLP
225 Franklin St., 26th Floor
Boston, MA 02110
(646) 541-8484
erosen@dynamisllp.com

Michael B. Homer
DYNAMIS LLP
225 Franklin St., 26th Floor
Boston, MA 02110
(617) 693-9732
mhomer@dynamisllp.com

*Attorneys for Defendant Kohli*

17

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on February 28, 2025, a true and correct copy of the foregoing document was served by e-filing upon counsel of record.

<u>/s/  Eric S. Rosen</u>
Eric S. Rosen
DYNAMIS LLP
225 Franklin St., 26th Floor
Boston, MA 02110
(646) 541-8484
erosen@dynamisllp.com

# EXHIBIT A



**U.S. Securities and Exchange Commission**

Home / Enforcement and Litigation / Litigation Releases / Russell Armand, Maxwell Hernandez, Manpreet Singh Kohli, and Nam Tran

# Russell Armand, Maxwell Hernandez, Manpreet Singh Kohli, and Nam Tran

## U.S. SECURITIES AND EXCHANGE COMMISSION
## Litigation Release No. 26155 / October 15, 2024

### *Securities and Exchange Commission v. Russell Armand, Maxwell Hernandez, Manpreet Singh Kohli, and Nam Tran*, No. 1:24-cv-12586-AK (D. Mass. filed Oct. 9, 2024)

### SEC Charges Four Promoters in Crackdown on Manipulation of Crypto Assets Offered and Sold as Securities

The Securities and Exchange Commission announced fraud charges against four individuals for engaging in schemes to manipulate the markets for two crypto assets, "Saitama Inu" and "SaitaRealty," being offered and sold as securities to retail investors. As alleged, the schemes were intended to induce investor victims to purchase the crypto assets by creating the false appearance of an active trading market for them.

According to the SEC's complaint, crypto asset promoters Russell Armand, a resident of Texas, Maxwell Hernandez, a resident of Massachusetts, Manpreet Singh Kohli, a resident of India and England, and Nam Tran, an apparent resident of Washington, through the "Saitama" website, whitepaper, and social media statements, allegedly made public misrepresentations about their team's development of a "Saitama ecosystem" of multiple

products (including smart wallet applications and trading platforms) to artificially increase the value of the Saitama Inu crypto asset. The defendants also made allegedly false statements about buying or holding Saitama Inu while surreptitiously selling substantial amounts of the crypto asset. The defendants also allegedly engaged in market manipulation themselves and hired so-called market makers ZM Quant Investment Ltd. and Gotbit Consulting LLC to provide market-manipulation-as-a-service, which included generating artificial trading volume or manipulating the price of the Saitama Inu and SaitaRealty crypto assets that were offered and sold as securities to retail investors in unregistered transactions.

The SEC's complaint, filed in the United States District Court for the District of Massachusetts, alleges that all defendants violated Sections 5(a), 5(c), and 17(a) of the Securities Act of 1933 and Sections 9(a)(2) and 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 thereunder. The complaint seeks permanent injunctions, conduct-based injunctions, disgorgement of allegedly ill-gotten gains plus pre-judgment interest, civil penalties, and officer-and-director bars against all the defendants. Armand and Hernandez consented to bifurcated settlements, subject to court approval, permanently enjoining them from violating the charged provisions of the federal securities laws, subjecting them to conduct-based injunctions, and barring them from acting as officers or directors. The court will determine the amount of disgorgement and prejudgment interest and any civil penalties.

The SEC appreciates the assistance of the FBI and the United States Attorney's Office for the District of Massachusetts, which has announced parallel criminal actions.

The SEC's investigation was conducted by David D'Addio, Amy Harman Burkart, Ivan Panchenko, Jeffrey Cook, and John McCann in the SEC's Boston Regional Office, as well as Colin Missett and Joy Guo of the Crypto Asset and Cyber Unit (CACU). They were supervised by Amy Gwiazda, Michael Brennan, Donald Battle, and Jorge Tenreiro of CACU and by Celia Moore and John T. Dugan of the Boston Regional Office. The team also thanks the staff of the SEC's Office of Strategic Hub for Innovation and Financial Technology for their assistance. The litigation will be led by Mr. D'Addio and Ms. Burkart.

## RESOURCES

- **SEC Complaint**

EXHIBIT B




 Home > Cases

# El-Khouri (Appellant) v Government of the United States of America (Respondent)

## Case summary

### Case ID

UKSC/2023/0127

### Parties

#### Appellant(s)

Joseph El-Khouri

#### Respondent(s)

Government of the United States of America

### Judgment appealed

 [2023] EWHC 1878

HTML

## Judgment details

### Judgment date

12 February 2025

## Neutral citation

[2025] UKSC 3

## Hearing dates

### Full hearing

### Start date

9 October 2024

### End date

18 November 2024

## Justices

 Lord Reed

 Lord Briggs

 Lord Stephens

 Lord Lloyd-Jones

 Lord Leggatt

## Judgment details

# Hilary Term 2024

**LORD LLOYD-JONES AND LORD LEGGATT (with whom Lord Reed, Lord Briggs and Lord Stephens agree):**

1. This appeal concerns the definition of an "extradition offence" and the operation of the double criminality rule in section 137 of the Extradition Act 2003 ("the 2003 Act").

2. The United States of America seeks the extradition of the appellant, Mr El-Khouri, a dual UK / Lebanese national living in the United Kingdom, to be prosecuted in the US District Court for the Southern District of New York. The United States is designated as a category 2 territory under section 69 of the 2003 Act (by virtue of the Extradition Act 2003 (Designation of Part 2 Territories) Order 2003 (SI 2003/3334)). Extradition to category 2 territories is governed by Part 2 of the 2003 Act.

**The US Proceedings**

3. On 9 September 2019 a grand jury in New York City returned an indictment charging Mr El-Khouri with seventeen offences of securities fraud, wire fraud, fraud in connection with a tender offer and conspiracy to commit such offences.

4. The facts alleged by the United States are set out in the extradition request and attached indictment. In summary, Mr El-Khouri is accused of insider dealing. He is alleged to have made substantial payments to a middleman to obtain confidential inside information about prospective mergers and acquisitions of companies listed on US stock exchanges and then used this information to trade securities and make large profits.

5. Four others, referred to in the extradition request as "CC1" to "CC4", were allegedly part of the conspiracy. CC1 worked as an analyst in the London office of an investment bank which also had offices in the United States. CC1 was in a romantic relationship with CC2 who was an analyst in the London office of a different investment bank which also had offices in the United States. In the course of their employments, CC1 and CC2 each had access to confidential information, referred to as "material non-public information", about prospective mergers and acquisitions involving corporate clients of their respective banks. The public announcement of those mergers would be likely to cause share prices to move. The clients were companies with their headquarters in the United States and/or whose shares were traded on US stock exchanges.

6. It is alleged that CC1 and CC2 passed material non-public information to CC3 and CC4, said to be middlemen who "spent time in London, Paris and elsewhere". CC3 and CC4, who are brothers, are alleged to have provided cash and other benefits in return for this information.

7. CC4 was a friend of Mr El-Khouri. CC4 is alleged to have provided to Mr El-Khouri in 2015 inside information acquired from CC1 and CC2 about merger negotiations involving six different companies based in the United States. Mr El-Khouri allegedly agreed to pay CC1 for the information, and to pay CC4 a proportion of the profits which Mr El-Khouri made from using it.

8. Mr El-Khouri is alleged to have taken advantage of the information so acquired to trade in contracts for difference ("CFDs"), based on anticipated movements in the prices on the Nasdaq and New York Stock Exchanges of shares in the six companies concerned. He is alleged to have entered into these transactions with a broker based in the United Kingdom.

9. A person who trades in CFDs does not buy or sell shares in the company concerned. Instead, they purchase a financial instrument tied to the value of the underlying stock. In general terms, a CFD allows a trader to speculate on share price movements in the underlying security without actually owning the underlying shares. CFDs do not trade in the United States.

10. Mr El-Khouri is alleged to have made substantial payments to CC4 in cash and benefits in exchange for the material non-public information. These included:

    1. A payment of more than US$6,000 for CC4's hotel room and associated charges at a hotel in New York where he and Mr El-Khouri allegedly stayed on a trip to New York in or about March 2015;

    2. A further US$7,000 paid for CC4's accommodation at the same hotel in New York in December 2015;

    3. A payment of €105,900 made to charter a yacht for CC4 in Greece in or about July 2015; and

    4. A payment of €10,500 made to rent a ski chalet for CC4 in France in or about December 2015.

11. Through the CFD trading referred to above, Mr El-Khouri is alleged to have made profits amounting in total to nearly US$2 million.

**The UK investigation**

12. It is agreed by the parties to this appeal that the conduct alleged against Mr El-Khouri could, if proved in a trial in the United Kingdom, amount to insider dealing contrary to section 52 of the Criminal Justice Act 1993 ("the CJA 1993"). Under section 52(1):

"An individual who has information as an insider is guilty of insider dealing if, in the circumstances mentioned in subsection (3), he deals in securities that are price-affected securities in relation to the information."

It is common ground that the CFDs referred to above were relevant securities for the purposes of this provision. The circumstances mentioned in subsection (3) include the circumstance that the person dealing relies on a professional intermediary. It is not in dispute that entering into or bringing to an end CFDs with a broker, as Mr El-Khouri allegedly did here, would constitute dealing in securities (within the definition in section 55 of the CJA 1993) relying on a professional intermediary (as defined in section 59).

13. The UK Financial Conduct Authority ("FCA") conducted an investigation between November 2016 and January 2018 into Mr El-Khouri and the alleged conduct. The FCA concluded, however, that there was insufficient evidence to prosecute Mr El-Khouri, in particular because there was no evidence from any participant who could provide a narrative of how the scheme of insider dealing operated and there were also further weaknesses in the available circumstantial evidence. Mr El-Khouri was not interviewed.

**The extradition proceedings**

14. On 9 September 2019 a warrant for Mr El-Khouri's arrest was issued by the US District Court for the Southern District of New York in respect of the seventeen charges referred to

above. A request for his extradition was later submitted to the United Kingdom. Following his voluntary surrender, Mr El-Khouri was detained in London. He was later released on bail.

15. An extradition hearing took place before District Judge Baraitser at Westminster Magistrates' Court in January 2021. Mr El-Khouri resisted extradition on two grounds, only one of which remains relevant on this appeal. This ground was that the conduct alleged in the extradition request did not constitute an extradition offence for the purposes of Part 2 of the 2003 Act because it did not meet the requirement of double criminality in section 137. The district judge rejected this contention and decided that all the requirements for extradition were met. She accordingly sent the case to the Secretary of State who ordered extradition.

16. Mr El-Khouri appealed to the High Court against the district judge's decision. The High Court (Holroyde LJ and Stacey J) dismissed the appeal for reasons given in a judgment dated 21 July 2023: [2023] EWHC 1878 (Admin). The court nonetheless certified under section 114(4)(a) of the 2003 Act that the following point of law of general public importance was involved in its decision:

"Was the High Court's approach to whether the Appellant's alleged conduct constituted an 'extradition offence' correct, having regard to the requirements of section 137(3)(b) of the Extradition Act 2003?"

Although the High Court refused permission to appeal to the Supreme Court, the Supreme Court itself granted permission to appeal under section 114(3) of the 2003 Act.

Section 137 of the 2003 Act

17. The question whether a person's conduct constitutes an extradition offence for the purposes of Part 2 of the 2003 Act is governed by section 137. Section 137 gives effect to the double criminality rule which is a central feature of international extradition law. Broadly stated, the rule requires that the conduct which forms the basis of the extradition request should constitute a crime under the law of both the requesting and the requested state.

18. Section 137 provides in material part:

"(1) This section sets out whether a person's conduct constitutes an 'extradition offence' for the purposes of this Part in a case where the person—

(a) is accused in a category 2 territory of an offence constituted by the conduct, or

(b) has been convicted in that territory of an offence constituted by the conduct but not sentenced for it.

(2) The conduct constitutes an extradition offence in relation to the category 2 territory if the conditions in subsection (3), (4) or (5) are satisfied.

(3) The conditions in this subsection are that—

(a) the conduct occurs in the category 2 territory;

(b) the conduct would constitute an offence under the law of the relevant part of the United Kingdom punishable with imprisonment or another form of detention for a term of 12 months or a greater punishment if it occurred in that part of the United Kingdom;

(c) the conduct is so punishable under the law of the category 2 territory.

(4) The conditions in this subsection are that—

(a) the conduct occurs outside the category 2 territory;

(b) in corresponding circumstances equivalent conduct would constitute an extra-territorial offence under the law of the relevant part of the United Kingdom punishable with imprisonment or another form of detention for a term of 12 months or a greater punishment;

(c) the conduct is so punishable under the law of the category 2 territory.

(5) The conditions in this subsection are that—

(a) the conduct occurs outside the category 2 territory;

(b) no part of the conduct occurs in the United Kingdom;

(c) the conduct constitutes, or if committed in the United Kingdom would constitute, an offence mentioned in subsection (6);

(d) the conduct is punishable under the law of the category 2 territory with imprisonment or another form of detention for a term of 12 months or a greater punishment.

…"

The offences mentioned in subsection (6) are offences under the International Criminal Court Act 2001 and its Scottish counterpart of genocide, crimes against humanity and war crimes (and ancillary offences).

**Three features of section 137**

19. As explained in Norris v Government of the United States of America [2008] AC 920, para 65, there are two fundamentally different versions or conceptions of the double criminality rule between which a choice must be made when the rule is enacted in legislation. One approach is to consider the foreign offence for which extradition is sought and see whether it corresponds to an offence under domestic law. On this approach (the offence test) the court will invariably have to examine the legal ingredients of the foreign offence and compare them with those of the supposedly corresponding domestic offence to ensure that there is no mismatch between them. The alternative approach (the conduct test) is to focus on the conduct alleged against the requested person in the foreign state and consider whether that conduct would constitute an offence under domestic law.

20. In Norris, at paras 87-91, the appellate committee of the House of Lords in a joint opinion concluded, after a detailed survey of earlier legislation and case law, that, while the language of section 137 was consistent with either test, the wider interpretation applying the conduct test was to be preferred. This interpretation avoided the need always to investigate the legal ingredients of the foreign offence, a problem which had long been identified as complicating and delaying the extradition process. The wider interpretation was also consistent with the approach almost universally followed in the common law world. As summarised at para 91:

> "In short, the conduct test should be applied consistently throughout the 2003 Act, the conduct relevant under Part 2 of the Act being that described in the documents constituting the request … , ignoring … mere narrative background but taking account of such allegations as are relevant to the description of the corresponding United Kingdom offence."

21. Since the decision in Norris, section 137 has been amended to insert an additional subsection (7A), which states:

> "References in this section to 'conduct' (except in the expression 'equivalent conduct') are to the conduct specified in the request for the person's extradition."

22. Two more points should be noted at this stage about how the double criminality rule has been enacted in section 137.

23. First, section 137 distinguishes between conduct alleged to constitute an extradition offence which occurred in the category 2 territory (section 137(3)) and such conduct which occurred outside the category 2 territory (section 137(4) and (5)). (We need not be concerned with section 137(5) which, as noted above, makes special provision for international offences of genocide, crimes against humanity and war crimes and has no application in the present proceedings.) Depending on whether the conduct occurred in or outside the category 2 territory, the wording of the test to be applied to give effect to the double criminality rule differs.

24. Second, as the tests of double criminality under section 137(3) and section 137(4) are different, it cannot have been intended that the conduct alleged to constitute an extradition offence should fall within both subsections. They are clearly intended to be mutually exclusive. Each case must be allocated to one or the other. This is problematic, as many crimes are international in that they take place across national borders with relevant conduct occurring in more than one state. Such a situation is particularly likely to arise in cases where extradition is sought. How are such cases to be accommodated within the statutory scheme? In such cases, not only is the binary distinction drawn in section 137 unhelpful, but the 2003 Act does not specify the criteria to be applied in allocating cases to one category or the other.

**Cando Armas**

25. This problem arose in Office of the King's Prosecutor, Brussels v Cando Armas [2005] UKHL 67; [2006] 2 AC 1. The defendant in that case had been convicted in Belgium in his absence and sentenced to five years' imprisonment. He was subsequently arrested in the United Kingdom on a European arrest warrant and a request was made to extradite him to Belgium to serve his sentence. The warrant stated:

> "Cando Armas is a member of an organised gang which is responsible for the systematic illegal immigration of Ecuadorean citizens towards Europe. This organisation was directed from London by Cando Armas. Once arrived in Belgium, Cando Armas took care of accommodation and fake passports for the illegal Ecuadorean immigrants. If necessary, the illegal immigrants were escorted to Great Britain."

26. The question of double criminality was governed by section 65 of the 2003 Act, which applies when the requested person has been convicted and sentenced in a category 1 territory. Section 65(3) and (4) were in materially similar terms to section 137(3) and (4). Also relevant was section 65(2), which stated:

> "The conduct constitutes an extradition offence in relation to the category 1 territory if these conditions are satisfied—
>
> (a) the conduct occurs in the category 1 territory and no part of it occurs in the United Kingdom;
>
> (b) a certificate issued by an appropriate authority of the category 1 territory shows that the conduct falls within the European framework list;
>
> ..." (emphasis added)

The offences with which the defendant had been charged all fell within the "European framework list", referred to in section 65(2)(b).

27. The prosecutor relied on section 65(2) and section 65(3). On an appeal to the House of Lords the question raised was whether, on the facts alleged in the arrest warrant, the conditions in either of these subsections were met. The House of Lords held unanimously that the conditions in subsection (3) were satisfied, although those in subsection (2) were not.

28. The leading judgment was given by Lord Bingham of Cornhill, with whom all the other law lords agreed. He held first, at paras 15-16, that subsection (2) did not apply because some of the conduct alleged in the warrant was said to have taken place in the United Kingdom. The condition in subsection (2)(a) that no part of the conduct occurs in the United Kingdom was therefore not satisfied. The defendant argued that, as the conduct charged did not occur wholly within Belgium, the category 1 territory, the condition in subsection (3)(a) was also not satisfied. Lord Bingham, at para 17, rejected this argument on the ground that subsection (3), in contrast to subsection (2), does not contain the qualification that no part of the conduct should have occurred in the United Kingdom. It was therefore to be inferred that no such qualification was intended. It was enough, under subsection (3)(a), that some of the conduct occurred in the category 1 territory even if part of the conduct occurred in the United Kingdom.

29. Lord Hope of Craighead agreed with the conclusions reached and reasons given by Lord Bingham (see paras 19, 29). But he said, at para 29, that "I should like to add some comments of my own on the meaning that is to be given to the word 'conduct' in this context". With regard to the condition in section 65(3)(a) that the conduct occurred in the territory of the requesting state, Lord Hope, at para 34, posed two questions: (1) whether the person must be within the territory of the requesting state at the time of the conduct which he is alleged to have committed, and (2) whether the conduct must have occurred exclusively within that territory. He considered that the answers were to be found in the language used read in its context, which was, he said, "of course, provided by the common law" and "in particular by the rules which apply when jurisdiction is claimed on the basis of territoriality" (para 35). He took it to be "now well established" that the defendant need not be physically present in the territory and that criminal jurisdiction can be exercised in respect of actions that took place outside the territory so long as the e¬ffects of those actions were intentionally felt within the territory. He concluded that conduct occurs in the category 1 territory for the purposes of section 65(3)(a) "so long as its eff¬ects were intentionally felt there, irrespective of where the person was when he did the acts which constituted such conduct."

30. To illustrate his point, Lord Hope then referred to three criminal cases holding that an English or Scottish court had jurisdiction to try the defendant for an offence involving an act done abroad which had an intended effect within the court's jurisdiction: Director of Public Prosecutions v Stonehouse [1978] AC 55; Clements v HM Advocate 1991 JC 62; and HM

Advocate v Megrahi 2000 JC 555. Lord Hope said, at para 40, that he would construe the word "conduct" in section 65(3)(a) of the 2003 Act in the light of these authorities. To satisfy the condition in section 65(3)(a), the conduct must occur "in" the category 1 territory. However:

> "a purposive meaning must be given to the word 'conduct' in this context. It would impose a wholly artificial restriction on the extradition process if it were to be taken as meaning that all the conduct which resulted in the off¬ence must have taken place exclusively within the category 1 territory. Actings elsewhere will be sufficient to constitute conduct in that territory so long as their intended eff¬ect was to bring about harm within that territory."

31. The other law lords agreed with the conclusions and reasons given by Lord Hope, as well as those of Lord Bingham. It is clear, however, that these observations of Lord Hope were obiter dicta. In Cando Armas some of the conduct relied on in the warrant was alleged to have taken place in Belgium and that was held to be enough to satisfy section 65(3)(a): it did not matter that part of the conduct occurred in the United Kingdom. It was unnecessary for the prosecutor to argue and, so far as the case report shows, the prosecutor did not argue that actions taking place in the United Kingdom would constitute conduct "in" Belgium so long as their intended eff¬ect was to bring about harm within that territory. None of the criminal cases which Lord Hope regarded as providing a relevant analogy appears to have been cited in argument. It is unclear what prompted Lord Hope to add the comments that he did on the meaning of the word "conduct" in section 65. But, as we read his speech, they were not a necessary part of his reasons for agreeing with Lord Bingham that, to satisfy section 65(3), it did not matter that the conduct alleged in the warrant did not occur wholly within Belgium and that some of the conduct allegedly took place in the United Kingdom. See also Lord Scott of Foscote at para 49.

**Where did the conduct alleged here take place?**

32. If one focuses simply on where the acts of Mr El-Khouri specified in the extradition request occurred and leaves aside any consideration of their intended effects, almost none of those acts occurred in the United States. Almost all occurred in the United Kingdom. Thus, Mr El-Khouri allegedly received in the United Kingdom inside information obtained by co-conspirators through their work in the London offices of investment banks. He allegedly used this information to buy and sell for profit CFDs relying on a professional intermediary who was in the United Kingdom. Mr El-Khouri is not alleged to have dealt in any securities in the United States. The only act complained of which he is said to have done in the United States was to pay for a hotel room in New York for CC4 as part of the payments which he allegedly made to CC4 in exchange for the inside information.

33. On these facts if one then asks whether the conduct occurred "in" or "outside" the territory of the requesting state on the footing that the categories are mutually exclusive, it might be thought obvious that the conduct occurred "outside" the United States, so that the relevant test of double criminality is that set out in section 137(4).

34. The United States, however, has not relied in these proceedings on section 137(4). Instead, it has relied on section 137(3), arguing that the conduct specified in the extradition request occurred in the United States. This might not at first sight appear a promising argument. But it was accepted by the district judge on the basis that effects of Mr El-Khouri's actions were likely to have been felt on US markets and that this was enough to satisfy the condition in subsection (3)(a). In the High Court and in their written case for the appeal to this court, counsel for Mr El-Khouri did not take issue with that conclusion. Their arguments on whether the conditions in section 137(3) are satisfied were directed exclusively to subsection (3)(b).

35. At the start of the hearing of the appeal on 9 October 2024, the court invited the parties to address two questions: (1) whether the subsection applicable in this case is subsection (4) rather than subsection (3) of section 137; and (2) whether the reasoning in Cando Armas was correct. The court heard full argument on these questions as well as the other issues in the appeal on that day and at a resumed hearing on 18 November 2024. The court has also considered supplemental written cases lodged by the parties on the questions raised by the court.

36. Before coming to those questions, we will first consider Mr El-Khouri's case that the courts below were wrong to find that the test of double criminality in subsection (3)(b) is satisfied.

**The test of double criminality where the conduct occurs in the foreign territory**

37. That test is, in short, whether the conduct specified in the extradition request would constitute an offence under UK law if it occurred in the United Kingdom. In what one might think of as the paradigm case where all the acts specified in the request were done in the territory of the requesting state, this requires an exercise of transposition. The court must consider a hypothetical situation in which those acts were done in the relevant part of the United Kingdom and ask whether, in that situation, the acts would constitute an offence under the law of that part of the United Kingdom. For example, in Cleveland v Government of the United States of America [2019] EWHC 619 (Admin); [2019] 1 WLR 4392 the requested person was accused of being an accessory to offences of murder and possession of a firearm during the commission of a felony in the state of Georgia. The extradition request alleged that she had been the passenger in a vehicle when the driver shot the driver of another vehicle. In applying section 137(3)(b), the High Court had to decide whether, if the conduct

alleged had occurred in England and Wales, it would satisfy the requirements for liability as an accessory under English law.

38. In the present case no transposition of this kind is necessary because almost all the alleged acts actually did occur in the United Kingdom. So there is no need to postulate a hypothetical situation in which acts done in the territory of the requesting state were done in this country. Counsel for the United States submitted that the correct approach in applying section 137(3)(b) is simply to ask whether conduct which did in fact occur in the United Kingdom would constitute an offence under UK law. As it is agreed that the conduct of Mr El-Khouri would, if proved, constitute an offence of insider dealing under section 52 of the CJA 1993, the answer is that it would. The conduct therefore constitutes an extradition offence.

39. In response, counsel for Mr El-Khouri argued that such an approach is contrary to principle. They submitted that it is wrong to extradite a person to a foreign state on the basis that the person has allegedly committed an offence in the United Kingdom. If anything, the fact that the conduct occurred in the United Kingdom might be thought to indicate that the United Kingdom is the proper place for any criminal proceedings. To avoid such a paradoxical approach, counsel for Mr El-Khouri contended that a further transposition exercise is necessary in applying subsection (3)(b). They argued that subsection (3)(b) does not just require conduct alleged to have occurred in the territory of the requesting state to be treated as having occurred in the United Kingdom: it should be interpreted as also requiring conduct alleged to have occurred outside the territory of the requesting state to be treated as having occurred outside the United Kingdom.

40. We agree with the submission that it is wrong in principle to treat the commission of an offence in the United Kingdom as a basis for extradition to another country. But we do not agree that this result can be avoided by interpreting subsection (3)(b) in the way suggested. That contention is inconsistent with the words of subsection (3)(b). The sole hypothesis required by the subsection is that conduct which in fact occurred in the foreign territory occurred "in" (the relevant part of) the United Kingdom. It is impossible to read the language used as requiring or permitting the court to transpose any conduct in the opposite direction and to treat conduct which in fact occurred within the United Kingdom as having occurred outside it.

41. By contrast, subsection (4)(b) does require this. Under that subsection the test is whether in corresponding circumstances equivalent conduct would have constituted an extra-territorial offence of the required gravity under UK law. For this purpose, it is necessary to construct a mirror image of what actually occurred. "Corresponding circumstances" are circumstances in which conduct of the requested person (or any other relevant event) alleged to have occurred outside the territory of the requesting state is assumed to have occurred outside the (relevant part of the) United Kingdom, and vice-versa. (No assumed change of location is required for any conduct occurring in a third state because in

corresponding circumstances such conduct would also have taken place in a third state: such conduct therefore stays where it is in carrying out the transposition exercise.)

42. Applied here, the test in subsection (4)(b) would therefore require the assumption to be made that the conduct of Mr El-Khouri (and his alleged co-conspirators) which is said to have occurred in the United Kingdom (and therefore outside the territory of the United States) occurred in the United States (and therefore outside the United Kingdom). In other words, subsection (4)(b) requires the kind of transposition which counsel for Mr El-Khouri seek to suggest is required by subsection (3)(b). The different language used in subsections (3)(b) and (4)(b), however, demonstrates that they were intended to have different effect. Had Parliament intended to impose under subsection (3)(b) transposition in both directions, it would have used the same language as was used in subsection (4)(b).

43. This distinction between the two subsections also makes sense within the scheme of the 2003 Act. One purpose of the double criminality rule is to protect the accused from the exercise of an exorbitant foreign jurisdiction. The requirement that the conduct should be an offence within the criminal jurisdiction of the United Kingdom serves that purpose: see R (Al-Fawwaz) v Governor of Brixton Prison [2001] UKHL 69; [2002] 1 AC 556, paras 95 and 105(2) (Lord Millett). The more onerous requirement under subsection (4)(b) is a necessary safeguard against exorbitant claims where the requesting state seeks to exercise extra-territorial jurisdiction. Extradition will be possible only if the United Kingdom territory would exercise jurisdiction in corresponding circumstances. In this way, UK standards concerning extra-territorial jurisdiction are applied. Contrary to the submission of Miss Clair Dobbin KC on behalf of Mr El-Khouri, no such adjustment to achieve jurisdictional correspondence is needed if the conduct is considered to have taken place within the territory of the requesting state, because no question of extra-territorial jurisdiction then arises.

44. The argument made on behalf of Mr El-Khouri was considered and rejected by the High Court in Hosseini v Head of the Prosecution Department of the Courts of Higher Instance, Paris, France [2006] EWHC 1333 (Admin) (Richards LJ, Toulson J). Mr Hosseini was accused of participation in illegally trafficking immigrants through France to England. The conduct alleged included his sending money orders from England to persons involved in the network in France. In seeking extradition under Part 1 of the 2003 Act, France relied on the double criminality provision in section 64(3) of the 2003 Act which was materially identical to section 137(3). The High Court, treating Lord Hope's observations in Cando Armas as authoritative, accepted that the sending of the money orders from the United Kingdom to France could properly be regarded as conduct of Mr Hosseini occurring partly in France and partly in England, "as if he had gone from England to France to deliver the money orders personally to the recipients" (para 30).

45. Counsel for Mr Hosseini disputed, however, that section 64(3)(b) was satisfied. He submitted that section 64(3)(b) required the court to ask whether in corresponding

circumstances the conduct, or equivalent conduct, would constitute an offence in the relevant part of the United Kingdom and that for this purpose it was necessary to assume that Mr Hosseini was physically outside the United Kingdom when he did the acts alleged. On that basis the conduct would not constitute an offence in England and section 64(3)(b) would not apply (para 27). This was in substance the same argument that counsel for Mr El-Khouri make here.

46. In rejecting this argument, Richards LJ stated, at para 32:

> "I do not think that section 64(3)(b) occasions any difficulty. It simply requires one to assume that the conduct alleged in the warrant occurred in the relevant part of the United Kingdom and to ask whether, on that hypothesis, it would constitute an offence under the law of that part of the United Kingdom. To deal with it as a hypothesis may strictly be unnecessary to the extent that the conduct alleged did in fact occur in the relevant part of the United Kingdom; but in my view it does not give rise to any conceptual or practical difficulty. I would reject [counsel for Mr Hosseini's] submission that the exercise of transposition requires one to ask whether in corresponding circumstances equivalent conduct would constitute an offence in the relevant part of the United Kingdom. Section 64(4), which deals with true extraterritoriality, contains that language, section 64(3) does not, and there can be no justification for importing the language of the former into the latter." (emphasis in original)

47. This reasoning was followed in Kodos v Prosecutor General's Office of the Republic of Lithuania [2010] EWHC 897 (Admin), where the extradition of Mr Kodos to Lithuania was sought on the basis of allegations that he had trafficked women from Lithuania to England for the purposes of prostitution. Richards LJ (with whom Cranston J agreed) held, at para 20, that section 64(3)(a) was satisfied, as part of the conduct had occurred in Lithuania. They also concluded that the condition in section 64(3)(b) was satisfied (para 21). This condition simply required one to assume that the conduct alleged in the warrant occurred in England and to ask whether, on that hypothesis, it would constitute an offence under English law. Section 64(3)(b) did not require a similar exercise of transposition to that required by the differently worded condition (c) of section 64(4), which was materially identical to section 137(4)(b).

48. In our view, this analysis was entirely correct and applies equally to subsections 137(3)(b) and (4)(b). We would therefore reject the submission made on behalf of Mr El-Khouri that correct transposition in accordance with section 137(3)(b) requires the court to ask whether in corresponding circumstances equivalent conduct would constitute an offence in the relevant part of the United Kingdom. In applying section 137(3)(b) to the present case, it is not necessary or permissible to assume that relevant conduct which in fact took place outside the United States took place outside the United Kingdom.

**Revisiting the dicta in Cando Armas**

49. As we have seen, even though almost all of the conduct specified in the extradition request occurred in the United Kingdom, counsel for Mr El-Khouri felt constrained to accept that that conduct occurred in the United States within the meaning of section 137(3)(a) of the 2003 Act, so that the test of double criminality applicable in this case is that set out in section 137(3)(b). Having boxed themselves into a corner by making this constraint, they then attempted to escape its consequences by arguing that subsection (3)(b) has the same meaning and effect as subsection (4)(b), even though the wording is materially different and clearly not intended to operate in the same way. A more logical response to the point that subsection (3)(b) is not designed to deal with a case such as this is to question the assumption that the conduct falls within subsection (3). That assumption was based on the view expressed by Lord Hope in Cando Armas that acts done outside the territory of the requesting state will be sufficient to constitute conduct in that territory so long as their intended effect was to bring about harm within that territory. The extradition request does not in fact, so far as we can see, make any allegation that the acts of Mr El-Khouri were intended to (or did) cause harm in the United States. But the more fundamental question is whether the interpretation of section 65(3)(a) - and by extension section 137(3)(a) - of the 2003 Act adopted by Lord Hope in Cando Armas is correct.

50. We consider that interpretation to be mistaken for three reasons. First, it does not accord with the language used. Second, it renders the distinction drawn in sections 65 and 137 between conduct that occurs "in" and "outside" the territory of the requesting state unworkable. Third, the justification given for the interpretation in Cando Armas is flawed.

51. Taking these points in turn, the word "conduct" would normally and naturally be understood as a synonym for acts done by the requested person in the specified location and not as including effects (whether intended or not) felt in that location of acts done somewhere else. A compelling reason is needed to interpret "conduct" as bearing such an abnormally wide meaning. Lord Hope implicitly acknowledged this when he said that "a purposive meaning must be given to the word 'conduct' in this context": see Cando Armas, para 40 (quoted at para 30 above).

52. Secondly, it is necessary to interpret the words in the context of these specific statutory provisions. The result of giving the word "conduct" such an abnormally wide meaning is to wreak havoc with the scheme of section 137 (and analogous provisions of the 2003 Act). As noted earlier, subsections (3) and (4) draw a binary distinction between conduct that occurs "in" and conduct that occurs "outside" the territory of the requesting state. We observed that the distinction may be difficult to draw in a situation where the conduct alleged comprises various acts some of which occurred within and some of which occurred outside the territory. But in principle that problem can be addressed by formulating an appropriate test. By contrast, it makes a nonsense of the provisions if the same physical acts are classified as simultaneously occurring both "outside" the territory of the requesting state because they

are done outside it and "in" that territory because their intended effect was to bring about harm within the territory and this is viewed as sufficient to constitute conduct "in" the territory. This approach creates a paradox comparable to the fate of Schrödinger's cat.

53. Lord Hope makes no mention of section 65(4), which was equivalent to section 137(4) and applied when "the conduct occurs outside the category 1 territory". No consideration appears to have been given to the fact that conduct occurring outside the territory falls within subsection (4). Had this been appreciated, it would have been necessary to explain how the same conduct can consistently be regarded as falling within subsection (3) so long as its effects were intentionally felt in the category 1 territory. In such a case is the test of double criminality to be applied that in subsection (3)(b), or that in subsection (4)(b), or whichever test the requesting state chooses to rely on? None of those alternatives makes rational sense. In our view (see para 24 above), the only tenable analysis of the relationship between subsections (3) and (4) is that they are mutually exclusive. The same conduct cannot, consistently with the statutory scheme, be classified as occurring in two different places at once, both "in" and "outside" the territory of the requesting state.

54. Leading counsel for the United States, Mr Mark Summers KC, sought to defend the expansive interpretation of conduct occurring "in" the requesting state adopted by Lord Hope in Cando Armas in a way that recognises the mutual exclusivity of subsections (3) and (4). This required him to argue that not all cases where the acts specified in the extradition request were done outside the territory of the requesting state fall within subsection (4)(a). He submitted that the words "the conduct occurs outside the … territory" should be read down in light of the reference in subsection (4)(b) to an "extra-territorial offence". On this interpretation conduct occurring outside the territory of the requesting state only falls within subsection (4)(a) if equivalent conduct would constitute an offence under the law of the relevant part of the United Kingdom which is classified as an "extra-territorial offence".

55. Mr Summers had difficulty identifying what offences (if any) would fall within this class. That difficulty was inescapable because the expression "extra-territorial offence" is not a term of art. It is not defined in the 2003 Act and has no generally understood or accepted meaning. It cannot, in our view, reasonably be used to justify giving a wholly artificial (and indeterminate) meaning to the words of subsection (4)(a). Rather, the expression simply reflects the fact that the conduct with which subsection (4) is concerned is conduct occurring outside the court's territorial jurisdiction. The use of the term does not affect the territorial scope of subsection (4).

56. In short, the only way to make sense of the relationship between subsections (3) and (4) is to understand the word "conduct" as bearing its ordinary meaning and to read subsections (3)(a) and (4)(a) as concerned solely with where the physical acts alleged were done and not with where any effects of those acts (intentionally or otherwise) were felt.

57. Our third reason for rejecting the interpretation of subsection (3)(a) adopted by Lord Hope in Cando Armas is that the justification given for it does not withstand scrutiny. Lord Hope supported the claim that a "purposive" meaning must be given to the word "conduct" by saying that it "would impose a wholly artificial restriction on the extradition process" if the language used were to be taken as meaning that all the conduct which resulted in the offence must have taken place exclusively within the territory of the requesting state. We agree that, as held in Cando Armas, the language used should not be taken to have that meaning. The condition that "the conduct occurs in the ... territory" does not require that all the conduct specified in the extradition request must have occurred exclusively within the territory: the condition may be satisfied even if part of the conduct occurred somewhere else. But it does not follow that, as Lord Hope immediately went on to assert: "Actings elsewhere will be sufficient to constitute conduct in that territory so long as their intended eff¬ect was to bring about harm within that territory". That is a different contention altogether and not one that is required to avoid imposing an artificial restriction on the extradition process.

58. What led Lord Hope to put the gloss that he did on the word "conduct" was an assumption that the language should be construed in the "context" of the common law rules which govern when criminal jurisdiction can be exercised by a UK court in relation to acts done abroad (see para 29 above). This was, however, purely an assumption because nowhere does Lord Hope explain why these rules should be thought relevant. The question whether a person may be prosecuted in the United Kingdom for acts done in a foreign country is a different question from whether conduct is to be regarded as occurring "in" another country for the purpose of deciding which double criminality test to apply in the context of extradition proceedings. We can see no reason why the answer to the former question should have any bearing on the answer to the latter question. The assumption on which the interpretation of subsection (3)(a) was founded was therefore invalid.

59. Again, the essential mistake was to overlook subsection (4) and the need to interpret subsections (3)(a) and (4)(a) in a way that renders them consistent with each other. We think it clear that the underlying scheme is a simple territorial approach to criminal jurisdiction which takes for granted that courts have jurisdiction over acts occurring within the state's own territory but recognises that they may also in a variety of circumstances exercise jurisdiction in respect of acts occurring outside its territory. The function of subsections (3)(a) and (4)(a) is merely to divide cases into these two categories. In making the allocation there is no need to take any view about the circumstances in which criminal jurisdiction may properly be claimed (whether under rules of common law or otherwise) when some or all of the conduct occurs abroad. That question becomes relevant only if the case falls in the second, extra-territorial category. Nor is there even then any need to develop any general theory of when jurisdiction can properly be exercised in relation to acts done abroad, whether based on a concept of intended effects or otherwise. All that is necessary is to ask whether, on facts

transposed in accordance with subsection (4)(b), a UK court would exercise jurisdiction in the particular case. This gives effect to the underlying principle that, in deciding whether to grant extradition, we should accord to other states the jurisdiction which we claim for ourselves but no more.

60. Instead of following this simple and rational scheme, the approach proposed in Cando Armas applies a test of when extra-territorial jurisdiction can be claimed in deciding whether, in applying section 65(3)(a) and its analogues, the conduct should be treated as having occurred in the requesting state's own territory. This is an illogical approach.

61. A further defect in Lord Hope's account of territorial jurisdiction is that it considers only the common law and takes no account of the fact that the territorial scope of many criminal offences is defined by statute. (The offence of insider dealing is itself an example: see para 70 below.) These statutory rules can be detailed and specific (see eg Part 1 of the CJA 1993) and are not captured by a broad theory of jurisdiction based on intended effects. If domestic rules which govern when a UK court will exercise jurisdiction in relation to acts done abroad are considered relevant at all to this stage of the analysis, there can be no justification for limiting the field of vision to rules of common law and ignoring statutory rules which expressly define the territorial scope of relevant offences.

62. Noticing this defect in turn draws attention to another flaw in the approach: it puts the cart before the horse. That is because, to apply the rules of UK law which determine whether a UK court will exercise jurisdiction in relation to acts done abroad, it is necessary to identify an offence under the law of the relevant part of the United Kingdom which is constituted by the requested person's conduct and to analyse the elements of the offence. It is also necessary to determine whether a statutory provision defining the territorial scope of an offence applies. Yet under the scheme of section 137 (and similar provisions of the 2003 Act) considering whether the conduct alleged (or "equivalent conduct") would constitute an offence under UK law is an exercise to be performed only after you know whether subsection (3) or subsection (4) applies. Applying such an approach to decide at the outset whether the case falls within subsection (3) therefore approaches the matter the wrong way round.

63. All this simply emphasises the muddle, as we see it, that occurred in Cando Armas in introducing questions about the extra-territorial scope of offences under UK law, which are properly relevant only when applying the test of double criminality in subsection (4)(b), into the initial decision whether the applicable test is that in subsection (3) or subsection (4). The mistake made is not one that it would be right to leave uncorrected on the ground that to do so would undermine legal certainty. We have already commented that Lord Hope's observations were obiter dicta on a point which appears not to have been argued. We in any case consider it essential to correct an interpretation of what Parliament enacted which, for

the reasons given, we regard as clearly wrong and would produce an unprincipled result if followed in this case.

64. In summary, we conclude that it was an error to suggest in Cando Armas that rules of UK domestic law which govern the exercise of extra-territorial criminal jurisdiction are relevant to the question whether the conduct specified in the extradition request occurred in or outside the territory of the requesting state for the purposes of section 65(3) and 65(4) and their analogues. The latter question is a question of fact to be answered simply by considering where the acts of the requested person specified in the extradition request are alleged to have occurred (ignoring mere narrative background and focusing on the substance of the criminality alleged). It was also a mistake to suggest in Cando Armas that the place where effects of those acts were felt (intentionally or otherwise) is relevant for this purpose. The answer to the first question posed by Lord Hope (see para 29 above) is therefore that, to satisfy the condition in subsection (3)(a) that the conduct occurs in the territory of the requesting state, the person must be within the territory of the requesting state at the time of the conduct which he is alleged to have committed. In stating this conclusion we emphasise that we are here concerned solely with the limited question of how cases are to be allocated for the purposes of subsections 137(3) and 137(4) of the 2003 Act and their statutory analogues. For these purposes the language used should be interpreted in a way which makes the allocation of conduct to one category or the other as straightforward as possible.

65. There may, even so, be cases concerned with a course of conduct some of which occurred inside and some outside the territory of the requesting state. In such cases the conduct constituting the substance of the alleged criminality need not have occurred exclusively within that territory. The ratio decidendi of Cando Armas, which we do not question, is that the condition in subsection (3) may be satisfied even if some part of that conduct occurs outside the territory of the requesting state.

**Did the conduct occur in or outside the United States?**

66. A difficult question of classification could arise in a case where the relevant conduct of the requested person occurred partly in the territory of the requesting state and partly in the United Kingdom. Does the case fall within subsection (3)(a) or (4)(a)? Similarly, difficult questions might sometimes arise as to where relevant conduct should be considered to have occurred. No such difficulty, however, arises in this case. Here, no part of the conduct alleged to constitute insider dealing can sensibly be considered to have occurred in the United States. The substance of the alleged criminality (dealing in securities using inside information and conspiring with others to do so) occurred in the United Kingdom and no relevant conduct occurred in the United States. The only act of Mr El-Khouri which allegedly occurred in the United States was making a payment for a hotel room for CC4 while on a trip with him to New York. This was one of various benefits allegedly provided to CC4 in exchange for the

supply of material non-public information along with others which included payments allegedly made to charter a yacht for CC4 in Greece and to rent a ski chalet for him in France (see para 10 above). The places where these benefits were enjoyed and where Mr El-Khouri was situated when he paid for them are purely incidental details of the narrative of events.

67. This is therefore a plain case where the conduct occurred outside the territory of the requesting state. It falls within subsection (4)(a) and not subsection (3)(a).

**Is the test of double criminality in section 137(4)(b) satisfied?**

68. In presenting its case for extradition before the district judge, the United States relied exclusively on section 137(3). It did not make any alternative case that, if the applicable provision is section 137(4), the test of double criminality in subsection (4)(b) is satisfied. At the resumed hearing of this appeal, however, Mr Summers KC on behalf of the United States sought for the first time to advance such an alternative case.

69. As discussed above (paras 41-42), the assumption required by subsection (4)(b) in this case is that all the conduct of Mr El-Khouri and other relevant events alleged in the extradition request took place outside the United Kingdom.

70. It is plain that such "equivalent conduct" would not constitute an extra-territorial offence of insider dealing under section 52(1) of the CJA 1993. The territorial scope of that offence is defined in section 62(1). This provides that an individual is not guilty of an offence of insider dealing under section 52(1) unless:

"(a) he was within the United Kingdom at the time when he is alleged to have done any act constituting or forming part of the alleged dealing;

(b) the regulated market on which the dealing is alleged to have occurred is one which, by an order made by the Treasury, is identified … as being, for the purposes of this Part, regulated in the United Kingdom; or

(c) the professional intermediary was within the United Kingdom at the time when he is alleged to have done anything by means of which the offence is alleged to have been committed."

71. On the transposed facts, none of these conditions would be met. Mr El-Khouri was not within the United States at the time when he is alleged to have done any act constituting or forming part of the alleged dealing; the dealing is not alleged to have occurred on a market regulated in the United States; and the professional intermediary allegedly relied on by Mr El-Khouri was not within the United States when the alleged dealing occurred.

72. Mr Summers submitted, however, that (leaving aside the question of territoriality) the facts alleged in the extradition request disclose other offences under English law as well as

the offence of insider dealing: namely, (1) an offence of fraud under section 3 of the Fraud Act 2006; and/or (2) a money laundering offence under section 329 of the Proceeds of Crime Act 2002. We express no view on whether that submission is well founded or not. But even if it is, we are satisfied that on the transposed facts equivalent conduct would not constitute an extra-territorial offence under English law.

73. We need not be concerned with the suggestion that the allegations against Mr El-Khouri disclose an offence under section 3 of the Fraud Act 2006 because in its supplemental written case the United States accepted that offences under that Act do not carry extra-territorial jurisdiction. But it maintained that an offence under section 329 of the Proceeds of Crime Act 2002 does.

74. Section 329 of the Proceeds of Crime Act 2002 provides that "a person commits an offence if he- (a) acquires criminal property; (b) uses criminal property; [or] (c) has possession of criminal property". The term "property" is defined in section 340(9) as "all property wherever situated" including money. Pursuant to section 340(3): "Property is criminal property if- (a) it constitutes a person's benefit from criminal conduct ..., and (b) the alleged offender knows or suspects that it constitutes or represents such a benefit". The definition of "criminal conduct" in section 340(2) includes not only conduct which constitutes an offence in any part of the United Kingdom but also conduct which "would constitute an offence in any part of the United Kingdom if it occurred there". Putting this together, a person who (with the relevant knowledge) acquires, uses or has possession of a benefit in the form of money from conduct occurring in the United States which would constitute an offence in England if it occurred there commits an offence under section 329.

75. To come within the territorial scope of section 329, however, the acquisition, use or possession of the proceeds of the criminal conduct must itself occur in the United Kingdom. When the provisions of the Proceeds of Crime Act 2002 concerned with money laundering are intended to have extra-territorial application, the statute says so. In the absence of any express stipulation that a criminal offence is committed even if the relevant act takes place abroad, the ordinary presumption therefore applies that Parliament has not made such an act a criminal offence triable in the United Kingdom. The Act does not provide that to acquire, use or possess abroad property derived from criminal conduct committed abroad constitutes a criminal offence in the United Kingdom. That would be a truly exorbitant extra-territorial jurisdiction for the United Kingdom to assert and the Act does not assert it.

76. Mr Summers on behalf of the United States submitted otherwise. He relied on section 340(11), which states:

"Money laundering is an act which –

(a) constitutes an offence under section 327, 328 or 329,

..., or

(d) would constitute an offence specified in paragraph (a) … if done in the United Kingdom."

77. This provision, however, is merely a definition of the term "money laundering". Section 340(11) does not provide that an act which would constitute an offence under section 329 if done in the United Kingdom does in fact constitute an offence in the United Kingdom. Indeed, it is incompatible with any such contention. The language of paragraph (d) confirms that an act described in section 327, 328 or 329, if done abroad, does not constitute an offence in the United Kingdom. The effect of section 340(11)(d) is to bring such an act, even though it does not constitute an offence in the United Kingdom, within the definition of the term "money laundering".

78. The relevance of the definition of "money laundering" is apparent from sections 330 to 332 of the Act which create certain offences of failing to disclose money laundering in which the person concerned knows or suspects, or has reasonable grounds for knowing or suspecting, that another person is engaged. By reason of section 340(11)(d), such offences may be committed even though the act of money laundering which the person fails to disclose is not itself an offence under UK law provided that it would constitute an offence under section 327, 328 or 329 if done in the United Kingdom. This does not assist the argument which Mr Summers sought to make. There is no provision of the Act which says that an act of money laundering itself constitutes an offence.

79. Mr Summers relied on a decision of the Criminal Division of the Court of Appeal in R v Rogers [2014] EWCA Crim 1680; [2015] 1 WLR 1017, and four decisions of the High Court in extradition cases in which Rogers was regarded as binding authority for the proposition that sections 327 to 329 of the Proceeds of Crime Act 2002 have extra-territorial effect: Sulaiman v Tribunal de Grande Instance, Paris [2016] EWHC 2868 (Admin), paras 18-21; Jedinak v District Court in Pardubice (Czech Republic) [2016] EWHC 3525 (Admin), paras 31-45; Balaz v District Court of Zvolen (Slovakia) [2021] EWHC 1862 (Admin), paras 10-16; and Rogala v Circuit Court in Lublin (Poland) [2021] EWHC 3324 (Admin), para 42.

80. In Rogers, the defendant was a UK citizen who lived in Spain. While in Spain, he permitted money constituting criminal property obtained by defrauding persons in the United Kingdom to be paid into and then withdrawn from his Spanish bank account. He was convicted under section 327(1)(c) of the Proceeds of Crime Act 2002 (converting criminal property). On appeal, he argued that the United Kingdom did not have jurisdiction because all the relevant acts were committed in Spain in relation to a Spanish bank account. The Court of Appeal rejected that argument on two grounds. The ground relevant here is that the "provision at section 340(11)(d) that money laundering is an act which would constitute an offence (including one under section 327) if done in the United Kingdom, appears to admit of no other construction

than that Parliament intended, extra-territorial effect to this legislation" (para 47). The judgment records that when counsel for the defendant was asked what alternative construction could be put on section 340(11)(d), he was unable to suggest one and fell back on a submission that "the language used fell short of indicating a clear intention by Parliament to confer extra-territorial jurisdiction" (para 48). The court was not persuaded by that submission and concluded that the defendant's conversion of criminal property was an offence in the United Kingdom even though it took place in Spain.

81. The decision in Rogers has been criticised by commentators and, in our opinion, rightly so: see Criminal Law Week, case comment at CLW/14/31/7; case comment by Rudi Fortson QC at [2014] Crim LR 910; and Blackstone's Criminal Practice (2025) at A8.5. It is unfortunate that counsel for the defendant and the court in Rogers failed to recognise that section 340(11)(d) merely defines "money laundering" and does not either create an offence itself or extend the territorial scope of the offences created by sections 327, 328 and 329 to acts done abroad. Indeed, as noted above, its language is positively inconsistent with the notion that Parliament intended those provisions to apply to acts done abroad. The Court of Appeal noted, at para 48, that section 340(11) (and two other provisions mentioned) "clearly relate to the conduct element of the offence rather than the criminal property element". The court therefore recognised, correctly, that the only extra-territorial effect of section 340(11) is to bring within the scope of the offences created by sections 327, 328 and 329 relevant acts of dealing in the United Kingdom with criminal property that represents the proceeds of criminal conduct committed abroad; and that it does not extend the scope of those provisions to acts of dealing with criminal property which occurred abroad. The court, however, lost sight of this point in concluding that converting criminal property in Spain was an offence under the Act.

82. It follows that, in our opinion, Rogers was wrongly decided. We do not think it seriously arguable that acquiring, using or possessing in the United States money which represents the proceeds of a crime in the United States can constitute an offence under section 329 of the Proceeds of Crime Act 2002. The attempt to argue that the condition in section 137(4)(b) is satisfied in the present case therefore fails.

## Conclusions

83. We will summarise our main conclusions:

> 1. Subsections 137(3) and (4) are mutually exclusive. In applying section 137, it is therefore necessary to decide at the outset whether the conduct of the person whose extradition is sought occurred "in" or "outside" the territory of the requesting state.
> 2. For this purpose the court is concerned, and concerned only, with where the person's acts specified in the extradition request were physically done, ignoring in the case of

both provisions mere narrative background and focusing on the substance of the alleged criminality. The court is not concerned with where any consequences of those acts occurred or were felt.

3. It is not a requirement of subsection (3) or (4) that the relevant conduct occurred exclusively in, or outside, the territory of the requesting state (as the case may be).

4. In this case, however, all the relevant conduct of Mr El-Khouri occurred outside the United States. The conditions which must be satisfied for the conduct to constitute an extradition offence are therefore those in subsection (4) and not those in subsection (3).

5. The test of double criminality in subsection (4)(b) requires the court to consider whether an offence would be committed under UK law if the alleged conduct of the requested person (and any other relevant event) occurring outside the territory of the requesting state had occurred outside (the relevant part of) the United Kingdom (and vice-versa).

6. The UK offence most obviously raised by the conduct alleged in the extradition request is insider dealing contrary to section 52(1) of the CJA 1993. In corresponding circumstances equivalent conduct would not constitute that offence, as such conduct would fall outside the territorial scope of the offence as defined in section 62 of the CJA 1993. Nor would such conduct arguably fall within the territorial scope of section 329 of the Proceeds of Crime Act 2002.

84. For these reasons, we would allow the appeal, order the discharge of Mr El-Khouri and quash the order for his extradition.

---

**Website Information**

Cookie Policy

Privacy Policy

Accessibility

Terms and Conditions

Social Media Policy

Sitemap

**Working for Us**

Job Listings

JA Recruitment

Appointment of Justices

Diversity and Inclusion

**Contact Us**

Contact Us

Case Management Portal

General Enquiry

Complaints

Book a Room during a Hearing

Hold your Event at the UKSC

Information Requests

**Press Office**

Press Office

**Cymraeg**

Welsh language link

Toggle dark mode

Go to the JCPC website



© 2025 UK Supreme Court. All rights reserved.