## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,** | § § § | |
| **Plaintiff,** | § | **No. 1:24-cv-12586-AK** |
| | § | |
| **v.** | § | |
| | § | |
| **RUSSELL ARAMAND, et al.,** | § § | |
| | § | |
| **Defendants.** | § | |
| | § | |

## <u>NOTICE OF SUPPLEMENTAL AUTHORITY</u>

Defendant Kohli respectfully submits this notice to inform the Court of the decision that Judge Carol Bagley Amon issued on February 28, 2025 in *S.E.C. v. Schueler et al.*, No. 23-cv-5749 Dkt. 57 (E.D.N.Y.) ("*PulseChain*"). *See* Exhibit A. The decision, which was released after Mr. Kohli filed his motion to dismiss on personal jurisdiction and extraterritoriality grounds, supports Defendant Kohli's pending Motion to Dismiss [ECF No. 16] (the "Motion") because it confirms that the allegations in the SEC's Complaint [ECF No. 1] are insufficient to establish personal jurisdiction over Kohli, and further that the conduct alleged is not within the reach of the U.S. securities laws under the required extraterritoriality analysis.

In *PulseChain*, the Securities and Exchange Commission ("SEC") brought claims under the Securities Act and Securities Exchange Act against Richard Heart, a U.S. citizen residing in Finland. *See* Ex. A at 1. Heart was the founder and primary operator of the Hex, PulseChain, and PulseX crypto token projects, and maintained websites and social media accounts promoting the tokens throughout their offer periods. *See id*. at 2. The SEC alleged that Heart had violated the securities laws by promoting, offering, and selling unregistered securities and by defrauding investors via misappropriation of funds. *See id*. at 1. Heart moved to dismiss under Federal Rules

12(b)(2) and 12(b)(6), arguing that the SEC had failed to establish personal jurisdiction as to any of its claims, and further, that the conduct at issue was extraterritorial. *See id.* at 11, 22.

Judge Amon ruled that the *Pulsechain* complaint should be dismissed based on a failure to establish personal jurisdiction. *See* Ex. A at 20, 22. The court reaffirmed that broad or globally accessible internet postings, without more, do not give rise to personal jurisdiction. Instead, the SEC must plead specific U.S.-focused activities by the defendant—such as U.S.-based transactions, or deliberate targeting of U.S. investors. *See id.* at 18–19. Here, as described in Mr. Kohli's motion to dismiss, the allegations *as to Mr. Kohli* mirror those of *Pulsechain*. The Complaint alleges that generic, unspecific statements were put out on social media, and which could be viewed by individuals in the United States. *See* Dkt. 16 at 5. As described in *Pulsechain*, such allegations are insufficient.

On the extraterritoriality analysis, Judge Amon further determined that the SEC had failed to plead a claim under Rule 12(b)(6). *See* Ex. A at 22. Like their allegations against Mr. Kohli, the SEC in *Pulsechain* failed to allege that Heart's U.S. investors' deposits were "matched on servers in the United States" or "first validated on the blockchain in the United States." *Id.* at 25. Furthermore, Judge Amon held that none of Heart's offers of securities were domestic because the Complaint failed to allege that Heart was in the United States at the time of any of the offers. *See id.* at 28. Finally, Judge Amon examined the SEC's allegations of fraud under both the *Morrison* transactional test and the "conduct and effects" test, only to determine that the SEC failed both. *See id.* at 29. Under the *Morrison* test, the SEC failed to establish that any token investors "became irrevocably bound in the United States." *Id.* Under the "conduct" prong of "conduct and effects," merely providing information about a token project online, absent any clear allegation that this conduct "was directed at the United States," could not support an inference that the conduct was

"within" the United States. *Id*. at 30. Finally, under the "effects" prong, mere allegations that "some investors in the U.S. deposited crypto assets" was not sufficient to establish that Heart's conduct had a "substantial effect" within the forum. *Id*.

In sum, the allegations in *Pulsechain* are similar to those against Mr. Kohli. Because of that, this case provides an additional basis for dismissing the Complaint against Mr. Kohli.

Dated: March 17, 2025

Respectfully submitted,

*/s/ Eric S. Rosen*
Eric S. Rosen
DYNAMIS LLP
225 Franklin St., 26th Floor
Boston, MA 02110
(646) 541-8484
erosen@dynamisllp.com

Michael B. Homer
DYNAMIS LLP
225 Franklin St., 26th Floor
Boston, MA 02110
(617) 693-9732
mhomer@dynamisllp.com

*Attorneys for Defendant Manpreet Kohli*

## **CERTIFICATE OF SERVICE**

I hereby certify that on March 17, 2025, a true and correct copy of the foregoing

document was served by e-filing upon counsel of record.

/s/ Eric S. Rosen
Eric S. Rosen
DYNAMIS LLP
225 Franklin St., 26th Floor
Boston, MA 02110
(646) 541-8484
erosen@dynamisllp.com

# EXHIBIT A

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------x
SECURITIES AND EXCHANGE
COMMISSION,

                  Plaintiff,

      -against-

RICHARD J. SCHUELER, a/k/a RICHARD
HEART, HEX, PULSECHAIN, and
PULSEX,

                  Defendants.
--------------------------------------------------------x

<u>NOT FOR PUBLICATION</u>
**MEMORANDUM & ORDER**
23-cv-5749 (CBA) (PK)

**AMON, United States District Judge:**

## INTRODUCTION

Plaintiff Securities and Exchange Commission ("SEC") brought this action against Defendants Richard J. Schueler (a/k/a Richard Heart) ("Heart"), Hex, PulseChain, and PulseX. (ECF Docket Entry ("D.E.") # 1 ("Compl.").)[1]  The SEC alleges that Heart violated the Securities Act of 1933 ("Securities Act"), 15 U.S.C. §§ 77a, <u>et seq.</u>, and the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§ 78a, <u>et seq.</u>, by promoting, offering, and selling unregistered crypto asset securities and defrauding investors by misappropriating investor funds.

Pursuant to Rules 12(b)(2) and 12(b)(6) of the Federal Rules of Civil Procedure, Heart moves to dismiss all claims both for lack of personal jurisdiction and for failure to state a claim. For the reasons stated below, the motion to dismiss is GRANTED.

---

[1] The SEC failed to respond to Heart's challenge to the SEC's purported "alter ego" theory regarding Hex, PulseChain, and PulseX.  (D.E. # 50 ("Def. Mot.") 22-24.); (see generally D.E. # 52 ("SEC Opp.").)  At oral argument, the SEC conceded that it failed to respond to this argument and that the alter ego claims were "not part of [its] theory for why the Court would have personal jurisdiction."  (D.E. # 56 ("Oral. Arg. Tr.") 7:2-8:14.)  I therefore find that the SEC chose to abandon any arguments it could have made regarding the alleged alter ego entities.  See Maher v. All. Mortg. Banking Corp., 650 F. Supp. 2d 249, 267-68 (E.D.N.Y. 2009); Lipton v. Cnty. of Orange, 315 F. Supp. 2d 434, 446 (S.D.N.Y. 2004) ("This Court may, and generally will, deem a claim abandoned when a plaintiff fails to respond to a defendant's arguments that the claim should be dismissed.")

# BACKGROUND

The following facts are taken from the Complaint and are assumed true for purposes of this motion.  I draw all reasonable inferences in the SEC's favor.  See Buon v. Spindler, 65 F.4th 64, 76 (2d Cir. 2023).[2]

Heart is a United States citizen currently residing in Finland.  (Compl. ¶ 1.)  He is the founder of Hex, PulseChain, and PulseX, each alleged to be a crypto asset security (collectively, "Heart's Crypto Assets"). [3]  (Id.)

## I.    The Offer Periods

### a.    Hex

From December 3, 2019, to November 19, 2020, Heart offered and sold Hex tokens to investors, some of whom resided in the United States, in exchange for ETH ("Hex Offer Period").[4] (Id. ¶¶ 20, 29; Bahr Decl. ¶ 12.)  Hex is an "ERC Token," which is a technical standard that defines how "fungible tokens" operate on the Ethereum blockchain.[5]  (Compl. ¶ 12 n.1.)  Heart designed Hex to operate on Ethereum as a "smart contract."  (Id. ¶ 20.)[6]

The Hex offering and communications occurred globally through social media and Heart's websites.[7]  (Id. ¶ 34; Bahr Decl. ¶ 6.)  To facilitate the Hex offering, Heart created several digital

---

[2] I also rely, as appropriate, on certain of the exhibits attached to the Declaration of Derek Kleinmann ("Kleinmann Decl." (D.E. #53)), including a transcript from the PulseChain Conference in Las Vegas, Nevada in September 2022 ("PulseCon Tr." (D.E. #53-4)) and the Declaration of Kyle Bahr ("Bahr Decl." (D.E. #53-5)).

[3] "Crypto-assets, which are also called cryptocurrency or tokens, are decentralized digital commodities . . . ." In re Bibox Grp. Holdings Ltd. Sec. Litig., 534 F. Supp. 3d 326, 329 (S.D.N.Y. 2021) (internal quotations omitted).

[4] ETH is a unit of cryptocurrency that is the native token, or digital asset, of the Ethereum blockchain.  SEC v. Telegram Grp. Inc., 448 F. Supp. 3d 352, 360 n.3 (S.D.N.Y. 2020) (internal citation omitted).

[5] Blockchains are decentralized digital ledgers that serve to validate transfers of cryptocurrency.  Id. at 360 n.2. "Blockchains consist of 'blocks' of data that track the ownership and transfer of crypto assets on a given network, dating back to the first-ever transaction on that network."  Risley v. Universal Navigation Inc., 690 F. Supp. 3d 195, 202 (S.D.N.Y. 2023).

[6] Smart contracts perform self-executing functions when predetermined conditions are met.  (Compl. ¶ 20 n.2.)

[7] Heart allegedly operates and controls: hex.com, hex.win, ethhex.com, pulsechain.com, and pulsex.com.  (Compl. ¶¶ 12-14.)

wallet addresses which he allegedly owns and controls.[8]  (Compl. ¶ 36.)  Heart created a digital wallet address on the Ethereum blockchain known as the "Hex contract address" ("Hex CA") and a separate private wallet address known as the "Hex Flush Address," which was programmed directly into Hex's code before he sold any Hex tokens.  (Id. ¶¶ 30, 35-36; Bahr Decl. ¶ 13.) Investors sent ETH to the Hex CA and received Hex tokens in return.  (Compl. ¶¶ 29-30.)  The ETH in the Hex CA would then be automatically transferred, or "flushed," to the Hex Flush Address.  (Id. ¶ 35; Bahr Decl. ¶ 14.)

According to the SEC, after investors' ETH transferred into the Hex Flush Address, it was sent through a series of transactions, known as "recycling," involving intermediary digital wallet addresses on crypto asset trading platforms before eventually being sent back into the Hex CA. (Compl. ¶ 37.)  The holders of the digital wallet addresses perpetuating the "recycling" transactions would receive additional Hex for each transaction.  (Bahr Decl. ¶ 21.)  During its investigation, the SEC discovered that approximately 94 to 97 percent of the ETH deposited into the Hex CA went through this "recycling" process.  (Compl. ¶ 37.)  The SEC alleges that Heart created a false appearance of significant organic demand for Hex tokens, when in reality, the majority of these transactions were "recycling" transactions that let Heart gain control over a large number of Hex tokens.  (Id.)

During the Hex Offer Period, Heart marketed and promoted Hex using several online and social media platforms, including Twitter, YouTube livestreams ("YouTube Live") and the Hex.com website.  (Id. ¶ 34.)  For example, Heart marketed Hex's "staking" feature, frequently referring to Hex as the first high yield "Blockchain Certificate of Deposit" on Ethereum.  (Id. ¶ 44;

---

[8] "Digital wallets, pieces of software akin to a bank account for digital assets, store private keys, which grant control over individual tokens, and permit users to easily send and receive tokens via the blockchain." Telegram, 448 F. Supp. 3d at 362 n.4 (internal quotations omitted).

Bahr Decl. ¶ 35.)  Staking allows investors to "lock up"[9] their Hex tokens for a designated period in exchange for additional Hex tokens as a return on their investment.  (Compl. ¶¶ 21, 45; Bahr Decl. ¶ 35.)  Heart likened "staking" to conventional interest payments, claiming that investors would receive an average investment return of 38 percent.  (Compl. ¶¶ 21-22, 46.)  Heart also explained that the "staking" protocol benefitted everyone who held Hex tokens because "when people lock up their [Hex] coins," that would "cause[] the price to go up" and "the market cap to go down," allowing investors to "keep building appreciations and mad gains."  (Id. ¶¶ 22-23, 49.)

The Complaint further alleges that Heart touted Hex's capacity for profitability claiming to investors that "if you want to get rich, [Hex is] built for that" and that Hex was "designed to surpass ETH" and become "the highest appreciating asset that has ever existed in the history of man."  (Id. ¶¶ 24-25.)

It also recounts Heart's efforts to make Hex a success.  Heart shared with potential investors "how to videos" describing how investors could purchase and stake their Hex tokens.  (Id. ¶ 26.)  Heart promised investors he would "personally call [crypto asset trading platforms]" to get Hex listed.  (Id. ¶ 28.)  Heart sent private Twitter messages to a crypto asset trading platform which subsequently listed Hex on its platform in December 2019.  (Id.)  Heart further claimed to investors that "almost all" of his time was going towards developing the Hex ecosystem.  (Id. ¶ 27.)  Two U.S. investors invested in Hex after learning about Hex through Heart's online activities. (Kleinmann Decl. ¶¶ 12-13.)

Heart also used incentives to attract investors.  He promoted a rewards program called "BigPayDay" that rewarded investors who "staked" their Hex tokens with bonus payments of

---

[9] The Hex tokens would be sent to an ownerless address on the Ethereum blockchain.  The "locked up" tokens could not be transferred out until the smart contract recognized the necessary predetermined conditions.  (Compl. ¶ 22.)

unclaimed Hex tokens. (Compl. ¶¶ 32, 47.)[10] Heart also orchestrated two separate airdrops to generate additional investor interest in Hex. (Id. ¶ 33.)[11] He identified significant holders of both Bitcoin and ETH and directed his developers to deposit Hex tokens into the holders' digital wallets. (Id.) The alleged purpose of these airdrops was to increase market awareness for Hex. (Bahr Decl. ¶ 24.)

Ultimately, the Hex offering received at least 2,371,362 ETH deposits from 21,156 identifiable digital wallet addresses, including deposits from 10 U.S. investors. (Compl. ¶ 34; Kleinmann Decl. ¶ 11.)

### b. PulseChain

From July 15, 2021, to August 3, 2021, Heart coordinated an offering to raise investor funds to allegedly develop PulseChain ("PulseChain Offer Period"). (Compl. ¶ 51.) The SEC alleges that the PulseChain Offer Period was "unofficially" extended to April 6, 2022. (Id. ¶ 51 n.6; Bahr Decl. ¶ 53.)

PulseChain is a hard fork[12] of the Ethereum blockchain with its own native token Pulse ("PLS"). (Compl. ¶ 13.) The primary purpose of PulseChain was to run faster and with cheaper "gas" fees than Ethereum. (Id. ¶ 51; Bahr Decl. ¶ 47.)[13]

---

[10] Throughout the Hex offering, Heart allegedly distributed at least $1 billion worth of Hex tokens through this program. (Compl. ¶ 47.)

[11] An airdrop is a distribution of crypto assets where the recipient receives crypto assets without providing cash consideration or taking any steps to accept. (Compl. ¶ 33 n.11.)

[12] A "fork" occurs when an existing blockchain, in this case Ethereum, is copied and then a new set of rules applies independent of the copied blockchain. (Bahr Decl. ¶ 46); see also Raina S. Haque, Rodrigo Seira Silva-Herzog, Brent A. Plummer, Nelson M. Rosario, Blockchain Development and Fiduciary Duty, 2 STAN. J. BLOCKCHAIN L. & POL'Y 139, 164 (2019) ("[A hard fork] effectively allows any individual to copy the current publicly-available source code of a certain public blockchain's software application, modify it to reflect a new ruleset, re-release it to the public and coalesce a community around the revised protocol.").

[13] "Gas" fees are akin to a transaction fee that enables users to execute transactions on the network. PulseChain uses PLS as "gas." (Compl. ¶¶ 51 n.5, 54, 57.)

To participate in the PulseChain offering, investors deposited or "sacrificed" crypto assets, including ETH, into a digital wallet address ("PulseChain SA").  (Compl. ¶ 51.)  In exchange, PulseChain investors ultimately received PLS tokens in May 2023, when PulseChain launched.  (Id. ¶¶ 52, 53.)

During the PulseChain Offer Period, Heart promoted and marketed PulseChain through his websites and social media.  For example, Heart touted the expected profits for potential PulseChain investors, claiming that "14,000x is a reasonable estimate for what could be possible for Pulse[.]"  (Id. ¶ 58.)  Heart also emphasized his efforts to develop PulseChain.  On YouTube Live, Heart described his progress to get PulseChain ready for the launch.  (Id. ¶ 65.)

Ultimately, the PulseChain offering collected crypto asset deposits worth over $354 million, including deposits from at least 10 U.S. investors.  (Id. ¶ 55; Kleinmann Decl. ¶ 11.)

### c.  PulseX

From December 29, 2021, to February 26, 2022, Heart coordinated an offering to raise investor funds to allegedly develop PulseX ("PulseX Offer Period").  (Compl. ¶ 67.)  The SEC alleges that the PulseX Offer Period, like the PulseChain Offer Period, was also "unofficially" extended to April 6, 2022.  (Id.; Bahr Decl. ¶ 53.)  Heart developed PulseX and its native token PLSX around the same time as PulseChain.  PulseX is a decentralized protocol on the Ethereum blockchain that acts as PulseChain's "decentralized crypto asset trading platform" through a fork of the Uniswap platform. [14]  (Compl. ¶ 14.)

---

[14] According to the SEC, most secondary market transactions occur on Uniswap, a decentralized crypto asset trading platform.  (Compl. ¶ 41.)  On Uniswap, users identify which tokens they want to trade, and which tokens they want to receive, and then Uniswap "swaps" the identified tokens.  See Risley, 690 F. Supp. 3d at 207 (discussing how Uniswap executes token swaps).

To participate in the PulseX offering, investors similarly deposited, or "sacrificed," crypto assets to a PulseX digital wallet address ("PulseX SA"). (Id. ¶ 67.) In exchange, investors ultimately received PLSX in May 2023, when PulseX launched. (Id. ¶¶ 67, 69.)

During the PulseX Offer Period, Heart promoted and marketed PulseX through his websites and social media. Heart claimed PulseX was the "coolest, highest liquidity automated market maker exchange" and that it was "well within the realm of possibility" that PLSX would appreciate around "10,000x in two years." (Id. ¶ 70.) According to the SEC, Heart tied the launch of PulseX and PulseChain to an increase in profits for investors in Heart's Crypto Assets. Heart explained that when an investor deposits Hex tokens during the PulseX Offer Period, hundreds of millions of dollars in Hex tokens are removed from the supply. (Id. ¶ 72.) With this reduced supply of Hex tokens in circulation, Heart claimed that Hex tokens would appreciate and be "more valuable" on Pulse than on Ethereum. (Id.)

Ultimately, the PulseX offering received crypto asset deposits worth over $676 million, including deposits from at least 10 U.S. investors. (Id. ¶ 67; Kleinmann Decl. ¶ 11.)

## II. Post-Offer Period Statements

### a. Hex

After the Hex Offer Period, Heart continued to market and promote Hex to allegedly drive Hex's demand on the secondary market. (Compl. ¶ 38.) Hex's websites published statements claiming that "Hex appreciated faster than anything else" and that "Hex's primary design intention is price appreciation . . . ." (Id. ¶ 39.) Heart also directed potential investors to visit his website Ethhex.com, which allowed investors to transact in secondary market purchases directly through Uniswap. (Id. ¶¶ 41-42.)

Heart also made two virtual appearances before audiences in the United States.  In the SEC's view, Heart continued to promote Hex, PulseChain and PulseX during these appearances. Heart appeared at a conference known as "Hex Conference" in March 2022 and a conference known as "PulseCon" in September 2022.  (Kleinnman Decl. ¶¶ 5, 8-10.)  During these appearances, Heart touted Hex's "giant volume" on decentralized exchanges and that he "wouldn't be surprised if at some point Hex started doing the same things that it used to do, which is just overperforming like crazy."  (Id. ¶¶ 5, 9.)  On August 15, 2022, Heart also appeared in person for a live podcast interview in Miami, Florida, where he discussed Hex, PulseChain, and PulseX ("Miami Interview").  (Id. ¶ 6.)  Heart again bragged about Hex's performance, claiming Hex produced "10,000x" returns in two years.  (Id.)

### b. PulseChain and PulseX

After the PulseChain and PulseX Offer Periods, Heart continued to market and promote PulseChain and PulseX.  He stated at PulseCon that his developers are "geniuses; they find bugs other people don't" and that "before we launch . . . we want everything to be right." (PulseCon Tr. 2-3.)  These statements are alleged to have led investors to believe that if Heart and his developers did not complete PulseChain's development, the value of their investment would collapse.  (Compl. ¶ 65.)  Heart also stated that because PulseChain is "gonna launch at zero . . . it's pretty hard to beat the ROI of something that goes from zero to anything . . . it's like infinite ROI."  (Id. ¶ 59.)  Based on Heart's statements, one Brooklyn investor believed that his deposits were being used to develop PulseChain and that PLS tokens would increase in value.  (Id. ¶¶ 59, 64.)

Regarding PulseX, Heart, through a Telegram chat, described how PulseX functioned to one potential U.S investor.  (Id. ¶ 70.)  Heart provided the investor with step-by-step instructions

on how to purchase crypto assets and how to transfer them to PulseChain and swap on PulseX. (Id.)  Further, on YouTube Live, when asked about an update on the launch of PulseChain and PulseX, Heart replied that "[i]t's done when it's done. Software is hard. The [developers] are working hard on it. That's all there is to it."  (Id. ¶ 75.)

### III.    PulseChain Fraud Allegations

The SEC further alleges that Heart defrauded PulseChain investors and engaged in deceptive conduct.  From August 3, 2021, through September 22, 2022, the SEC alleges that Heart misappropriated $12.1 million of PulseChain investor deposits to purchase luxury items, including cars, watches, and diamonds. (Id.  ¶¶ 61, 62.)  To disguise these transactions, PulseChain deposits were first transferred to Heart's private wallet and then transferred through a series of "mixer"[15] transactions before ending up on three crypto asset platforms.  (Id.)  According to the Complaint, these mixer transactions ultimately benefited Heart through his personal purchases.  (Id. ¶¶ 61-62.) Heart never disclosed to investors that their deposits would be used to fund such purchases.  (Id. ¶ 66.)

### IV.    Complaint's Causes of Action

Based upon these allegations, the SEC asserts two basic claims for relief against Heart. First, it alleges that Heart violated Section 5 of the Securities Act by failing to register the offer and sale of Heart's Crypto Assets as required by the securities laws ("Unregistered Securities Claims").  15 U.S.C. §§ 77e(a), 77e(c).  Second, it alleges that Heart violated the antifraud provisions of the federal securities laws with respect to the offer and sale of his crypto asset PulseChain ("PulseChain Fraud Claims").  15 U.S.C. §§ 77q(a)(1), 77q(a)(3), 78j(b); 17 C.F.R. §§ 240.10b-5(a), 10b-5(c).

---

[15] Mixer transactions anonymize transactions by disguising the origin, destination, and parties involved.  (Compl. ¶ 61.)

## STANDARD OF REVIEW

### I.      Rule 12(b)(2)

To defeat a motion to dismiss for lack of personal jurisdiction, the plaintiff "need make only a prima facie showing that jurisdiction exists." Hoffritz for Cutlery, Inc. v. Amajac, Ltd., 763 F.2d 55, 57 (2d Cir. 1985) (internal citation omitted).  Under this standard, a plaintiff "must plead facts which, if true, are sufficient in themselves to establish jurisdiction as to each defendant," Balestra v. ATBCOIN LLC, 380 F. Supp. 3d 340, 349 (S.D.N.Y. 2019) (internal quotation omitted), and to "each claim asserted." Sunward Elecs., Inc. v. McDonald, 362 F.3d 17, 24 (2d Cir. 2004).  A plaintiff "can make this showing through his own affidavits and supporting materials, containing an averment of facts that, if credited, would suffice to establish jurisdiction over the defendant."  Whitaker v. Am. Telecasting Inc., 261 F.3d 196, 208 (2d Cir. 2001) (internal quotations omitted).  Further, the plaintiff may make a prima facie showing "notwithstanding a controverting presentation by the moving party," because "all pleadings and affidavits are construed in the light most favorable to the plaintiff, and [because] where doubts exist, they are resolved in the plaintiff's favor." Hoffritz, 763 F.2d at 57 (internal citation omitted).

### II.      Rule 12(b)(6)

Federal Rule of Civil Procedure 12(b)(6) provides for dismissal of a complaint that "fail[s] to state a claim upon which relief can be granted."  To survive dismissal, a complaint must state a claim that is "plausible on its face" by alleging sufficient facts for "the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (internal quotation and citation omitted).  A court must dismiss a claim if the "well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct." Id. at 679.  Although courts will not credit "conclusory statements" or "[t]hreadbare recitals of the

10

elements of a cause of action," id. at 678, the court must accept as true all material allegations and draw all reasonable inferences in the plaintiff's favor, Johnson v. Priceline.com, Inc., 711 F.3d 271, 275 (2d Cir. 2013). "In considering a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6), a district court may consider the facts alleged in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint." DiFolco v. MSNBC Cable L.L.C., 622 F.3d 104, 111 (2d Cir. 2010) (internal citation omitted).

## DISCUSSION

### I.   Personal Jurisdiction

Heart first asserts that the SEC has failed to establish personal jurisdiction as to any of its claims. "To establish personal jurisdiction over a defendant, due process requires a plaintiff to allege (1) that a defendant has certain minimum contacts with the relevant forum, and (2) that the exercise of jurisdiction is reasonable in the circumstances." In re Terrorist Attacks on Sept. 11, 2001, 714 F.3d 659, 673 (2d Cir. 2013) (internal quotation omitted); see, e.g., Int'l Shoe Co. v. Washington, 326 U.S. 310, 316 (1945). For purposes of the minimum contacts analysis, the SEC only asserts that I have specific jurisdiction over Heart. "Specific jurisdiction exists when a court exercises personal jurisdiction over a defendant in a suit arising out of or related to the defendant's contact with the forum . . . ." In re Platinum & Palladium Antitrust Litig., 61 F.4th 242, 269 (2d Cir. 2023) (internal quotation omitted). In determining whether specific jurisdiction exists, courts must assess the "quality and nature" of "the defendant's contacts with the forum state under a totality of the circumstances test." Best Van Lines, Inc. v. Walker, 490 F.3d 239, 242 (2d Cir. 2007) (quoting Burger King Corp. v. Rudzewicz, 471 U.S. 462, 475 (1985)). "The crucial question is whether the defendant has purposefully availed itself of the privilege of conducting

activities within the forum State, thus invoking the benefits and protections of its laws, such that the defendant should reasonably anticipate being haled into court there." Id. (cleaned up).

Section 77v(a) of the Securities Act and Section 78aa of the Exchange Act, which together govern all causes of action in the Complaint, authorize nationwide service of process, meaning that courts "look[] to contacts with the entire United States rather than with the forum state" when determining whether to exercise personal jurisdiction over defendants. SEC v. Stubos, 634 F. Supp. 3d 174, 186 (S.D.N.Y. 2022) (internal quotation omitted); see, e.g., Balestra, 380 F. Supp. 3d at 349-350 (analyzing defendants' contacts with the United States when determining personal jurisdiction for claims arising under the Securities Act); SEC v. Sharef, 924 F. Supp. 2d 539, 544 (S.D.N.Y. 2013) (same for the Exchange Act). In determining which contacts to consider, the "guiding principle" of the minimum contacts test is whether the suit "relates to the defendant's contacts with the forum." CFTC v. TFS-ICAP, LLC, 415 F. Supp. 3d 371, 382 (S.D.N.Y. 2019) (quoting SEC v. Straub, 921 F. Supp. 2d 244, 253 (S.D.N.Y. 2013)); see also Steel v. United States, 813 F.2d 1545, 1549 (9th Cir. 1987) ("[C]ourts must examine the defendant's contacts with the forum at the time of the events underlying the dispute when determining whether they have jurisdiction.") The SEC then must show "some sort of causal relationship between [Heart's] U.S. contacts and the episode in suit, and the [SEC's] claim must in some way arise from [Heart's]

purposeful contacts with the forum." Charles Schwab Corp. v. Bank of Am. Corp., 883 F.3d 68, 84 (2d Cir. 2018) (internal quotation omitted).

Because the SEC must establish this Court's jurisdiction with respect to its Unregistered Securities Claims and its PulseChain Fraud Claims, I address each set of claims in turn.

### a. Unregistered Securities Claims

In support of its Unregistered Securities Claims, the SEC relies on contacts that occurred before, during, and after the offer periods. I will first consider Heart's contention that the SEC's alleged post-offer period contacts are not relevant to the inquiry. (Def. Reply 5, 11.)

### i. Post-Offer Period Contacts

Heart argues that his virtual attendance at the Hex Conference, PulseCon and his in-person appearance at the Miami Interview are irrelevant because investors could no longer participate in the alleged offer and sale of Heart's Crypto Assets. (Id. 4-6, 10-12.) The SEC argues generally that Heart's "mix of online plus in-person promotions" together, were specifically directed towards the United States and thus constitute sufficient minimum contacts. (SEC Opp. 10-15; Oral. Arg. Tr. 19-24.) But fails to adequately address the timing issue raised by Heart.

Here, the "relevant 'suit related conduct'" is the "conduct that could have subjected [Heart] to liability" under Sections 5(a) (sale of unregistered securities) and 5(c) (offer of unregistered securities) of the Securities Act for registration violations. Waldman v. Palestine Liberation Org., 835 F.3d 317, 335 (2d Cir. 2016). Contacts that postdate the offer periods could not subject Heart to liability because investors could no longer purchase Heart's Crypto Assets pursuant to the offer. See Sarkisian v. OpenLocker Holdings, Inc., 700 F. Supp. 3d 105, 110 (S.D.N.Y. 2023) (finding no personal jurisdiction where the only alleged contacts with the forum did not occur during the "events giving rise to liability"). For Hex, the offer period closed in November 2020

(Compl. ¶ 20), well before the conferences took place.  Although Heart did discuss Hex extensively during the Hex Conference, it is irrelevant to the offer and sale of unregistered securities because investors could no longer participate in the offer period.  The Complaint alleges that since the "Hex Offering closed, Hex investors can only purchase Hex tokens from third parties" on platforms such as Uniswap.  (Id. ¶ 41.)  But Heart is not alleged to have any control or involvement in Uniswap.

Regarding PulseChain and PulseX, although the Hex Conference took place before the end of the "unofficially extended" offer periods for PulseChain and PulseX, nothing was said of significance that related to those offerings.  Heart only mentioned PulseChain and PulseX as having a "product market fit" with "a lot of traction, a lot of demand."  (Kleinmann Decl. ¶ 5.)  The Hex Conference instead focused on Hex's post-offer performance.  (Id.)  Without more, Heart's presence at a virtual conference focused on a different post-offering asset is insufficient to establish personal jurisdiction.  The remaining alleged contacts, PulseCon and the Miami interview, took place after the PulseChain and PulseX offer periods ended.

Moreover, there is no allegation that Heart received investor deposits after the Hex, PulseChain, and PulseX Offer Periods closed.  Absent such allegations, Heart's suit-related conduct does not "arise out of or relate to" his post-offer period contacts.  See 7 W. 57th St. Realty Co., LLC v. Citigroup, Inc., No. 13 Civ. 981 (PGG), 2015 WL 1514539, at *10 (S.D.N.Y. Mar. 31, 2015) (finding no personal jurisdiction where the "[p]laintiff has not pled facts suggesting that the [defendant's] conduct . . . took place within the relevant time period"), aff'd, 771 F. App'x 498 (2d Cir. 2019); Callahan v. Wisdom, No. 3:19-CV-00350 (KAD), 2020 WL 2061882, at *11

(D. Conn. Apr. 29, 2020) (refusing to consider certain forum contacts because they were "unrelated to the instant suit").

Accordingly, I find that Heart's participation in the virtual conferences and his in-person interview are not relevant contacts that could subject Heart to liability for the alleged offer and sale of Heart's Crypto Assets.

### ii. Contacts Before and During the Offer Period

For the relevant periods, the SEC relies on Heart's online marketing efforts through social media and his websites. Because this conduct occurred outside of the United States, courts employ the effects test, which permits a court to assert specific personal jurisdiction over a defendant "if the defendant expressly aimed its conduct at the forum." Dennis v. JPMorgan Chase & Co., 343 F. Supp. 3d 122, 203 (S.D.N.Y. 2018) (quoting Licci ex rel. Licci v. Lebanese Canadian Bank, SAL, 732 F.3d 161, 173 (2d Cir. 2013)). Incidental effects, or even foreseeable effects are insufficient; instead, the defendant "must have intentionally caused—i.e., expressly aimed to cause—an effect in the forum through his conduct elsewhere." 7 W. 57th St. Realty Co., LLC, 2015 WL 1514539, at *9.

### 1. Heart's Internet Contacts

The SEC alleges that Heart extensively marketed Heart's Crypto Assets on his websites and social media. (SEC Opp. 14.) Heart counters that his online efforts to market and promote Heart's Crypto Assets were globally available and not expressly directed towards the United States. (Def. Mot. 18-19.) For the reasons stated below, the remaining suit-related internet contacts, even considered collectively, are insufficient to establish personal jurisdiction.

When determining whether to exercise personal jurisdiction over a defendant because of activity on his website, the Second Circuit considers as a relevant factor a websites' interactivity

in determining "whether the defendant, through the website, purposefully avail[ed] himself of the privilege of conducting activities" in the forum.  Best Van Lines, Inc., 490 F.3d at 252 (internal quotation omitted) (alteration in original).

A website's degree of "interactivity" exists on a spectrum.  Id. at 251 (citing Zippo Mfg. Co. v. Zippo Dot Com, Inc., 952 F. Supp. 1119 (W.D. Pa. 1997)).  At one end of the spectrum are active websites – sites where a defendant "clearly does business over the Internet" because he contracts with residents of a foreign jurisdiction through "knowing and repeated" internet communications.  Zippo, 952 F. Supp. at 1124.  On the other end are passive websites, which do not confer jurisdiction.  Passive websites generally do not give users "any ability to directly purchase the services through the website."  A.W.L.I. Grp., Inc. v. Amber Freight Shipping Lines, 828 F. Supp. 2d 557, 568, 574 (E.D.N.Y. 2011) (internal citation omitted) ("Most courts have found that the maintenance of a web site alone, without more, does not rise to the level of purposeful availment of [a forum's] laws.").  Finally, the middle of the spectrum involves "interactive sites," which "permit[] the exchange of information between users in another state and the defendant, which depending on the level and nature of the exchange may be a basis for jurisdiction."  Citigroup Inc. v. City Holding Co., 97 F. Supp. 2d 549, 565 (S.D.N.Y. 2000).

The SEC argues that Heart conducted business over the internet through his websites and social media campaigns, but the facts as alleged fail to support that position.  In making this argument, the SEC relies on my decision in SEC v. PlexCorps, No. 17-CV-7007 (CBA) (RML), 2018 WL 4299983 (E.D.N.Y. Aug. 9, 2018), but that reliance is misplaced.  In PlexCorps, the SEC brought suit against the defendants for violations of federal securities laws for promoting and selling their crypto asset to U.S.-based customers.  I rejected the defendants' motion to dismiss for lack of personal jurisdiction because the defendants created several significant internet contacts

with the United States while promoting their "initial coin offering," or ICO.  Id. at *20.  The defendants used Facebook to directly message information about the ICO to U.S.-based customers, respond to questions, and provide links to the defendants' websites.  Id. at *14.  The defendants also facilitated sales on their websites through payment portals through which users could "provide their credit-card information and purchase" the crypto asset.  Id. at *16.  In part because the defendants' website contacts "evince[d] that they clearly d[id] business over the internet," id. at *19 (internal quotation omitted), I determined that personal jurisdiction was proper.[16]

Here, unlike in PlexCorps, Heart's website contacts were not "active."  The Complaint fails to allege that Heart facilitated transactions, collected credit card information, or entered into contracts with U.S.-based investors through his websites.  Therefore, Heart did not "clearly do[] business" over his websites.  Zippo, 952 F. Supp. at 1124.  Nor do Heart's website contacts fall towards the middle of the spectrum.  The Complaint alleges that Heart provided information via YouTube and on his website on how users could invest in Heart's Crypto Assets.  (Compl. ¶¶ 26, 67.)  However, Heart did not directly message U.S.-based investors or respond to questions through his websites.  Rather, Heart disseminated "how to" information, which alone is not sufficient.

Heart's website contacts instead fall closer to the passive end of the Zippo spectrum.  As alleged, Heart's websites included clickable tabs that provided information on how to purchase Heart's Crypto Assets (SEC Opp. 15-16 (citing Compl. ¶¶ 26, 41-42, 51, 67))[17], but "simply

---

[16] In addition to the defendants' website contacts, I determined in PlexCorps that the defendants' trip to the United States to promote the ICO and numerous accounts with U.S.-based payment servicers to facilitate sales constituted significant contacts in support of exercising personal jurisdiction.  Id. at *19.  At oral argument, the SEC rightly acknowledged that it did not "have all th[e] contacts that existed in PlexCorps."  (Oral Arg. Tr. 28:21-22.)

[17] The SEC's reliance on Ethhex.com is also misplaced.  The SEC argues that Heart "directly facilitate[d] sales" through designing Ethhex.com, a website interface that allows investors to engage in secondary market transactions through Uniswap.  (SEC Opp. 16; Compl. ¶ 42.)  However, Ethhex.com does not sell Hex; instead, it provides a link to a third-party platform wherein users can swap tokens directly with other users which is insufficient to support

post[ing] information on an Internet Web site which is accessible to users in foreign jurisdictions . . . is not grounds for the exercise [of] personal jurisdiction." Best Van Lines, 490 F.3d at 251 (quoting Zippo, 952 F. Supp. at 1124); see, e.g., Atwal v. iFinex Inc., No. 22-CV-149 (JLS) (LGF), 2023 WL 3063450, at *9 (W.D.N.Y. Mar. 22, 2023) ("Defendants did not purposefully avail themselves of the privilege of conducting business in [the forum] simply because a [forum] resident submitted a support ticket on their website and briefly communicated with a representative . . . ."); Safex Found., Inc. v. SafeLaunch Ventures Ltd., 694 F. Supp. 3d 1, 16 (D.D.C. 2023) (finding the accessibility of a foreign cryptocurrency company defendant's website and some of its interactive features, including a clickable link to a third-party cryptocurrency exchange, insufficient to support a finding of personal jurisdiction under the D.C. long-arm statute). Accordingly, Heart's website contacts simply provided globally available information and lack sufficient interactivity to constitute a significant contact.

Heart's social media statements fare no better. Heart claimed on YouTube that Hex "was built to outperform Ethereum and Bitcoin and all other cryptocurrencies." (Compl. ¶ 25.) But such statements are not alleged to be "expressly targeted" at the United States any more than at other forums. See 79th Grp., Inc. v. Moore, No. 1:23-CV-02521 (JLR), 2024 WL 36992, at *13 (S.D.N.Y. Jan. 3, 2024) (finding that a social media post accessible to forum residents but not "expressly targeted" at them could not establish personal jurisdiction); cf. Hardin v. TRON Found., No. 20-CV-2804 (VSB), 2024 WL 4555629, at *7 (S.D.N.Y. Oct. 23, 2024) (finding that the

---

exercising personal jurisdiction. See Novak v. Overture Servs., Inc., 309 F. Supp. 2d 446, 456 (E.D.N.Y. 2004) (finding that a website that "sells no goods" but "provides links to other sites that sell goods . . . does not provide grounds for personal jurisdiction . . . ."). What is more, the Complaint fails to allege that any U.S. investor used Ethhex.com to purchase Hex through the secondary market. See Royalty Network Inc. v. Dishant.com, LLC, 638 F. Supp. 2d 410, 420 (S.D.N.Y. 2009) (finding it unnecessary to reach the jurisdictional question regarding the defendant's transaction of business where the plaintiff provided "no evidence that any [forum] resident actually engaged in any such transactions" through the defendant's website).

defendants' social media statement, "If your friends ask you where is the best exchange to buy $TRX in United States and Europe, the best answer is @krakenfx!" targeted the U.S. market).

In sum, the relevant online communications described in the Complaint during the offer periods consist of untargeted, globally available information. The SEC failed to plead sufficient facts to suggest that Heart's online statements were "purposefully directed to [the forum] rather than a [global] audience." Best Van Lines, 490 F.3d at 253.

### 2. U.S.-Based Developer

The SEC argues half-heartedly[18] that Heart's involvement with Bahr, a software developer, to develop Heart's Crypto Assets constitutes purposeful conduct directed at the United States. (SEC Opp. 18.) For the reasons discussed below, Bahr's involvement with Heart falls short of what is necessary to exercise personal jurisdiction over Heart.

First, there is no allegation that Bahr was in the United States while he worked with Heart. The affidavit says only that Bahr "currently" lives in the United States. (Bahr Decl. ¶ 2.)[19] Even if Bahr were in the United States, he was not an employee of Heart; instead, he was only a volunteer, and his activities were purely incidental to his presence in the forum. (Id. ¶¶ 2-3, 56); see Outdoor Partners LLC v. Rabbit Hole Interactive Corp., No. 13 Civ. 1797 (KBF), 2013 WL 6503525, at *6 (S.D.N.Y. Dec. 9, 2013) (finding that a defendant who "did nothing more than to contract with a [forum resident]" who "tested and de-bugged [defendant's] games in [the forum]" did not have minimum contacts with the forum); Callahan, 2020 WL 2061882, at *12 (finding that "merely . . . engaging a consultant, who, purely incidental to his work for the [defendant], was located in [the forum]" did not establish personal jurisdiction). Further, Bahr's activities are not

---

[18] At oral argument, the SEC acknowledged that Bahr was "not one of our princip[al] contacts we're relying on." (Oral. Arg. Tr. 29:2-12.)

[19] Further, the SEC admits that there was nothing to "suggest[] that Mr. Heart knew that he was dealing with somebody in the United States when he was engaging him for work on Hex and PulseChain." (Id.)

alleged to relate to efforts to market and promote the alleged securities at issue.  Cf. SEC v. Terraform Labs Pte Ltd., No. 22-368, 2022 WL 2066414, at *3 (2d Cir. June 8, 2022) (affirming a finding of personal jurisdiction where the defendant "retained U.S.-based employees" that were directly involved in promoting the digital assets at issue).

Because Heart did not engage in substantial suit-related conduct in or directed at the United States in connection with the offer and sale of Heart's Crypto Assets, I find that Heart does not have sufficient contacts with the United States for specific jurisdiction.  See Walden v. Fiore, 571 U.S. 277, 284 (2014) ("[T]he defendant's suit-related conduct must create a substantial connection with the forum State.")  Since I conclude that minimum contacts are lacking, I need not determine whether exercising personal jurisdiction over Heart for the Unregistered Securities Claims would satisfy the Fifth Amendment's "reasonableness" requirement.  See In re EHang Holdings Ltd. Sec. Litig., 646 F. Supp. 3d 443, 455 (S.D.N.Y. 2022).

### b. PulseChain Fraud Claims

I further find that there is no personal jurisdiction over Heart for the PulseChain Fraud Claims.  As discussed above, because the relevant conduct for Heart's alleged fraudulent conduct occurred entirely out of forum, the Second Circuit relies on the "effects test."  Licci, 732 F.3d at 173 (citing Calder v. Jones, 465 U.S. 783, 789 (1984)).  Pursuant to the "effects test," personal jurisdiction is proper if Heart "expressly aimed [his] conduct at the forum."  Id.  The SEC fails to meet this test.

The SEC's allegations of Heart's misuse of investor funds and material omissions all occurred abroad.  (SEC Opp. 38-42).  Heart's alleged deceptive acts include misappropriating investor funds between August 2021 and September 2022 and using devices to conceal the funds' movement.  (Compl. ¶¶ 61-63.)  To the extent the Complaint shows that Heart misappropriated

investor funds through deceptive mixer transactions, those actions occurred entirely outside of the United States.  The alleged misappropriation occurred through digital wallets and crypto asset platforms, none of which were alleged to have any connection with the United States.  See In re Aegean Marine Petroleum Network, Inc. Sec. Litig., 529 F. Supp. 3d 111, 137 (S.D.N.Y. 2021) (finding that the defendant did not direct his conduct toward the United States because "[t]o the extent that the complaint establishes that [the defendant] embezzled funds, those actions were entirely outside of the United States").

The SEC alleges that Heart's material omissions included telling investors about PulseChain's development progress and that their investments supported free speech ideals, while failing to disclose his luxury purchases.  (Compl. ¶¶ 64-66, 75.)  As an initial matter, although the timeline for the PulseChain Fraud Claims encompasses Heart's attendance at the virtual conferences and his in-person interview in Miami, the SEC "does not allege that these events relate in any way to the conduct underlying" its fraud claims.[20]  Aegean, 529 F. Supp. 3d at 137 (internal quotation omitted).  What remains are online statements wherein Heart allegedly spoke about the use of PulseChain investor funds to develop the blockchain.  As discussed above, globally

---

[20] The SEC conceded that that it was "not using any of the conferences" as a part of its fraud claims.  (Oral Arg. Tr. 25:14-22.)

available internet content not expressly directed at the United States is insufficient to establish minimum contacts.  See Best Van Lines, 490 F.3d at 253; 79th Grp., 2024 WL 36992, at *13.

Accordingly, "a focus on the relationship of [Heart], the forum, and [Heart's] suit-related conduct points to the conclusion that there is no specific personal jurisdiction over [Heart]" for the PulseChain Fraud Claims in this case. [21] Waldman, 835 F.3d at 337.

## II.     Application of the United States Securities Laws

Even if the SEC had established personal jurisdiction over Heart, the Complaint cannot stand because it fails to adequately plead that either the transactions or conduct at issue were domestic under the federal securities laws.

### a.  Section 5(a) Sales of Securities Claim

It is a "longstanding principle of American law that legislation of Congress, unless a contrary intent appears, is meant to apply only within the territorial jurisdiction of the United States."  Morrison v. Nat'l Australia Bank Ltd., 561 U.S. 247, 255 (2010) (internal quotation omitted).  The SEC alleges that Heart sold securities without filing a registration statement in violation of 15 U.S.C. § 77e(a).

In Morrison, the Court determined that the Exchange Act applied to "[1] securities listed on domestic exchanges, and [2] domestic transactions in other securities."  Morrison, 561 U.S. at 267.[22]  A plaintiff, therefore, must show that "transactions at issue were either listed on domestic

---

[21] The SEC also raised — for the first time at oral argument — that because Heart talked about the test set forth in SEC v. W.J. Howey Co., 328 U.S. 293 (1946), his online conduct was directed towards U.S. investors.  (Oral Arg. Tr. 26-27.)  However, "federal district courts generally reject arguments raised for the first time at oral argument."  N-N v. Mayorkas, 540 F. Supp. 3d 240, 255 (E.D.N.Y. 2021) (collecting cases); see United States v. Barnes, 158 F.3d 662, 672 (2d Cir. 1998) ("Normally, [the court] will not consider arguments raised for the first time in a reply brief, let alone [at or] after oral argument.") (quoting Keefe v. Shalala, 71 F.3d 1060, 1066 n.2 (2d Cir. 1995)).  In any event, it is unclear whether the allegations in the Complaint support the SEC's new argument.  The Complaint only alleges that "Heart is familiar" with the Howey test but does not allege specific statements tracking Howey's language directed towards U.S. investors.

[22] The Morrison framework also applies to Securities Act claims.  Williams v. Binance, 96 F.4th 129, 136 (2d Cir. 2024).

exchanges, or that the purchase or sale occurred in the United States." Hardin, 2024 WL 4555629, at *14 (internal quotation omitted). Heart's Crypto Assets did not trade on domestic exchanges. (SEC Opp. 29; Def. Mem. 24.) Thus, the relevant inquiry is limited to the second prong: whether the SEC has alleged domestic transactions in crypto assets.

To establish the existence of a "a domestic securities transaction in securities not listed on a domestic exchange, . . . a plaintiff must allege facts suggesting that irrevocable liability was incurred or title was transferred within the United States." Absolute Activist Value Master Fund Ltd. v. Ficeto, 677 F.3d 60, 68 (2d Cir. 2012). "[I]rrevocable liability can be used to determine the locus of a securities purchase or sale." Id. Parties may become irrevocably bound if there was a "meeting of the minds." Id. at 68. Factual allegations "including, but not limited to, facts concerning the formation of the contracts, the placement of purchase orders, the passing of title, or the exchange of money" in the United States may be sufficient to show that parties became irrevocably bound within the United States. Id. at 70. But merely asserting in "conclusory fashion . . . that transactions took place in the United States is insufficient to adequately plead the existence of domestic transactions." Id. (internal quotation omitted).

Heart contends that the federal securities laws do not apply to the sale of Heart's Crypto Assets because the Complaint merely alleges that an unspecified number of U.S.-based investors participated in the offerings. (Def. Mem. 29; Def. Reply 16-17.) The SEC argues that irrevocable liability attached when U.S.-based investors deposited crypto assets into digital wallets located on the blockchain in exchange for Heart's Crypto Assets. (SEC Opp. 32.) In support of its position, the SEC relies on the Second Circuit's recent decision in Williams v. Binance which addressed the extraterritorial application of securities law under Morrison to transactions in crypto assets.

In Williams, the court held that the plaintiffs had plausibly alleged that their securities law

claims involved domestic transactions for the purposes of <u>Morrison</u>. <u>Williams</u>, 96 F.4th at 141. There, the plaintiffs were U.S.-based purchasers of crypto assets on defendant Binance's digital asset exchange. <u>Id.</u> at 132. The plaintiffs alleged that while in the United States, they registered accounts with Binance, accepted Binance's terms of use, and placed buy orders which were matched on Binance's servers – the majority of which were in the United States. <u>Id.</u> at 134-35. Pursuant to the terms of use, once the trades were matched, they could not be cancelled. <u>Id.</u> at 135. Further, Binance disclaimed having any physical location or being subject to any country's securities regulation regime. <u>Id.</u> at 133, 136, 139. Binance did, however, have a "substantial presence, with servers, employees, and customers throughout" the United States. <u>Id.</u> at 133.

The court acknowledged that determining where irrevocable liability attaches is "particularly difficult when a transaction takes place over an exchange that claims to have no physical location in any geographic jurisdiction and not be subject to the oversight of any country's regulatory authority." <u>Id.</u> at 136-37. Despite this difficulty, the court noted that transactions on such a digital exchange cannot occur "nowhere." <u>Id.</u> at 138. The court determined that "two transactional steps" gave rise to an inference that irrevocable liability occurred in the United States. <u>Id.</u> at 137.

Under the first transactional step, the court found it was "appropriate to determine where matching occurred solely based on the location of the servers" because "Binance ha[d] not registered in any country, purport[ed] to have no physical or official location whatsoever, and the authorities in Malta, where its nominal headquarters are located, disclaim[ed] responsibility for regulating Binance." <u>Id.</u> at 139. The court distinguished cases involving trades executed over a foreign exchange because "the application of United States securities law here does not risk incompatibility with the applicable laws of other countries." <u>Id.</u> (internal quotation omitted). The

24

court held that the first transactional step occurred when the "transactions at issue were matched, and therefore became irrevocable, on servers located in the United States." Id. at 137.

The court next determined that the transactions were domestic for a "second, interrelated reason." Id. at 139. The court explained that "in the context of transactions not on a foreign exchange, our cases look to facts concerning the formation of the contracts, the placement of purchase orders, the passing of title, or the exchange of money to determine when and where an investor becomes irrevocably bound to complete a transaction." Id. at 140 (internal quotation omitted). In considering these factors, the court concluded that irrevocable liability attached when the plaintiffs "entered into the Terms of Use with Binance, placed their trade orders, and sent payments, all of which they claim occurred from their home states within the United States." Id. In a prior case, the Second Circuit held "that the 'mere placement of a buy order in the United States for the purchase of foreign securities on a foreign exchange' was not, 'standing alone,' sufficient to allege that a purchaser incurred irrevocable liability in the United States." Id. (quoting City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG, 752 F.3d 173, 181 (2d Cir. 2014)). The Williams court distinguished City of Pontiac because the plaintiffs in Williams made "domestic payments" pursuant to Binance's terms of use, which rendered their agreements to purchase crypto assets binding, and because of the "lack of sovereignty and comity concerns" where no country claimed its regulatory regime applied. Id.

Here, unlike in Williams, the Complaint fails to allege that investors' deposits were "matched" on servers in the United States.[23] Nor does the Complaint allege that the deposits were first validated on the blockchain in the United States. Cf. Williams v. Block one, No. 20-CV-2809

---

[23] The Williams court also relied on Binance's "substantial presence" in the United States, including "servers, employees, and customers" to find that matching plausibly occurred on Binance's U.S.-based infrastructure. Williams, 96 F.4th at 133, 138 (internal citation omitted). Here, as alleged, Heart does not have a presence, let alone a substantial one, in any way comparable to Binance.

(LAK), 2022 WL 5294189, at *7 (S.D.N.Y. Aug. 15, 2022) (noting that "[i]n general, irrevocable liability is incurred when the transaction has been verified by at least one individual node of the blockchain") (internal quotation omitted).  Thus, the Complaint fails to satisfy the first transactional step under Williams.

The SEC interprets Williams, however, to stand for the proposition that "sending buy orders and payments from the United States" is a "second, separate basis" to establish irrevocable liability.  (SEC Opp. 32.)  Therefore, under this standalone basis, irrevocable liability occurred in the United States when U.S.-based investors deposited crypto assets into digital wallets on the blockchain.  (Id.)  In response, Heart argues that the Second Circuit expressly observed that placing purchase orders from the United States was only a "second, interrelated reason" to find that irrevocable liability attached in the United States.  (Def. Reply 17) (citing Williams, 96 F.4th at 139).

Whether it is or is not an independent basis to show that the parties became irrevocably bound within the United States, there are insufficient allegations to apply this basis.  First, the Second Circuit specifically expressed that "we have reason here to consider" where the trades originated because "Binance expressly disclaims having any physical location" and therefore the "sovereignty and comity concerns" are "less present."  Williams, 96 F.4th at 140; see SEC v. Binance Holdings Ltd., 738 F. Supp. 3d 20, 73 (D.D.C. 2024) (explaining that because "Binance disclaimed having any location or being subject to any other particular jurisdiction . . . [the Williams court] reject[ed] its argument that the plaintiffs' transactions were not domestic").

Here, Heart made no such disclaimers.  Rather, the Complaint alleges that Heart is a resident of Finland.  (Compl. ¶ 1.)  Unlike Malta's express disclaimer of regulatory responsibility over Binance, Finland is not alleged to have made any such disclaimer.  Further, the SEC attempts

to assert in "conclusory fashion" that the transactions took place in the United States. The investors did not enter into terms of use with Heart; instead, the SEC relies on allegations that investors deposited crypto assets into digital wallets, "including from investors in the United States," which is insufficient. (Id. ¶¶ 29, 34, 55, 67); cf. Messieh v. HDR Glob. Trading Ltd., No. 20-CV-3232 (ALC), 2024 WL 1436755, at *3 (S.D.N.Y. Apr. 3, 2024) (finding irrevocable liability incurred in the United States because customers "entered into Terms of Use Agreements," "purchased the tokens" from within the United States, and the defendants' employees liquidated the plaintiffs' crypto holdings from within the United States).

Courts have required far more U.S.-centric allegations to show that the crypto asset transactions at issue were sufficiently domestic. In Barron v. Helbiz Inc., the court found that the alleged transactions were domestic because the digital wallets that generated crypto assets for U.S.- based investors were controlled by a U.S. resident and operated out of the United States and the defendants were in the United States when they sold their own crypto assets to the public. No. 20 CIV. 4703 (LLS), 2023 WL 5672640, at *6 (S.D.N.Y. Sept. 1, 2023). In In re Tezos Sec. Litig., the court determined the alleged transactions were domestic because users participated in the transactions from the United States through an interactive website hosted in the United States and operated by a U.S. resident, and the transaction was "validated by a network of global nodes clustered more densely in the United States than in any other country." No. 17-CV-6779-RS, 2018 WL 4293341, at *8 (N.D. Cal. Aug. 7, 2018). Here, no similar allegations are present; instead, the SEC's allegations fall short of adequately pleading a domestic transaction.

I acknowledge the Second Circuit's concern that transactions on a digital exchange cannot occur "nowhere," but as alleged, I cannot reasonably infer that these transactions occurred in the United States. Accordingly, the SEC has failed to adequately allege domestic transactions for its

Section 5(a) claims.

### b. Section 5(c) Offers of Securities Claims

Section 5(c) prohibits offering a security without a registration statement. 15 U.S.C. § 77e(c). The parties disagree about what test I should apply to determine whether Heart's alleged offer of Heart's Crypto Assets without a registration statement was domestic. Heart argues that the relevant consideration is the location of the offeror. (Def. Mem. 26; Def. Reply 18.) The SEC claims that it is what the offerees heard while in the United States that should control, and because Heart engaged in conduct, albeit abroad, that targeted U.S. investors, there is sufficient domestic conduct to apply U.S. securities laws. (SEC Opp. 33-37.)

Courts in this district have determined that for an "offer" to be domestic under the Securities Act, "a person or entity must (1) attempt or offer, in the United States, to dispose of securities or (2) solicit, in the United States, an offer to buy securities." SEC v. Goldman Sachs & Co., 790 F. Supp. 2d 147, 165 (S.D.N.Y. 2011) (cleaned up); see SEC v. Ripple Labs, Inc., No. 20 Civ. 10832 (AT) (SN), 2022 WL 762966, at *13 (S.D.N.Y. Mar. 11, 2022) ("[I]t is the location of the offerors . . . that is relevant.") Here, the Complaint does not allege that Heart attempted to offer securities during the relevant offer periods while in the United States. Cf. Ripple, 2022 WL 762966, at *13 (finding that the defendants made domestic offers because the defendants resided in the United States when they directed their offers of crypto assets). Accordingly, I find that the

SEC has failed to show that Heart made domestic offers of Heart's Crypto Assets.[24]

### c. PulseChain Fraud Claims

The SEC asserts its PulseChain Fraud Claims under Section 10(b) of the Exchange Act and under Section 17(a) of the Securities Act. The parties dispute which test governs these claims. The SEC argues that Congress, through the Dodd–Frank Wall Street Reform and Consumer Protection Act, Pub. L. No. 111–203, 124 Stat. 1376 (2010) ("Dodd-Frank"), overrode Morrison's transactional test and reinstated the previously applied "conduct and effects" test for SEC antifraud actions. (SEC Opp. 22-24.) Heart argues that Morrison's transactional tests governs because Dodd-Frank's plain language does not rebut the presumption against extraterritoriality, and also because the Second Circuit explicitly questioned of the impact of Dodd-Frank on Morrison. (Def. Reply 14) (citing Parkcentral Glob. Hub Ltd. v. Porsche Auto. Holdings SE, 763 F.3d 198, 211 n.11 (2d Cir. 2014)). I need not determine which test should govern because the SEC has failed to state a claim for its PulseChain Fraud Claims under either inquiry.

Under Morrison, the SEC again fails to sufficiently allege that participants in the PulseChain offering became irrevocably bound in the United States. As discussed above, allegations that crypto assets were deposited into digital wallets on the blockchain by an unknown number of U.S. investors is insufficient. (Compl. ¶¶ 55, 60, 64.)

To satisfy the conduct and effects test, the SEC must show "(1) conduct within the United States that constitutes significant steps in furtherance of the violation" or "(2) conduct occurring

---

[24] The SEC relies on SEC v. Balina, No. 1:22-CV-00950-DAE, 2024 WL 2332965, at *1 (W.D. Tex. May 22, 2024), motion to certify appeal granted, 2024 WL 4607048 (W.D. Tex. Aug. 16, 2024). There, the court held that the defendant made a domestic offer of his crypto asset from outside the United States through extensive marketing efforts on social media platforms. 2024 WL 2332965, at *6. Aside from being an out-of-circuit decision, the facts in Balina are not present here. Unlike here, the defendant was a U.S. resident who traveled abroad for two months while he promoted an ICO through social media, including to a pool of investors known to reside in the United States. Id. at *1-2, 6. The court also discussed "public policy" concerns that counseled against encouraging others to "temporarily leav[e] the United States, to evade United States securities regulations while targeting United States investors." Id. at *8. The Complaint is devoid of similar allegations or public policy concerns that warrant following Balina.

outside the United States that has a foreseeable substantial effect within the United States."
15 U.S.C. § 77v(c); 15 U.S.C. § 78aa(b).

Here, the SEC fails to allege sufficient facts that place Heart's conduct within the United
States. For example, the SEC alleges that Heart discussed the benefits of PulseChain, its profit
potential, and his development efforts on PulseChain's website and YouTube. (Compl ¶¶ 56,
58- 59, 64-65, 72, 75.) Notably, the Complaint fails to allege that this conduct was directed at the
United States; instead, it merely alleges this conduct originated abroad through online activities.
See Cornwell v. Credit Suisse Grp., 666 F. Supp. 2d 381, 391 (S.D.N.Y. 2009) (finding alleged
misrepresentations and omissions that originated abroad did not satisfy the conduct test). As such,
I cannot reasonably infer that Heart's conduct was "conduct within the United States." 15 U.S.C.
§ 77v(c); 15 U.S.C. § 78aa(b); cf. SEC v. Scoville, 913 F.3d 1204, 1219 (10th Cir. 2019) (finding
the defendants engaged in conduct within the United States in furtherance of their fraud because
the defendants created and promoted investments while residing in the United States through their
website which was housed on servers located in the United States).

The SEC also fails to satisfy the effects test. The Complaint alleges that some investors in
the U.S. deposited crypto assets during the PulseChain Offer Period. (Compl. ¶ 55.) This fails to
show that the alleged fraud had a "substantial effect in the United States." 15 U.S.C. § 77v(c); 15
U.S.C. § 78aa(b); see Cornwell, 666 F. Supp. 2d at 395 ("[T]he Court has no information regarding
the percentage of [the defendant's] shares that were owned by United States investors . . . [and]
therefore cannot find that the fraud would have had a substantial effect in the United States or upon
United States citizens.") (internal quotation omitted); cf. Consol. Gold Fields PLC v. Minorco,
S.A., 871 F.2d 252, 262 (2d Cir. 1989), amended, 890 F.2d 569 (2d Cir. 1989) (finding the effects
test satisfied "where American residents representing 2.5 percent of Gold Fields' shareholders

owned 5.3 million shares with a market value of about $120 million"); In re SCOR Holding (Switzerland) AG Litig., 537 F. Supp. 2d 556, 561 (S.D.N.Y. 2008) ("Given such broad U.S. holdings [between 14 percent and 29 percent], it must be concluded at this stage that the alleged fraud, even if it occurred entirely outside the United States, would have had a substantial effect in the United States or upon United States citizens.") (internal quotation omitted).

For the reasons discussed above, I find that the SEC has failed to state a claim for its PulseChain Fraud Claims.

### III.     Leave to Amend

The SEC asks that should I grant Heart's motion, I grant the SEC leave to amend the Complaint. (SEC Opp. 62.) "The court should freely give leave [to amend] when justice so requires." Fed. R. Civ. P. 15(a)(2). This is a "liberal" and "permissive" standard that is "consistent with our strong preference for resolving disputes on the merits." Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC, 797 F.3d 160, 190 (2d Cir. 2015) (internal quotation omitted).

If the SEC believes in good faith that it can amend the Complaint to remedy the deficiencies identified herein, any such amended complaint must be filed within twenty days of the date of this Order.

### CONCLUSION

For the reasons set forth, Heart's motion to dismiss is granted.


SO ORDERED.

Dated: February 28, 2025
       Brooklyn, New York

                                      s/Carol Bagley Amon
                                     Carol Bagley Amon
                                     United States District Judge